Matthew McGill  4/4/2023

**1**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION
CASE NO.: 5:21-CV-00480-CEH-PRL

MATTHEW MCGILL, individually,

     Plaintiff,

vs.

MARTHA MACFARLANE, DAVID NEBEL,
and TOWN OF HOWEY-IN-THE-HILLS,
     Defendant.
_____/

VOLUME 1 OF 2

VIDEOTAPED DEPOSITION OF:

MATTHEW MCGILL

Examination of a Witness, beginning

at 10:00 A.M. and adjourning at 4:55 P.M.

on Tuesday, April 4, 2023, taken by the

Defendant at 201 E. Pine Street, Suite

1200; Orlando, Florida, before

Roberta Turner, RPR, FPR-C, CLR, CCR (GA),

ACR (NY), Certified Court Reporter.

**2**

1 APPEARANCES:
2     The Goodwin Firm
    ANDREW J. SILVERS, ESQ.
3     andrew@goodwin-firm.com
    801 W. Bay Drive, Suite 705
4     Largo, Florida  33770
5        On behalf of the Plaintiff;
6
    Dean, Ringers, Morgan & Lawton, P.A.
7     DOUGLAS T. NOAH, ESQ.
    dnoah@drml-law.com
8     201 E. Pine Street, Suite 1200
    Orlando, Florida  32801
9
      and
10
    Gray Robinson
11     THOMAS J. WILKES, ESQ
    tom.wilkes@gray-robinson.com
12     301 E. Pine Street, Suite 1400
    Orlando, Florida  32801
13
      On behalf of the Defendants.
14
15
  ALSO PRESENT:  GEORGE OTALVARO, VIDEOGRAPHER;
16           MARTHA MACFARLANE, MAYOR,
          Howey-In-The-Hills;
17           SEAN O'KEEFE, TOWN MANAGER,
          Howey-In-The-Hills.
18
19
20
21
22
23
24
25

**3**

1           I N D E X
2 WITNESS
  MATTHEW MCGILL
3
    Direct Examination by Mr. Noah       6
4
    Cross-Examination by Mr. Silvers    242
5
6
  CERTIFICATE OF OATH             245
7
  CERTIFICATE OF REPORTER        246
8
9
        DEFENDANT'S EXHIBITS MARKED
10
  NO. 1 Charter/Article 2 - Mayor and Town
11        Council                67
12 NO. 2 Section 3 - Office of the Mayor    75
13 NO. 3 Resolution 2013-010         90
14 NO. 4 Chapter 42 Town Council      100
15 NO. 5 West's FSA 286.0114         115
16 NO. 6 Plaintiff's Answers to Defendant Town
       of Howey-In-The-Hills First
17        Interrogatories to Plaintiff   116
18 NO. 7 Ordinance Ticket           119
19 NO. 8 Chapter 166 Vehicles and Trailers  125
20 NO. 9 E-Mail Dtd 02-23-18         131
21 NO. 10 Meeting Minutes 04-09-18     140
22 NO. 11 Meeting Minutes 04-23-18     148
23 NO. 12 Courtesy Notice 09-19-18     152
24 NO. 13 Ordinance Ticket          153
25 NO. 14 E-Mail Dtd 09-19-18        156

**4**

1     I N D E X  C O N T I N U E D
2 NO. 15 E-Mail Dtd 12-03-18       170
3 NO. 16 Council Meeting 12-10-18    176
4 NO. 17 E-Mail Dtd 12-19-18       178
5 NO. 18 E-Mail Dtd 01-22-19       184
6 NO. 19 Council Meeting January 28   192
7 NO. 20 Council Meeting 02-25-19   200
8 NO. 21 Notes for February 25th Meeting  206
9 NO. 22 E-Mail Dtd 03-20-19       210
10 NO. 23 Letter Dtd 04-02-19       210
11 NO. 24 E-Mail Dtd 05-07-19       213
12 NO. 25 Letter Dtd 02-04-20       214
13 NO. 26 E-Mail Dtd 02-04-20      217
14 NO. 27 E-Mail Dtd 02-20-20      218
15 NO. 28 Notes for Special March 6, 2019 Meeting  223
16 NO. 29 E-Mail Dtd 07-27-20      229
17 NO. 30 Photograph          233
18
19
20
21
22
23
24
25

**TURNER REPORTING, INC.**
**407-497-6070**

Matthew McGill  4/4/2023

29

1    A  Yes.
2    Q  I have your dates of residence there from
3  September, 2014 through November, 2016.  Does that
4  square with your recollection?
5    A  What was the ending date, sir?
6    Q  November, 2016.
7    A  That sounds about right.
8    Q  Okay.  Why did you move from Clermont?
9    A  Because it was getting too crowded, and it
10  was becoming more of a city.  And my wife and I
11  didn't want to live in an area like that.
12    Q  Okay.  While you lived in Clermont, did
13  you apply or request to participate in any
14  governmental agency?
15    A  Governmental agency?
16    Q  Let me define that.  I'm being
17  exceptionally broad as I can be, to include any
18  citizen committee, any commission that is created
19  by an ordinance for planning and zoning or some
20  other function that they -- that Clermont may have.
21      Did you ever participate in any of those
22  types of activities?
23    A  No.  I lived in an association, so being,
24  like, a vice president or president of association,
25  would that fall in that category?

30

1    Q  Not for what I'm talking about.
2    A  Then not that I can think of.
3    Q  Nothing for the city itself?
4    A  No, sir.
5    Q  Did you ever run for elected office in
6  Clermont?
7    A  No, sir.
8    Q  And what -- Oh, and you told me.  It was
9  becoming crowded.
10      So following Clermont, the next residence
11  I have you living at is Polk City.
12      Does that square with your recollection?
13    A  Yes, sir.
14    Q  And did you move there in November, 2016?
15    A  That sounds right.  It was right after the
16  Clermont.
17    Q  All right.  You moved from Clermont
18  directly to Polk City?
19    A  That's correct.
20    Q  And then I have you staying there until
21  October, 2017.  Is that about right?
22    A  That's about right.
23    Q  Okay.  Why did you move from Polk City?
24    A  Well, my wife wanted to live in a
25  small-town type atmosphere.  And I was traveling a

31

1  lot.  And that was in the country.  So she wanted
2  to be a little more, feel a little more safe, I
3  guess.
4    Q  Okay.  While you were at Polk City, did
5  you ever participate in any type of local
6  government agency?
7    A  As the same before, like run for --
8    Q  Yes, sir.
9    A  -- the county or anything like that; no,
10  sir.
11    Q  Right now, right now I'm -- Well, I think
12  you've answered to both.
13      You never ran for elected office there?
14    A  No, sir.
15    Q  And you never participated in any
16  commission, citizen's committee or anything like
17  that while you lived there?
18    A  No, sir.
19    Q  And then I understand you moved from Polk
20  City to Howey-In-The-Hills?
21    A  That's correct.
22    Q  All right.  It looks like you might have
23  had to have separate residences in Howey.  Is that true?
24    A  That's true.
25    Q  Okay.  The first one you resided at

32

1  October of 2017 through May, 2019.  Does that
2  square with your recollection?
3    A  That's about right.
4    Q  All right.  Why did you move from that
5  residence?
6    A  'Cause two reasons.
7    Q  Okay.
8    A  One, we found a house that we, that we
9  were ultimately looking for, a historical house
10  closer to the lake.  And second was, my son and my
11  grandkids and his wife wanted to move next to us.
12  And they wanted to buy the house we were in.
13    Q  Did that transpire, that your son bought
14  the house that you had lived in?
15    A  It did not.  They changed it because of
16  all the harassment and the bullying that was going
17  on with me and my family.  They didn't want to live
18  in that atmosphere, so they cancelled.
19    Q  What is your son's name that -- where you
20  had these plans that were cancelled?
21    A  My son's name?
22    Q  Yes, sir.
23    A  Matthew McGill.
24    Q  Where does your son live?
25    A  He lives in Volusia County.

TURNER REPORTING, INC.
407-497-6070

Matthew McGill 4/4/2023

37

1 he's friends with the chief of police. He said he
2 was friends with Mayor MacFarlane, so --
3     Q It's friendships there?
4     A Yes.
5     Q As a charter member, to your knowledge,
6 did Dan Powers have any ability to commit the city
7 to any type of, like, a contractual obligation?
8     A I'm not sure if he had that.
9     Q Daneen Hon, was she ever an elected
10 official at the town?
11    A I'm not sure.
12    Q Was she ever an employee of the town?
13    A I'm not sure.
14    Q What were you referring -- You mentioned
15 that there was another web page that was designed,
16 somehow against you. What are you referring to
17 there?
18    A There was a -- When they created -- When
19 they started an illegal recall against me. I
20 believe the creators of that website were
21 MacFarlane's friend David Miles and Patricia -- I
22 can't remember her last name. She lived on
23 Lakeshore.
24    Q All right. I think I understand your
25 answer to be, the web page that you're about to

38

1 tell us about was created by David Miles and
2 Patricia, last name unknown?
3     A Yes. I can't remember her name. Miller
4 maybe. I'm not sure. She lived on Lakeshore
5 Drive. I know that.
6     Q Did the web page have a name, or how did
7 you go about accessing the web page if I was
8 interested to do that?
9     A I don't remember the name. It had my
10 first and last name in it, but I don't know the
11 exact title of it. It's in my evidence that I
12 provided to the council.
13    Q Okay. Something along the lines, recall
14 Matthew McGill, something along those lines?
15    A It could be that, yeah, yeah.
16    Q Were you able to sell the first residence
17 that you owned in Howey-In-The-Hills, or do you
18 continue to own that to the present time?
19    A I sold it.
20    Q Okay. Do you recall when you sold it?
21    A I don't.
22    Q Okay. Was it more or less contemporaneous
23 with your move?
24    A I just don't remember. It was so long
25 ago.

39

1     Q Okay. And then according to my notes,
2 based on your interrogatory answers, I understand
3 that you left Howey-In-The-Hills in November, 2020.
4     Does that square with your recollection?
5     A I think that's about right.
6     Q Where did you move to after you left
7 Howey?
8     A Volusia County.
9     Q Is it unincorporated Volusia, or is it --
10 Or, do you live in a city?
11    A Unincorporated. And Volusia is not a
12 city, it's the county.
13    Q Have you changed residence -- After you
14 left Howey-In-The-Hills, have you changed residence
15 since you moved to Volusia County?
16    A No, sir.
17    Q And where you have lived in Volusia
18 County, have you been, have you run for elected
19 office?
20    A No, sir.
21    Q Since you moved to Volusia County, have
22 you participated in any type of citizen committee
23 or commission or anything along those lines?
24    A No, sir.
25    Q Why did you move from Howey?

40

1     A Well, we were forced out.
2     Q And describe for me what you mean when you
3 use the word, forced, in that context.
4     A Well, Howey was our dream town, the town
5 we wanted to retire in. And because of what
6 happened in town with the lies and my violation of
7 rights and the recall, they pretty much forced my
8 wife and I out of the town we were planning on
9 retiring to and staying in.
10    Q We're going to talk about the recall in
11 just a minute.
12    And when you say violation of your rights
13 in that answer, are you referring to the rights
14 that you're asserting in this lawsuit?
15    A Yes, sir. That's some of it, yes.
16    Q Okay. Well, is there more than that? If
17 there is, just tell me, because I want to make sure
18 that I know the scope of what I'm supposed to be
19 asking you today. If there's more than the rights
20 that you're asserting in this lawsuit, please list
21 them out for me.
22    A Whatever's in the lawsuit in my evidence,
23 that's where, sir.
24    Q Okay. So let's begin with the lies.
25 Which lies are you referring to?

10 (Pages 37 to 40)

49

1    moved to Howey.
2       A  You asking me a question?
3       Q  Yes.
4       A  I believe that's correct.
5       Q  Then my notes reflect that you were
6    elected to the town council on December 10, 2018.
7          Is that when you took office?
8       A  I believe that was the date I was sworn
9    in.
10      Q  And did that coincide with a town council
11   meeting when you were sworn?
12      A  I was sworn in at a town council meeting.
13      Q  Okay.  Once you were sworn, did you
14   participate in the December 10th meeting, or did
15   you attend that particular meeting as a non-elected
16   resident?
17      A  I believe I would have participated as an
18   elected official.
19      Q  Then my notes have that you were recalled
20   by a vote that occurred on August 18, 2020.
21          Does that square with your recollection?
22      A  That sounds like the date, sir.
23      Q  Okay.  And that was a, that was just after
24   a popular vote, the residents of Howey, the
25   majority voted to recall you during that vote?

50

1       A  The Howey residents had a special
2    election.
3       Q  Okay.  During -- Prior to the vote, is it
4    true that there were two petitions generated that
5    requested the recall vote?
6       A  There was two recall attempts.  Does that
7    answer your question?
8       Q  I think a petition is the recall attempt.
9    That's the --
10      A  There's a process.  That's part of the
11   process of a recall.
12      Q  Okay.
13      A  But, so there was two recall attempts.  So
14   there was also two petitions.
15      Q  And then the first time that there was a
16   recall petition, you challenged that petition, the
17   sufficiency of that petition in court?
18      A  Yes.
19      Q  And the court issued an injunction
20   preventing that from going forward; is that
21   correct?
22      A  Yeah.  They found that Mayor MacFarlane
23   and her friend, Dave Miles, lied on the petition,
24   came with a false document to try to persuade the
25   voters to vote against me, vote me out.  And that

51

1    was later taken out and not used during the second.
2       Q  Where does that knowledge come to you
3    from?  Is that from a court order that you have in
4    mind when you say that, or is that your
5    characterization of a court order?
6       A  It's fact.
7       Q  It's a fact?
8       A  It's a fact.
9       Q  I see.
10      A  The document was created.  It was a lie.
11   They were called out on it and they didn't use it
12   during the second one.
13      Q  Now, in the -- When you say they didn't
14   use it during the second one, does that mean that
15   the second -- you also challenged the second
16   petition for the recall; is that true?
17      A  That's correct.
18      Q  All right.  And the court -- You
19   challenged that in court, in federal court?
20      A  I -- Yeah.
21      Q  And the federal court found that that
22   petition was sufficient, so that the recall vote
23   can go forward; is that correct?
24      A  Yes, it's correct.
25      Q  That proceeded the vote to go forward, and

52

1    then you were recalled on August 18, 2020?
2       A  August 18th.
3       Q  August 18, 2020.
4       A  Yes.  That's the date of the recall.
5       Q  After --
6       A  I believe it is.
7       Q  After you were recalled, is it true that
8    you actually -- you also filed a lawsuit to
9    challenge the recall?
10      A  I don't remember if we did or not.  I know
11   that because the second recall was full of lies,
12   and I wanted to challenge --
13      Q  Did you say -- Sorry.  Did you say the
14   second recall was full of lies?
15      A  Oh, yeah.  'Cause the first one -- They
16   both were.
17      Q  Okay.
18      A  And that's one of the reasons why
19   Martha MacFarlane fired the town clerk and she
20   wanted to take over the clerk's position so she can
21   control if the lies could be submitted and used
22   during the petition process and the recall process,
23   so she can control the lies.
24      Q  I appreciate you wanting to get it out,
25   but do you remember what my question was?

13 (Pages 49 to 52)

Matthew McGill  4/4/2023

73

1  the time that you resided at Howey?
2      A  I'm not sure how exactly worded on the
3  previous document.
4      Q  Does it appear consistent though with your
5  recollection?
6      A  I can't say.  I'd have to see the
7  original.
8      Q  Then if you look at paragraph, Roman
9  Numeral 9, just read along with me and make sure
10  that I'm reading this accurately.
11          One of the powers is listed as, to direct
12  and supervise the administration of all
13  departments, offices and agencies of the town.
14          Have I read that accurately?
15      A  You have read that correctly.
16      Q  And is -- Was that true at the time that
17  you lived in Howey, that that was a power of the
18  mayor to do?
19      A  I believe I recall the part it says direct
20  and supervise the administrations of all
21  departments.
22      Q  Okay.  When you, when you resided there,
23  you recall that?
24      A  I believe reading that, yes.
25      Q  Okay.  As you read either Subparagraph 4

74

1  or Subparagraph 8, do you see that -- Do you read
2  into that, that there's any type of council member
3  oversight of the mayor when she's -- when he or she
4  is fulfilling those functions?
5      A  On this particular document the way it
6  reads now, I don't see that.
7      Q  And when you were residing in Howey, do
8  you recall that any individual council members had
9  oversight of the mayor when the mayor was
10  exercising those powers?
11      A  Well, don't we all have oversight if we
12  have the power to vote her out, the super majority?
13      Q  You took me kind of right to where I was
14  going.
15          Is it -- Is this your understanding, that
16  individual council members could not -- have no
17  oversight of the mayor's affecting out her -- his
18  or her responsibilities; however, if they were
19  unhappy with that, then as a body, they could vote
20  the mayor out and re-appoint a different mayor?
21      A  So as an individual council member by --
22  or themselves, they can't do anything.
23      Q  Right.
24      A  I believe that to be correct.
25      Q  Okay.  And the, and the concept that is

75

1  working here, is that the mayor performs these
2  functions, and if the council is unsatisfied with
3  the mayor's performance, the council as a body can
4  re -- can remove that mayor and re-appoint somebody
5  else?
6      A  The way the language is here, I believe
7  that to be true what you just said.
8      Q  And isn't that the way that it was when
9  you resided at Howey as well?
10      A  Again, I'd have to have the exact language
11  in front of me.
12      Q  Okay.  Do you recall it being any other
13  way than what I've just described?
14      A  May be a different type of vote.  I don't
15  know.  It could be.
16      Q  It could be, but as we sit here today, you
17  do not know?
18      A  I do not recall --
19      Q  Okay.
20      A  -- without the original document.
21          (Whereupon, Defendant's Exhibit Number 2
22  was marked for identification.)
23      Q  Okay.  Just hand you Exhibit Number 2.
24          MR. SILVERS:  I have a copy, I have
25  an actual copy over here too.  I

76

1  appreciate it.  I'm pretty sure that's the
2  same thing.
3          MR. NOAH:  Sure.
4      Q  Do you recognize Exhibit 2?
5      A  It looks like the same as the other one,
6  but formatted different.
7      Q  If I were to represent that this is an
8  excerpt from the ordinance, as opposed to the
9  charter, this is an ordinance from the Town of
10  Howey-In-The-Hills, would that square with your
11  recollection?
12      A  Depends.  When was the ordinance adopted?
13      Q  If you look at page 2 of the document --
14      A  Okay.
15      Q  -- there are adoption notes there that
16  talk about the ordinance was first generated by
17  2004-331, and then it's subsequent amendments.
18          Do you, looking at those dates, does this
19  appear to be an ordinance that was in effect at the
20  time that you were residing in Howey-In-The-Hills?
21      A  It appears to have the layout, but as far
22  as the language, I can't remember all the language.
23  So it appears that the layout of it, but I can't
24  remember the language, all of it.
25      Q  Do you have any reason to doubt my

TURNER REPORTING, INC.
407-497-6070

Matthew McGill  4/4/2023

109

1  **Did you have the opportunity during council reports**
2  **to raise issues, whether they were on the agenda or**
3  **not?**
4      A  There was times I couldn't.
5      Q  And for those times -- Let's make sure I
6  understand this first.
7          When you say that there were times that
8  you couldn't, then I assume that that means that
9  there were times that you could?
10     A  There were times when I could.  And there
11 were times when I couldn't, by order of Mayor,
12 Mayor MacFarlane.
13     Q  And what, what is it that would prevent
14 you -- What do you mean that you couldn't?  How
15 were you prevented from doing that?
16     A  Well, one example would be when I
17 submitted my items to the town clerk to put the
18 item on the agenda, and Mayor MacFarlane would
19 refuse it.  Well, then I'd try to bring it up at
20 the actual meeting.  And there was times Mayor
21 MacFarlane would say, that's not on the agenda, you
22 can't talk about it.
23         And then I would say, well, 'cause you
24 wouldn't put it on it.  And during that same
25 meeting, she would bring up topics that she didn't

110

1  have on the agenda.  So that's what I mean by
2  selective.
3      Q  Yeah.  I'm still trying to understand
4  this --
5      A  Okay.
6      Q  -- that --
7      A  Okay.
8      Q  What gives Mayor, in your mind, why did
9  **Mayor MacFarlane have the power to prevent you from**
10 **talking if there was something that you wanted on**
11 **the agenda?  You couldn't get it on the agenda, so**
12 **now you want to raise it on council reports, how**
13 **would you be prevented from doing that?  Did she --**
14 **Let's start with this.**
15         Did she physically prevent you?
16     A  She did.
17     Q  How dud she do that?
18     A  Physically with the gavel saying, stop,
19 you can't talk, you can't bring it up.  Now,
20 physically touch me or anything like that, no.  But
21 she said it -- She actually raised her voice,
22 continued to say I couldn't talk about a particular
23 topic, and then I would stop, because, 'cause she's
24 causing a scene.  And it wasn't becoming civil
25 because of her actions.

111

1      But there were agenda items that I wanted
2  on there.  There were business items.  And she just
3  flatly refused to let me talk about 'em.
4      Q  Okay.  So she would interrupt you.  And to
5  maintain civility, you would abide by her request,
6  no, to talk about --
7      A  I objected a couple times at times.  And
8  then when she got loud, louder, I moved on.  And I
9  told them they can't do that, you're violating my
10 rights.
11     Q  Well, I guess that's what begs the
12 question.  If your rights are being violated, why
13 didn't you assert your rights and say what you
14 wanted to say during those times?
15     A  'Cause it would have -- 'Cause she kept on
16 getting louder.  And as you can see, the rules of
17 the meeting, you got to maintain some kind of
18 civility.  And it wasn't going that direction
19 because of Mayor MacFarlane.
20         So I pleaded, I objected.  And then when
21 she became louder, I moved on.  But I made note of
22 it, even afterwards in an e-mail saying, you can't
23 do what you did, you violated my rights.
24         And that continued on and on and on.
25     Q  So your recollection of events is that you

112

1  **were maintaining decorum and civility and that's**
2  **what prevented you from talking?**
3      A  Well, and audiotapes will show that, that
4  I maintained that.  I didn't push it.  I didn't
5  talk over her to the point that, no, you're wrong,
6  mayor; you're violating my rights, I'm going to
7  speak anyway.  'Cause she kept on getting loud.  So
8  I just stopped; I told her you can't do this,
9  you're violating my rights.  And I moved on.
10     Q  Out of the sense of maintaining decorum
11 and civility; is that what you're saying?
12     A  It's probably one of the reasons.  The
13 crowd was getting out of control.  They're
14 heckling.  They were cursing at me in the audience,
15 and she wasn't addressing it.
16         So as a council member, elected official
17 for Howey, my best thing to do was point out what
18 they're doing wrong.  You're violating my rights
19 and you can't do this, and moved onto the next
20 topic.
21     Q  I'd like to understand your thoughts on
22 this.
23     A  Okay.
24     Q  It seems to me like, if I've under --
25 Andrew may disagree with me.  But it seems to me,

TURNER REPORTING, INC.
407-497-6070

Matthew McGill  4/4/2023

---

113

1  if I've understood the First Amendment properly,
2  that the greatest degree of protection any citizen
3  has in expressing themselves, is in the public
4  square, like at a park or on a sidewalk.  They can
5  say anything that they want to say.
6         And are you saying that it's violative of
7  your First Amendment rights if somebody interrupts
8  you and ridicules you and heckles you, and those
9  kind of things?  Is that, is that my understanding
10 of your version of -- your view of having your
11 rights infringed?
12     A  Having my rights infringe, as I explained
13 to you, is she flat out would not let me talk about
14 the topic.
15     Q  By interrupting you?
16     A  By saying I couldn't talk.
17     Q  Let's do it this way.
18     A  She was running, she was running the
19 meeting.
20     Q  I'm with you.
21     A  As we -- as you see where it says.  So the
22 person running the meeting will not let you talk
23 and creates, start creating a scene, and I object
24 to several times, what do you do as an elected
25 official?  What do you do as a human being?

---

114

1      Q  Did the -- did either mayor ever threaten
2  you that if you continued to talk, they would have
3  the police remove you from the room?
4      A  I don't remember if they did that or not.
5      Q  You think that's something that might
6  stick out in your mind if it happened?
7      A  Not really, 'cause a lot of threats were
8  made.  One mayor said, if you don't stop, I'm
9  shutting this meeting down.
10        So during my councilmen comments and
11 council business, it could have been said,
12 absolutely.
13     Q  Is there anything about the order of
14 business -- Strike that.  Let me ask a different
15 way.
16        Is there anything about Section 42 when
17 you reviewed it, in the copy that you reviewed that
18 placed time limits on council members speaking
19 during council reports?
20     A  In referring to Section 42-6, I might
21 recall reviewing when I became a council member,
22 was there a time limit on that?
23     Q  Yeah.  Whatever -- There's none in this,
24 you would agree with that, the document that I've
25 shown you, there's no time limits on council

---

115

1  reports.
2      A  I don't remember.
3      Q  Would you agree with that?
4      A  There's no time limits I've ever read.
5      Q  Okay.  That's what I was getting at.  So
6  the copy that you read back whenever you did your
7  research, didn't have time limits for council
8  reports?
9      A  No.
10     Q  I'm going to hand you what we'll mark as
11 Exhibit 5 to your deposition.
12        (Whereupon, Defendant's Exhibit Number 5
13 was marked for identification.)
14        MR. SILVERS:  That was Exhibit?
15        MR. NOAH:  Five.
16        MR. SILVERS:  Five.  The new one is
17 5. I think the one I'm showing him is --
18        THE WITNESS:  One.
19        MR. NOAH:  One is Article 2 of the
20 charter.  Two is Section 3 of the
21 ordinance.
22        MR. SILVERS:  Yeah.
23        MR. NOAH:  Three is Resolution
24 2013-10.
25        Four is another one that deals with

---

116

1  the order of business.
2         And now 5 is a statute.
3  BY MR. NOAH:
4      Q  Okay.  Have you ever seen Exhibit 5
5  before?
6      A  This is state statute.
7      Q  Uh-huh.
8      A  I don't remember reading this.
9      Q  All right.  To your knowledge, have, have
10 you ever pursued your rights under this particular
11 statute, or had a lawyer on your behalf preserve --
12 or try to -- what's the right expression --
13 remediate your rights under this statute?
14     A  I don't recall.
15     Q  The next document I'm going to hand you is
16 Exhibit 6.
17        (Whereupon, Defendant's Exhibit Number 6
18 was marked for identification.)
19        MR. NOAH:  I guess I don't have an
20 extra copy of that one.  Sorry.
21     Q  And if you would just familiarize yourself
22 with Exhibit Number 6.
23        MR. SILVERS:  Does anybody need an
24 extra?  I have it pulled up on my laptop.
25        MR. NOAH:  Thanks, Andrew.

---

TURNER REPORTING, INC.
407-497-6070

Matthew McGill  4/4/2023

117

1    **Q  Have you seen this document before?**
2    A  I'm still reviewing it.  You want me to
3  review the whole thing?  That's it, a lot of --
4    **Q  Right now -- I'm going to ask you specific**
5  **questions about it and direct your attention.**
6  **Right now --**
7    A  I see something that looks familiar, but I
8  haven't reviewed the whole thing yet.
9    **Q  Okay.  Why don't you look at the last**
10  **page.**
11    A  Last page.
12    **Q  In my copy it's actually the third to last**
13  **page.  It's page 23.**
14    A  All right.
15    **Q  Does your electronic signature appear on**
16  **that page?**
17    A  Down at the bottom?
18    **Q  Yes.**
19    A  Yes, sir.
20    **Q  And do you remember verifying answers to**
21  **questions that we had asked you in writing in this**
22  **lawsuit?**
23    A  I remember that part, sir.
24    **Q  Okay.  Does this appear to be that**
25  **document?**

118

1    A  There was like three or six I had to do.
2  They're separated.
3    **Q  This should have been --**
4    A  And I see --
5    **Q  This should have been three.  And this is**
6  **just one from the town.  That's all I'm asking you**
7  **about right now.  This is one from the town.**
8    A  Yeah.  There was actually two for Nebel,
9  two from MacFarlane and two from the town, the way
10  it was sent to me.  And then I answered those
11  questions.
12    **Q  All right.  And are -- is what I'm showing**
13  **you as Exhibit 6, answers that you provided to the**
14  **town with respect to questions it had asked you?**
15    A  I'm on page 3 and so far, they look like
16  the answers.
17    **Q  Okay.**
18    A  I haven't gone through the whole thing
19  yet.
20    **Q  Well, let's, let me refer you to page 22.**
21  **And if you read Paragraph 19 to yourself and see if**
22  **you recall being asked that question, and if you**
23  **recognize what follows there as your answer.**
24    A  This looks familiar, sir.
25    **Q  Okay.  Does that appear to be your answer**

119

1  to question 19 that you submitted?
2    A  Some of the information matches my -- what
3  I answer.
4    **Q  Some of it?**
5    A  What I see, yeah.  It seems like -- I know
6  it says it can be added and amended later, so I
7  know I added a lot more stuff that I presented to
8  the attorneys.
9    **Q  If you go up to question 18, does that**
10  **appear to be a question you were asked and your**
11  **response to that question?**
12    A  That looks familiar, sir.
13    **Q  And when you say it looks familiar, are yu**
14  **able to authenticate that those are answers that**
15  **you provided?**
16    A  Those are answers I provided.
17    **Q  Okay.  With respect to 18, do I understand**
18  **that one of the types of public comment that you**
19  **made that you felt you were retaliated for had to**
20  **do with criticisms of code enforcement?**
21    A  Yes, sir.
22    **Q  Let me show you -- Let me hand you what**
23  **we'll mark as Exhibit 7.**
24    **(Whereupon, Defendant's Exhibit Number 7**
25  **was marked for identification.)**

120

1    **Q  Do you recognize Exhibit 7?**
2    A  No.  I don't remember seeing this.  I'm
3  looking at the date.  And I don't remember seeing
4  this.
5    **Q  Were you -- Did you ever receive a**
6  **courtesy copy -- excuse me, a courtesy letter**
7  **having to do with a motor vehicle that you were**
8  **parking at your residence?**
9    A  I remember them coming to my house in
10  February of 2018.
11    **Q  Okay.**
12    A  Because the person on this Larry Chester.
13  He came to my house, Larry Chester, Chief Thomas,
14  and I think one of the council members was in the
15  back seat of the chief's car.  It was Scott.
16    There was a big uproar at the previous meeting about my
17  illegally parked R.V.  And I said, well, it's not
18  illegally parked, it's my adjoining property.  And
19  they said, no, it's illegally parked, a big uproar,
20  which was a lie, because I listened to the audio.
21    There was one complaint and it was
22  Councilman Conroy.  He complained that it was
23  illegally parked.  So I said, no, it's legally
24  parked.  He goes, well, you're wrong.  I said,

**TURNER REPORTING, INC.**
**407-497-6070**

Matthew McGill  4/4/2023

121

1  well, when I bought the property, the town clerk at
2  the time said, yeah, it's legal to park your
3  R.V. there if you buy the property behind your lot.
4        She goes -- Well, Chief Thomas said, well,
5  she didn't know what she was talking about, that's
6  why she got fired.
7        Again, I'm not going to argue with
8  authority or code enforcement.  I said, okay, I
9  will move my R.V., I'll put it in storage, pay for
10  it and I will deal with this when I find the
11  property documents.
12       Went back two weeks later with our laws.
13  It says, it is allowed to park there.  They were
14  wrong, 'cause it's called an adjoining lot.  And
15  once you have -- buy a lot behind you, it becomes
16  your lot, so it's no longer a vacant lot.
17       So I was allowed to park there.  So they
18  didn't know their job.  And that's when they looked
19  at that, well, we have to have the attorney
20  research this to make sure you're right.
21       That's when Attorney Ramos came back and
22  said, yeah, Mr. McGill is right, you guys are
23  wrong.  And then --
24       Can I finish?
25    **Q  Yeah.**

122

1     A  Thanks.  And then I also, at that time,
2  handed them another sheet with 32 violations in
3  town.  I said, okay, well, here is some real
4  violations that you're ignoring, that I see, I
5  researched.  And I saw past code enforcement
6  violations that you posted online, and none of
7  these were on it, so you might want to entertain.
8  These are actual violations.  So that's how this
9  went down.  But I never got a notice like this.
10    **Q  So the way you recall it in January 18th,**
11  **that is the first time you were, you came into**
12  **contact with code enforcement?**
13    A  That's not correct.  I think it was
14  February, 2018.  You said January.
15    **Q  I'm sorry.  I thought you had said --**
16  **Okay.**
17       **So in February, 2018, this is**
18  **approximately -- This is before you run for**
19  **council, right?**
20    A  Yes.  And I believe that was the first
21  time I was approached by them in a official
22  capacity.  I'm not sure if I met Larry Chester
23  prior to that in an unofficial capacity.  But that
24  was the first time in an official capacity.
25    **Q  Okay.  Had you -- When you were approached**

123

1  **with respect to your R.V., did you have any**
2  **perception that you were being approached in**
3  **retaliation for something that you had said on a**
4  **prior occasion?**
5     A  I can't remember what I was thinking at
6  that point.
7     **Q  Okay.  As you sit here today, are you**
8  **alleging that what you've just describe when you**
9  **were approached in February of 2018, that that was**
10  **retaliation for exercising free speech?  Are you**
11  **making that claim today?**
12    A  Again, I don't know what was going on at
13  that point without looking at my notes in evidence.
14  That was provided to the attorneys.
15    **Q  Did you know that a lawsuit has been filed**
16  **on your behalf alleging retaliation for engaging in**
17  **free speech?**
18    A  Yes, I do.
19    **Q  Did you read the complaint before it was**
20  **filed?**
21    A  Did I read the complaint?
22    **Q  Yes, sir.**
23    A  I read it.  Did I read it before it was
24  filed, I can't confirm that, but I read it.
25    **Q  Did you inform your lawyers what your**

124

1  **complaints were as to why you -- what your**
2  **allegations were as to why you thought you were**
3  **being retaliated against for speech?**
4     A  I provided my attorneys with the evidence
5  I had.
6     **Q  Okay.  And as we sit here today, you don't**
7  **know if this is part of your retaliation claim or**
8  **not?  Is that what you're --**
9     A  As far as the R.V.?
10    **Q  Yes, sir.**
11    A  I know it's in the complaint.
12    **Q  Are you alleging that you were approached**
13  **in February, 2018 by code enforcement in**
14  **retaliation for exercising your free speech rights?**
15  **Is that your allegation?**
16    A  Again, I don't remember my exact thought
17  at that time, but I made the complaint.  I had the
18  evidence.  I gave the evidence to my attorney and
19  we filed the suit.
20    **Q  And with that, is that the absolute best**
21  **you can do to answer the question that I just asked**
22  **you?**
23    A  Not -- Right now is probably the best.
24    **Q  Okay.  All right.  Let me hand you what**
25  **we'll mark as Exhibit 8.**

TURNER REPORTING, INC.
407-497-6070

125

1      (Whereupon, Defendant's Exhibit Number 8
2   was marked for identification.)
3      Q  And the question that is pending, is have
4   you ever seen Exhibit 8 before?
5      A  I don't believe I have.  This particular
6   document in my hand.
7      Q  When you testified that you went to code
8   enforcement with documents --
9      A  Uh-huh.
10      Q  -- did any of those documents deal with
11   parking R.V.s at -- on personal lots?
12      A  I would have to look at my records and my
13   evidence, if it did.
14      Q  Okay.  If you look at Section 166-3 of the
15   document that I've handed you that, I think,
16   authenticate, does that appear to be some language
17   having to do with permitted parking?
18      A  I see some parking restrictions and rules
19   here in this document, that's correct.
20      Q  If you look at Section-A, just for the
21   purpose of this question, you can assume -- let's
22   assume that that was a regulation that was in
23   existence at the city at the time this issue of
24   your R.V. came up.
25      Can you familiarize yourself with

126

1   Section-A, and tell us if that, in fact, was a
2   restriction on parking that existed at that time?
3      MR. SILVERS:  I want to be clear.
4   Are you asking -- Are we assuming or are
5   we --
6      MR. NOAH:  Yeah.  It probably was a
7   bad question.
8      MR. SILVERS:  Yeah.
9      MR. NOAH:  Let me try again.
10   BY MR. NOAH:
11      Q  As you read "A", do you know whether or
12   not that was a regulation that existed at the time
13   this incident arose in the Town of Howey?
14      A  I'm reading it, and some of the language
15   stands out to me.
16      Q  Does it stand out in your mind as
17   something that was an adopted regulation at the
18   time this incident arose in Howey?
19      A  Again, some of the language looks like it
20   was -- When I pulled it up and I used it, it was
21   some of the language.
22      Q  So if you look at Section-A, when your
23   R.V. was parked -- Well, first of all, does
24   Section-A say anything about an adjoining lot?
25   Start with that.

127

1      A  I don't see the words adjoining lot on
2   here.
3      Q  Now, it does refer to the side or rear
4   yard, does it not?
5      A  It does.  I see that.
6      Q  And an R.V. may be parked in those areas,
7   as long as it does not extend into the front yard,
8   it's not visible from the front yard, and the area
9   is completely enclosed by a six-foot fence or
10   landscape screen at least six feet in height.
11      Have I read that accurately?
12      A  You've read that accurately.
13      Q  When this incident arose in February of
14   2018, was your R.V. completely enclosed by a
15   six-foot fence or landscape screening at least six
16   feet in height?
17      A  Completely enclosed; no, sir.
18      Q  You mentioned that, and correct me if I've
19   got my chronology wrong, correct me as I've gotten
20   it wrong.
21      I think you said that on -- in February
22   you were -- 2018, you were visited by code
23   enforcement with respect to this issue.
24      A  And the chief of police as well.
25      Q  And the chief of police.  And at that

128

1   point, you agreed to move the R.V. pending doing
2   some research on what you were being accused of; is
3   that correct?
4      A  I was approached by the chief and code
5   enforcement who said I can't park my R.V. on a
6   vacant lot.  That was the violation they said.
7      Q  Okay.
8      A  They didn't point this out.  They said I
9   can't park my R.V. in a vacant lot.
10      Q  And then you said something about getting
11   a legal opinion.  Who told you --
12      What, what was that issue?  Who told you
13   that?
14      A  Larry Chester or chief of police.  One of
15   'em said that we're going to take this and give it
16   to Heather Ramos and have her look at it to see if
17   you're right or not.  And that's when she came back
18   to me and she says, Mr. McGill is right, they said
19   that.
20      Q  Who is Heather Ramos?
21      A  Heather Ramos was the town attorney at the
22   time.  I believe she works for the same law firm as
23   Mr. Wilkes.
24      Q  Now, when they told you that they were
25   going to get a legal opinion on that, did that seem

TURNER REPORTING, INC.
407-497-6070

Matthew McGill  4/4/2023

129

1  like a reasonable thing for code enforcement to do?
2      A  Well, I thought they should know their
3  job.
4      **Q  Right.**
5      A  So, but if they --
6      **Q  Not to argue with you, but --**
7      A  No.
8      **Q  In, in enforcing criminal statutes when**
9  **you were a police officer, are you saying that**
10 **reasonable minds never disagreed about what the**
11 **language of the statute meant?  That never happened**
12 **in your experience?**
13     A  I would never say that.  But when you have
14 a code enforcement officer --
15     **Q  So then let me just go this way.**
16     A  Okay.  I won't answer then.
17     **Q  Did -- Is interpreting code something that**
18 **reasonable minds can differ on?**
19     A  Interpreting or --
20     **Q  Interpreting.**
21     A  It depends what's up for interpretation.
22     **Q  Okay.  Well --**
23     A  Some things are black, some things are
24 black and white, some things are under
25 interpretation.

130

1      **Q  Well, the black and white that you just**
2  **read, suggests that there needs to be -- not**
3  **suggest, mandates a fence completely around the**
4  **R.V.**
5      A  If that was available at the time when I
6  had it.  I believe this was adopted, the one you
7  handed me, for one.  And, two, I'm also basing it
8  being new in the town what the chief of police and
9  the code enforcement officer believed to be the
10 law, on top of the building inspector among other
11 things what they believe to be the law.
12         And the law is you only needed, at that
13 time, a six-foot barrier, either a fence, closed
14 fence or a hedge along the back.  That was their
15 belief.
16         So then, obviously, that was
17 Heather Ramos' belief who was the attorney for the
18 town.
19     **Q  So I'm going to ask you this, and then I'm**
20 **going to live with your answer, whatever you tell**
21 **me.**
22         **Was it reasonable for the town officials**
23 **to seek a legal opinion as to whether or not their**
24 **interpretation of their code was correct?**
25     A  Do I think it's unreasonable or

131

1  reasonable.
2      **Q  Reasonable.  Was that a reasonable --**
3      A  I had no problem with them checking with
4  the town attorney.
5      **Q  Okay.  Do you know whether or not they did**
6  **in fact check with the town attorney?  On, you said**
7  **that.  She -- You said that she agreed with you; is**
8  **that right?**
9      A  Yes.  She told me herself.
10     **Q  Okay.  I'm going to hand you Exhibit 9.**
11         **(Whereupon, Defendant's Exhibit Number 9**
12 **was marked for identification.)**
13     **Q  And the question that's pending is whether**
14 **or not you recognize Exhibit 9.**
15     A  It's an e-mail between -- from
16 Heather Ramos to Larry Chester.
17     **Q  Yes.  Have you ever seen this document**
18 **before?**
19     A  I'm just reading the e-mail in full.  I
20 don't remember being given this e-mail, not that I
21 didn't.  I just -- I wasn't cc'd, but I wasn't also
22 a member on council.
23     **Q  Since you can't authenticate it, let's**
24 **assume for the purposes of this question that it is**
25 **what it purports to be, an e-mail from Ramos to**

132

1  Chester.
2          **As you read the document, does Ramos find**
3  **the operative provision to be exactly the one we**
4  **were just discussing about -- from this ordinance,**
5  **Exhibit Number 8?**
6          **Does she cite exactly the same thing that**
7  **I just cited to you?**
8      A  I'm sorry.  I want to make sure I read it
9  thoroughly.  And it looks like the same language.
10     **Q  So what Ms. Ramos -- Is it your**
11 **understanding as you -- from that document, if that**
12 **document is what it purports to be, that Ms. Ramos**
13 **understood the -- what the issue is, is whether --**
14 **it doesn't have anything to do with an adjoining**
15 **property, it has to do with whether or not there is**
16 **a fence completely surrounding the R.V.?**
17     A  Did she confirm that it was in a vacant
18 lot.  She confirmed that it was the abutting
19 property.
20     **Q  Well, she's doing more than that, right?**
21     A  Yeah.  And --
22     **Q  Matt, she's saying that what the operative**
23 **issue is, is whether or not you're complying with**
24 **the ordinance or whether there's an exception to**
25 **the ordinance.**

TURNER REPORTING, INC.
407-497-6070

133

1        Don't you read it that way?
2      A  I read it the fact that she cited in there
3  what's required for him to park the R.V. there.
4      Q  Including having a fence completely
5  surrounding the R.V.?
6      A  Fully enclosed, I see that, yeah.
7      Q  Then if you go back to Exhibit Number 7,
8  please.
9      A  Seven?
10     Q  Yeah.  And for this exercise, what I'd
11 like for you to do is, there's, there's an entry
12 under comments that says -- that is dated
13 03-07-2018.
14        Do you see that?
15     A  Under -- This is the one we're looking at?
16     Q  Yes, sir.
17     A  Under comments.  I'm having a hard time
18 finding comments on here.
19     Q  May I show it to you?
20     A  Yes, please.
21     Q  So there's the word --
22     A  Oh.  I was --
23     Q  -- comments.
24     A  -- looking up there.  I'm sorry.
25     Q  And then if you look under the comment

134

1  section, there's a date 03-07-2018.  Just tell me
2  if you found it, if you see it.
3      A  030 -- Yes, I see --
4      Q  Okay.
5      A  -- the first 02-20-2018 and then I see a
6  3-7-2018.
7      Q  Yeah.  What this exercise is, Mr. McGill,
8  if you would read the words that follow March 7,
9  2018 entry.  You can read it to yourself, but when
10 you come to a sentence that is inaccurate, stop and
11 let me know the sentence that you see that is
12 inaccurate.
13     A  First sentence is inaccurate, as far as
14 the content goes, as far as due to McGill traveling
15 for employment.  That's why I moved the R.V.
16 That's inaccurate.
17     Q  Okay.  Anything else that you see that is
18 inaccurate?
19        Thank you for bringing that to my
20 attention.
21     A  This is inaccurate because it's
22 impossible.
23     Q  What?
24     A  Okay.  Where it starts, chief and I
25 discussed.

135

1      Q  Yes.
2      A  Chief discussed the possibility of moving
3  the fence back to connect to the existing fence
4  around the residence on Croton Way.  It's
5  impossible, because that fence, there was a fence
6  on that property that goes towards the back.  So if
7  they moved it back to that, there would be no fence
8  at all.  There would be no barrier.  So that
9  doesn't make sense to why that's even in there, if
10 you understand what I'm saying.
11     Q  I don't, but my question goes to this.
12 Let's assume that it makes absolutely no sense.
13 But the sentence begins, chief and I discussed the
14 possibility.
15        Do you have any knowledge that they, in
16 fact, did not discuss that possibility, even if you
17 think that it's nonsense?  Do you -- I mean --
18     A  The way it's written right there, I have
19 no idea -- I have no idea if they did, but it's
20 impossible to do.
21     Q  Okay.  I understand your testimony.
22        So, and then, starting with Mr. McGill
23 advised.  And then if there's anything inaccurate
24 after that --
25     A  Yeah.

136

1      Q  -- I'd like to know.
2      A  Starting with, new, new case.  And it says
3  see case number 18-09-5275.  I have no idea what
4  he's talking about here.  It says, a new case, and
5  as I said, was eventually started and Mr. McGill
6  was issued a courtesy letter for failing to have no
7  permit to erect the fence.  I don't remember -- not
8  that it didn't happen, but I just don't remember
9  it.
10     Q  Okay.
11     A  Because it doesn't --
12     Q  The sections that say Mr. McGill advised
13 them and the sections that refer to John Ernest,
14 those are accurate sentences?
15     A  I don't -- I mean, I have no reason to
16 think they're not.
17     Q  Who is John --
18     A  I remember talking to John Ernest about
19 the trees.  He was the -- in charge of, I think it
20 was called the road department, public works.
21 Maybe public works is better.  And he wasn't an
22 arborist, but he knew a lot about trees.  So he was
23 sent to my house to look at the trees.
24     Q  Okay.  Do you know what the reference to
25 Ernest advised that it would be acceptable due to

Matthew McGill 4/4/2023

137

1 the condition of trees? Do you know what that's a
2 reference to, what's being discussed there?
3     A I'm not a hundred percent, but I believe
4 with the Town of Howey-In-The-Hills, the trees are
5 very protected, unless they're dying or have some
6 kind of sickness and the particular tree, you can't
7 remove 'em. So I think he was referring to some of
8 them could be trimmed back, some could be removed.
9     Q Okay. And you objected to that?
10     A I objected to it, because I still have to
11 park under existing trees.
12     Q And what's the problem with parking under
13 existing trees?
14     A Because the insurance of trees falling on
15 the R.V.
16     Q And, and when you did your research about
17 parking the R.V. and discussed this with code
18 enforcement, did you ever learn that there was any
19 exception from town rules based on whether or not
20 the property owner's insurance would cover
21 something or not? Does that exist in the town's
22 rules at that time?
23     A I don't remember reading that.
24     Q Okay. And then you said that you
25 weren't -- you didn't know anything about

138

1 19-09-5275. What about the remainder of the
2 comments, anything else that's inaccurate?
3     A I'm confused 'cause a fence was an
4 issue -- built yet, but he wants to -- It looks
5 like he's trying to -- The case was created saying
6 I didn't get a permit for a fence. I'm confused
7 with the order here, 'cause it looks like I didn't
8 have a fence and the put you in violation 'cause I
9 put a fence up. So it's just very confusing. So I
10 don't, I don't know what he means there.
11     Q Okay.
12     A Ask then -- Let me finish the rest here.
13     This is inaccurate. He obtained. It
14 starts with he obtained. I think it's the second
15 to last sentence, the last sentence, second to
16 last.
17     He obtained a permit, but Mr. Ron Von
18 Frankenstein held off signing off on it until he
19 received okay from the chief. That's not true.
20     Q What is inaccurate about it?
21     A Well, Mr. Von Frankenstein said the fence
22 was legal in his eyes, he wanted to sign off on it,
23 but the chief wouldn't let him.
24     Q Okay. And did Mr. Von Frankenstein say
25 that to you individually, or is that in writing

139

1 or --
2     A To my wife, to my wife and I.
3     Q Okay. Anything else that's inaccurate?
4     A It says here that after considerable
5 discussion between the chief Ron Von Frankenstein,
6 the town attorney and myself, the permit was
7 finally signed off on.
8     So I'm confused, because they're saying
9 I'm in violation, but they signed off on the fence.
10 If I'm in violation, how -- I'm confused here.
11     Q Okay.
12     A Because --
13     Q So you will dispute --
14     A -- it's saying with your exhibit -- I
15 think it was 8 or 9 where it says in there it has
16 to be fully enclosed. Well, if it's not fully
17 enclosed, how they -- If they believe that was the
18 law and it had to be from -- why would they sign
19 off on it.
20     Q Did you ever get a permit for a fence and
21 have it signed off on by the town? Did that ever
22 happen?
23     A Yes. Three different times.
24     Q So -- And with that, have you now told me
25 everything that's inaccurate about that comment?

140

1     A On this, yes. Well, I'd like to rephrase
2 that. Either inaccurate or confusing and didn't
3 make sense.
4     Q Now I'm going to hand you Exhibit 10.
5     (Whereupon, Defendant's Exhibit Number 10
6 was marked for identification.)
7     Q Do you recognize Exhibit 10?
8     A Have I ever seen it before? I don't
9 recall. I see it as minutes of the Howey-In-The-
10 Hills council meeting.
11     Q Do you recognize this as being the minutes
12 from a Howey Town Council meeting that occurred on
13 April 9, 2018?
14     A It says that's what it is, but I don't
15 know if they are or not.
16     Q Okay. Then let me refer you to page 2 of
17 2 under public comments.
18     A I see page 2 and public comments.
19     Q Who was Charles Richardson?
20     A Looks like he's a resident at 214 East
21 Laurel Ave.
22     Q Is that close to where you were living at
23 the time when this issue with the R.V. came up?
24     A That address is on the same road as my
25 adjoining lot is on, and it's going down towards

145

1    Q  Does it square with your recollection
2 though that after you put up the fence, your
3 neighbors were complaining about the fence?
4    A  Once the fence was up, there was
5 complaints from neighbors how the fence looked.
6    Q  Do you recall what their objections to
7 what it looked like?
8    A  Vaguely, not vaguely.  I kind of remember
9 what the petition said and the claims they made
10 about the fence.  And they were all inaccurate,
11 according to the building inspector,
12 Ron Von Frankenstein, 'cause he said, for one of
13 the problems they had, they said it was unsafe and
14 it wasn't built correctly.  And, in fact,
15 Ron Von Frankenstein said it was very secure and
16 safe, and probably would withstand a hurricane.  So
17 it was along those lines, those comments.
18        But the biggest complaint was the color of
19 it.  And that's when I said to either -- I can't
20 remember when it was, either to the chief of police
21 or Larry Chester, well, if they don't like the
22 color of the fence, they had my permission to go on
23 property and paint.
24    Q  What was the color?
25    A  It was white.  It was some white and there

146

1 was some off-white.  It was a used fence, stockade
2 fence.  And the one side panel, last panel was a
3 bluish color.
4    Q  Do you -- Do you have any explanation for
5 why 20 people would file a petition complaining
6 against you for a fence and they would be all
7 wrong?  Why -- Do you have an explanation for why
8 that would happen?
9    A  I do.  Because very, very early on when I
10 lived there, Chief Tom used to talk about how the
11 garden club runs the town.  The town council --
12 this is his words, not mine.  The town council
13 doesn't run the town, the garden club.  And you
14 don't want to get on their bad side, because it's
15 hundreds of members.  So once you get on their bad
16 side and they don't like something you do, they
17 will attack you.
18        So a lot of those members on that
19 petition, I was told, were garden club members.  So
20 I think that's why they got so many signatures, so
21 many people to sign it, which is about 20-something
22 to go against it, because we also passed out
23 pictures of other fences and others things around
24 the town that were horrific, and no one had a
25 problem with it.

147

1    Q  Between 2018 and when you left the Town of
2 Howey, how many council members were in the garden
3 club?
4    A  Active or former members or --
5    Q  Active members during that period of time.
6    A  I don't know.  I didn't --
7    Q  Were any of them?
8    A  Members prior?  I know Mayor MacFarlane
9 was a member.
10    Q  No.  When you change the contours of my
11 question --
12    A  Okay.
13    Q  -- I think that you're --
14        Let me start over.
15    A  Okay.
16    Q  As we sit here today, do you know whether
17 any elected town council members were a member of
18 the garden party between 2018 and 2020 when you
19 left the town?
20    A  I believe Mayor MacFarlane was.
21    Q  Do you know if there were any town
22 employees who were members of the garden club
23 during that period of time?
24    A  Does that include volunteers for the town?
25    Q  I wouldn't think so.  I think it would

148

1 include payroll employees that the town was
2 responsible for.
3    A  I'm not sure.
4    Q  And have I handed you Exhibit 11?
5    A  I have 11 in front of me.
6        (Whereupon, Defendant's Exhibit Number 11
7 was marked for identification.)
8    Q  Do you recognize Exhibit 11?
9    A  I recognize it to be minutes from the
10 April 23, 2018 meeting.
11    Q  And if you go back to the very -- to page
12 4 of 5 of that document under public comments.  Is
13 there an entry there that refers to you speaking
14 during public comment?
15    A  There is.  It says my name on the bottom
16 of 4 of 5.
17    Q  Okay.
18    A  And it continues onto 5 of 5 on the top.
19    Q  And as you read that comment, does that
20 appear to summarize what the -- the presentation
21 that you made at that time?
22    A  The top is cut off.  It says I was working
23 with Larry.  It says he was, he was working with
24 Larry Chester, code enforcement.  And I can't make
25 that out.

149

1    Q   See if my reading of it comports with
2  yours.
3       A   It's cut off on top.
4       Q   It is.  Everyone knows that the fence was
5  stable, as that concern was raised at the prior
6  meeting.
7          Is it something to that effect?
8       A   Again, they don't put everything you say
9  on here.
10      Q   Sure.
11      A   So I remember thanking them for being
12  polite to my wife.  And I remember talking in
13  length about, I believe the petition and how it was
14  false, maybe it -- how the fence was stable, but
15  it's -- they don't put everything you say on here,
16  so.
17      Q   Okay.
18      A   I don't know if they left stuff out, but I
19  did make a comment.
20      Q   During the public comment, were you ever
21  cut off or prevented from saying whatever you
22  wanted to say about that subject?
23      A   I don't recall being cut off, if I was or
24  not.
25         MR. SILVERS:  If we're going to

150

1  continue on 11, I just have a quick
2  question about -- I have on page 1, it
3  says page 1 of 2, and then it goes 2 of 5.
4         Is everybody else like that?
5       A   Yes.
6         MR. NOAH:  Mine is like that.  I
7  don't have an explanation for that.
8         MR. SILVERS:  Okay.  Well, then we're
9  all looking at the same thing anyway, so.
10  BY MR. NOAH:
11      Q   Matt, if you look at the bottom of each
12  page, to the left there's a date on it April 23,
13  2018.
14         Do all the pages have that same date?
15      A   They do.
16      Q   Okay.  There's something about the page
17  numbering that is clearly wrong.
18         MR. NOAH:  Thanks, Andrew.  I don't
19  have an explanation for it.
20      A   Can I ask you how that comes on the bottom
21  of every page?  Is it something automatic or is it
22  something that anybody can type on there that shows
23  a part of it?
24      Q   You can ask me, but I can tell you I have
25  absolutely no clue.

151

1       A   I don't know the authenticity of -- Like
2  he said, it's a page missing or are these added, a
3  date on there?
4       Q   Yeah.  I'm not a hundred percent sure that
5  you've authenticated this document.  I think we
6  were assuming that it was minutes, but I'm not sure
7  it's --
8       A   Okay.
9       Q   -- been authenticated.
10         We'll have somebody from the town who
11  will be able to authenticate it, I'm sure.
12         As you think about April 23, 2018, do you
13  have any knowledge about when you were denied
14  admission on the Planning and Zoning Board relative
15  to that day?  When you think about what was going
16  on at that time frame, are --
17      A   Sir, it was so many years ago --
18      Q   It doesn't help pinpoint or refresh your
19  recollection?
20      A   It doesn't, but I believe I said to you,
21  say between May and July of that year.  And, again,
22  I submitted all that stuff I had, I put in my
23  evidence.  I just can't recall the exact dates or
24  months.
25      Q   Let me give you Exhibit 12.

152

1         (Whereupon, Defendant's Exhibit Number 12
2  was marked for identification.)
3       Q   And just take a few minutes and
4  familiarize yourself with that.  And when you're
5  ready to discuss it, I might have some questions.
6         MR. NOAH:  Just looking we're at two
7  o'clock.
8         Does anybody need a break?  How is
9  everybody holding up?
10      A   I'm good.
11      Q   So the question that is pending, do you
12  recognize Exhibit 12?
13      A   I don't recognize receiving this exhibit,
14  and it's dated September 19, 2018.
15      Q   Yes, sir.
16      A   And the address is 119 East Croton Way.
17      Q   Was that the address that you lived at
18  during that period of time?
19      A   Yes.  I'm confused, 'cause it mentions on
20  the bottom, facts, observed fence from roadway and
21  check with town hall and learned a permit had not
22  been signed off on.
23         I don't know what this is.
24      Q   Okay.  So you never seen this document
25  before; is that what you're --

38 (Pages 149 to 152)

153

1    A  I don't recall seeing it and reading it.
2  I don't even know what it means.
3    Q  All right.
4    A  See, because it says the side portions of
5  the fence need to be extended.  Well, they --
6    Q  I'm going to come to that in just a
7  minute.
8    A  119 is completely enclosed.
9    Q  Let me go ahead and get -- Let me hand you
10  Exhibit 13, and then we'll come back to that issue.
11    (Whereupon, Defendant's Exhibit Number 13
12  was marked for identification.) had?
13    Q  Do you recognize Exhibit 13?
14    A  It's an ordinance ticket, which I've never
15  seen.  And location 119, that's where I live.
16  Address 119 where I live.  Comments.  Okay.  I'm
17  reading the comments.  It doesn't make sense,
18  because the location is fully enclosed, the entire
19  property is fully enclosed with a fence at this
20  point, and I don't understand what they're talking
21  about.
22    Q  Were there any gaps at all around the
23  residence?
24    A  Zero, zero gaps.  A gate in the back
25  portion, and it had one gate in the front portion.

154

1  And 119 Croton Way is fully, fully fenced in.
2    So the document, I'm just confused with
3  this document.
4    Q  When you constructed the fence, or had the
5  fence constructed, it completely enclosed the yard?
6    A  Yes.  119 East Croton Way.  I might even
7  have pictures of it.  Honestly, I think -- I'm
8  looking at this.  I think they got the wrong
9  address.  I think maybe he meant to put Laurel Way
10  or Ave.  It's just East Croton, that back yard is
11  fully enclosed.
12    Q  Is -- Where is Laurel Way?
13    A  Behind me.
14    Q  Do you own that property behind you,
15  Laurel Way?
16    A  That abuts to my property on East Croton.
17    Q  Do you own it?
18    A  Do I own it now, no.  I don't own it now.
19    Q  September 19, 2018, did you own Laurel
20  Way, the property on Laurel --
21    A  Yes.
22    Q  Okay.  Did you park the R.V. on it?
23    A  I started parking it there, yes.
24    Q  Was Laurel Way completely enclosed?
25    A  That was not completely enclosed, that

155

1  one.
2    Q  Okay.  So where the -- Was the property at
3  Laurel Way, was that a residential lot?
4    A  It was.
5    Q  Okay.  So as of September 19, 2018, you
6  were parking your R.V. on a residential lot that
7  was not enclosed by a fence; is that correct?
8    A  Not, that's not correct, not fully
9  enclosed.  There's parts of it that were open on
10  the side.
11    Q  Okay.  So let me rephrase my question.
12    In September, 2019 you parked your
13  R.V. on a residential lot that was not completely
14  enclosed?
15    A  That's not correct.
16    Q  And what is incorrect about that?
17    A  Well, for one the date.  I don't know if
18  we even owned an R.V. at that point.
19    Q  I'm curious how you can tell me something
20  is incorrect when you don't know whether or not you
21  even have an R.V.  How --
22    A  Because I know -- I'm pretty sure I sold
23  it sometime that year, and I don't know if it was
24  parked in that property on September 19, 2018.
25  That's why I want to -- I don't want to say

156

1  something that's not true.  So it might not have
2  been parked there.
3    Q  In 2018 did you own an R.V.?
4    A  Sometime in 2018, I did own an R.V.
5    Q  At any time during the time that you owned
6  it, did you park on a residential lot that you
7  owned that was not fully enclosed by a fence?
8    A  I parked on the plot in 2018, yes, that
9  abutted up to my residence on 119 East Croton Way.
10    Q  You're just not sure as we sit here today
11  if it was September or not?
12    A  If it was parked at that point, yes, I'm
13  not sure.
14    Q  Okay.  Let me hand you what we'll mark as
15  Exhibit 14.
16    (Whereupon, Defendant's Exhibit Number 14
17  was marked for identification.)
18    Q  If you have a chance to look at that, the
19  question that's going to be pending is whether or
20  not you recognize Exhibit 14.
21    A  I see the e-mails back and forth with
22  Larry and I.  I just don't remember; not that it
23  wasn't sent to me, the one that wasn't attached to
24  with Heather Ramos.  But I'm looking at the ones
25  between myself and Larry Chester.

161

1    Q  Do you recall the -- receiving an e-mail
2  from Lawrence Chester where he passed on the town
3  attorney's opinion to you?
4    A  Again, he could have.  I can't recall, it
5  was so long ago.
6    Q  And what I'm not seeing is, is you
7  responding that you don't own an R.V. anymore or
8  that they're wrong about the enclosure.
9        Does that look like that appear anywhere
10 on this document?
11   A  If I own it or not, I don't see that.
12   Q  Did you ever tell them that you don't own
13 an R.V., so why is all this going on?
14   A  I wouldn't have said that, because I still
15 had a trailer in that back yard.  'Cause it says --
16 the law says you can have one utility trailer, one
17 R.V. or camper or one boat, okay.  And I still had
18 a trailer back there, so I don't believe I would
19 have said that, because I still would have had to
20 enclose that particular trailer.
21   Q  Okay.  Did you ever dispute that the
22 trailer or the R.V., whatever it was, was, in fact,
23 in a completely enclosed area?  Did you ever tell
24 them that those are the facts, just come and take a
25 photograph of it?

162

1    A  I didn't have a chance to.
2    Q  Why do you say that?
3    A  Because they closed off on the permit.
4  They closed off on the violation.  They closed it.
5  So what is there to dispute.
6    Q  Okay.  So once they obtained this legal
7  opinion -- Well, let me ask you this.
8        Did you ever completely enclose the
9  residential lot on which either the trailer or the
10 R.V. was parked?
11   A  That lot was eventually fully enclosed.
12   Q  Is that what closed the entire issue?
13   A  No.
14   Q  Okay.  How did the issue close?
15   A  I believe it's in my evidence.  I don't
16 know exactly how it's put, but Lawrence Chester
17 says they're closing permits on illegal stuff all
18 around the town.  So I believe that's why they just
19 closed mine.
20   Q  And when you say closed, does your using
21 it in that sentence, you mean that they're simply
22 going to stop this particular enforcement procedure
23 and they're just going to consider the whole matter
24 completed?
25   A  No.  I was told by a witness,

163

1  Bernie Alimente, that the chief told him that, you
2  know what, we're just going to close it.  So when
3  he brings his R.V. back there, we're going to open
4  a new one.
5        And that's when Mr. Alimente said, but,
6  you know, he still has a dolly and a trailer,
7  utility trailer.  So it still has to be enclosed.
8  And the chief didn't realize I had it back there,
9  'cause it doesn't tower, stand tall like an
10 R.V.
11   Q  I'm only trying to understand from your
12 perspective.  How does this matter close out?  How
13 does it actually close?
14   A  Because he closed it, I guess through the
15 permit.  They send you a letter and let you know
16 the matter is no longer under violation or no more
17 courtesy letter, it's closed; we're satisfied the
18 way things are.
19        And the only reason he did that, because
20 he thought he was going to be sneaky and thought I
21 was bringing an R.V. back, and then he put me back
22 in violation.  That's when Mr. Alimente said, well,
23 you know, he has a utility trailer back there, and
24 as per your law, utility trailers still have to be
25 enclosed, in a fully enclosed.

164

1        So that was -- So I think they were
2  closing 'cause they think they can get me if I
3  brought an R.V. back.
4    Q  Were you ever cited -- After -- how did
5  you learn that -- Well, Strike that.
6        What date was it closed on?
7    A  Just documentation of it, I don't have it
8  in front of me.  I couldn't tell you.  If I had
9  take --
10   Q  Using this legal opinion from Ms. Ramos
11 September 19, 2018 as a landmark, was it closed
12 within months of that or weeks of that, or what's
13 your best estimation?
14   A  I can't -- Just a long time ago.  But I
15 did provide evidence from Larry.  He text me, and
16 he sent me, saying it is now closed.  So there is
17 evidence to the attorneys that shows when he closed
18 it sometime towards the end -- was it '18.  I don't
19 know the exact month.
20   Q  Once it was closed, were you ever cited?
21 Did you ever receive any other courtesy warning or
22 citation or anything else after?
23   A  Other than the ones you presented in front
24 of me?
25   Q  No.

Matthew McGill  4/4/2023

165

1    A  The last one being September 19th, 2018,
2 no, not that I'm aware of.
3    Q  Were you ever subject to any code
4 enforcement after that date?
5    A  Not that I can remember.
6    MR. NOAH:  Yep.  Now is a good time.
7    THE VIDEOGRAPHER:  Going off the
8 video record.  The time is 2:37 p.m.
9    (Whereupon, a recess was had from
10 2:37 p.m. to 2:57 p.m.)
11    THE VIDEOGRAPHER:  Going back on the
12 video record.  The time is 2:58 p.m.
13 BY MR. NOAH:
14    Q  Mr. McGill, one thing that I wanted to
15 clarify was your testimony about Mayor MacFarlane
16 cutting you off and not permitting you to speak
17 during the council meetings.
18    Did that occur during council reports, or
19 did that occur in the body of the meeting when you
20 all were discussing specific business?
21    A  All the above.
22    Q  But as we sit here today, you, you are
23 confident that you were cut off during the council
24 report?
25    A  It was called councilmen business,

166

1 councilmen reports, councilmen comments.  The
2 agenda was never consistent.  So the title as you
3 look at it, it depends on -- You got to look at --
4 if you look at the past agendas, you will see how
5 it's worded different.
6    So I was prevented from, during
7 councilman's comments when it came time for me to
8 talk.  And I try to bring up business, I was
9 completely forbidden from talking.
10    So it was during that time and all the
11 other times you said to those portions.  So it
12 wasn't just isolated to if you look at the agenda
13 during councilmen comments or councilmen business
14 or councilmen reports.  I say all three because
15 they worded different from the time I was there.
16    So it wasn't just then, it was during
17 other times as well.
18    Q  Well, it's the other times that I want to
19 focus on.  We had talked about the order of
20 business with new business and old business.  I'm
21 just going to stop at those two categories.
22 Remember we talked about that, what constituted new
23 business and what constituted old business?
24    A  Yes, sir.
25    Q  So let's assume, for example, that someone

167

1 came to the town commission because they wanted to
2 rezone their property in some way.  Then I take it
3 that when that issue first came up, that would be
4 on new business.  Is that true?
5    A  No.  I don't think that is correct.
6 There's, if I can recall, if you look at the
7 agenda, it's actually -- there was parts on the
8 agenda that would be listed not under new business,
9 but just by itself, because a builder might want to
10 come in and talk about rezoning the lots that he
11 was looking to build in that particular area.  So
12 it wouldn't be, technically, under new business.
13 It might be just an item on itself on the agenda.
14    Q  So I was overly restricted in my question.
15 Let's take your hypothetical.  So a builder comes
16 in, wants rezoning for lots.
17    In that circumstance, is it true that all
18 comments, whether they be from the council members
19 or whether they be from the public, had to be
20 restricted to that one issue, or was the council
21 member allowed to talk about whatever they wanted
22 to talk about when a builder came in looking for
23 rezoning?
24    A  It was never said, that I recall, that
25 when -- council members can only talk about this.

168

1 We only did, but I don't remember them having to
2 correct people during a particular example like
3 that, to say, you're getting off topic, you gotta
4 stick with the topic of what we're talking about.
5    So I don't remember them -- It might have
6 been said, but saying that you're getting off topic
7 to any of the council members, you gotta to stay on
8 topic and just talk about that particular item
9 that's on the agenda we're talking about.
10    Q  Would you agree that that would be a
11 reasonable restriction, that if some specific topic
12 of town business came up that the discussion during
13 that period of time would be limited to that topic?
14    A  I don't like to comment on what I think is
15 reasonable restrictions.  I mean, the First
16 Amendment right itself making people talk for three
17 minutes being a restriction, there shouldn't be any
18 restriction on First Amendment right, in my
19 opinion.
20    But it's -- I just -- You gotta keep it
21 reasonable.  What reasonable is, I don't know.
22    Q  And, to your recollection of events, if I
23 were to go back through all of the agendas during
24 the time that you were a council member, I would
25 find examples of Mayor MacFarlane or Mayor Nebel

TURNER REPORTING, INC.
407-497-6070

Matthew McGill  4/4/2023

165

1    A  The last one being September 19th, 2018,
2  no, not that I'm aware of.
3    Q  Were you ever subject to any code
4  enforcement after that date?
5    A  Not that I can remember.
6      MR. NOAH:  Yep.  Now is a good time.
7      THE VIDEOGRAPHER:  Going off the
8  video record.  The time is 2:37 p.m.
9      (Whereupon, a recess was had from
10  2:37 p.m. to 2:57 p.m.)
11      THE VIDEOGRAPHER:  Going back on the
12  video record.  The time is 2:58 p.m.
13  BY MR. NOAH:
14    Q  Mr. McGill, one thing that I wanted to
15  clarify was your testimony about Mayor MacFarlane
16  cutting you off and not permitting you to speak
17  during the council meetings.
18      Did that occur during council reports, or
19  did that occur in the body of the meeting when you
20  all were discussing specific business?
21    A  All the above.
22    Q  But as we sit here today, you, you are
23  confident that you were cut off during the council
24  report?
25    A  It was called councilmen business,

166

1  councilmen reports, councilmen comments.  The
2  agenda was never consistent.  So the title as you
3  look at it, it depends on -- You got to look at --
4  if you look at the past agendas, you will see how
5  it's worded different.
6      So I was prevented from, during
7  councilman's comments when it came time for me to
8  talk.  And I try to bring up business, I was
9  completely forbidden from talking.
10      So it was during that time and all the
11  other times you said to those portions.  So it
12  wasn't just isolated to if you look at the agenda
13  during councilmen comments or councilmen business
14  or councilmen reports.  I say all three because
15  they worded different from the time I was there.
16      So it wasn't just then, it was during
17  other times as well.
18    Q  Well, it's the other times that I want to
19  focus on.  We had talked about the order of
20  business with new business and old business.  I'm
21  just going to stop at those two categories.
22  Remember we talked about that, what constituted new
23  business and what constituted old business?
24    A  Yes, sir.
25    Q  So let's assume, for example, that someone

167

1  came to the town commission because they wanted to
2  rezone their property in some way.  Then I take it
3  that when that issue first came up, that would be
4  on new business.  Is that true?
5    A  No.  I don't think that is correct.
6  There's, if I can recall, if you look at the
7  agenda, it's actually -- there was parts on the
8  agenda that would be listed not under new business,
9  but just by itself, because a builder might want to
10  come in and talk about rezoning the lots that he
11  was looking to build in that particular area.  So
12  it wouldn't be, technically, under new business.
13  It might be just an item on itself on the agenda.
14    Q  So I was overly restricted in my question.
15  Let's take your hypothetical.  So a builder comes
16  in, wants rezoning for lots.
17      In that circumstance, is it true that all
18  comments, whether they be from the council members
19  or whether they be from the public, had to be
20  restricted to that one issue, or was the council
21  member allowed to talk about whatever they wanted
22  to talk about when a builder came in looking for
23  rezoning?
24    A  It was never said, that I recall, that
25  when -- council members can only talk about this.

168

1  We only did, but I don't remember them having to
2  correct people during a particular example like
3  that, to say, you're getting off topic, you gotta
4  stick with the topic of what we're talking about.
5      So I don't remember them -- It might have
6  been said, but saying that you're getting off topic
7  to any of the council members, you gotta to stay on
8  topic and just talk about that particular item
9  that's on the agenda we're talking about.
10    Q  Would you agree that that would be a
11  reasonable restriction, that if some specific topic
12  of town business came up that the discussion during
13  that period of time would be limited to that topic?
14    A  I don't like to comment on what I think is
15  reasonable restrictions.  I mean, the First
16  Amendment right itself making people talk for three
17  minutes being a restriction, there shouldn't be any
18  restriction on First Amendment right, in my
19  opinion.
20      But it's -- I just -- You gotta keep it
21  reasonable.  What reasonable is, I don't know.
22    Q  And, to your recollection of events, if I
23  were to go back through all of the agendas during
24  the time that you were a council member, I would
25  find examples of Mayor MacFarlane or Mayor Nebel

TURNER REPORTING, INC.
407-497-6070

173

1       A  Liaisons is, in the past, the council
2  members were liaisons to certain departments within
3  the town.  One example is the building department.
4  So a council member might have been assigned as a
5  liaison to work one on one with Mr. John Ernest to
6  see if he needed any help if any issues came up
7  before or after council meetings that needed to be
8  addressed or helped with.
9          Another is the police department, the
10 library.  I think one might be parks and recs.  To
11 give you some examples of what the -- someone would
12 be a liaison to.
13      Q  Okay.  Town water company and water leaks
14 at residential properties.  What is that a --
15          What is that topic?
16      A  I am not exactly sure what I was referring
17 to at that point.
18      Q  Golf cart crossing update.
19          What is that a reference to?
20      A  We were working on getting permission to
21 have the golf carts cross Highway 19 from one side
22 of the town to the other.
23      Q  New street light complaints of vandalism.
24      A  In terms of brightness and vandalism?
25      Q  I'm sorry, yes, you're correct.

174

1       A  Okay.  Again, they put new street lights
2  in, and some people were complaining that they were
3  too bright at night.  They're lighting up their
4  property.  And the other one was people were
5  vandalizing the street lights.
6       Q  Shooting them out because they're too
7  bright?
8       A  They actually spray paint 'em.
9       Q  Okay.  New construction of South Florida
10 Avenue.  Problem with construction and ground.
11          What does that topic refer to?
12      A  I can't -- I know they are putting a new
13 development down there.  And I know a resident
14 called me and took me to his house and showed the
15 new house they're putting up.  And he said they
16 were burying debris underneath the dirt, which is a
17 problem in Florida.  You could cause kind of like a
18 sinkhole and stuff.
19          Anyway, I remember a point that one of the
20 houses, one of the back walls during construction
21 completely came down.  And he had me take a picture
22 of it and bring it to the attention of the council.
23      Q  Okay.  Now, in this document, you're
24 identifying different topics that you want to have
25 discussed at the December 10, 2018 meeting; is that

175

1  right?
2       A  These are topics I wanted to talk during
3  the councilmen comments, slash, business, slash,
4  whatever they called it.
5       Q  And then in -- This document is nowhere
6  expressing what your view on any of these topics
7  is, does it?
8       A  Expressing my view on it?
9       Q  Yeah.
10      A  I'm not sure what the question is, sir.
11      Q  I can give you an example if it will help.
12 But like liaison for council members, just as a
13 random example, you're saying you'd like to discuss
14 that topic, but you're not expressing what your
15 opinion of that topic is, at least in this
16 document; is that true?
17      A  I was advised by the town clerk that any
18 time you do requested agenda items, you don't go
19 into detail as past agenda items will reflect and
20 previous mayors.  You just simply give the topic
21 that you wish to talk about, as long as it's -- you
22 got to keep it within town business.
23      Q  Okay.  So the answer to my question is
24 that document does not express a view, your view on
25 those issues?

176

1       A  The seven I don't see a view on there, no.
2       Q  Okay.  Let me hand you what we'll mark as
3  Exhibit 16.
4          (Whereupon, Defendant's Exhibit Number 16
5  was marked for identification.)
6       Q  And take a few minutes and familiarize
7  yourself with that document and then I may ask you
8  questions about it.
9       A  Okay.
10      Q  All right.  Do you recognize Exhibit 16?
11      A  It looks like notes, my personal notes
12 that I probably submitted into evidence that I
13 might refer to at council meetings.  I recognize
14 the font, looks like the font I use, so.
15      Q  When was this document generated?  Was it
16 generated before or during or after the December
17 10, 2018 meeting?
18      A  I'm not sure if I did it before or after,
19 and I just did from my notes.  I'm not sure.
20      Q  Who actually drafted this document?
21      A  I typed this up.
22      Q  Okay.  So this is all your, your
23 individual language?
24      A  Let me look through it.  I believe so.
25      Q  Okay.  When I look at agenda notes and

177

1  council comments' notes, Number 1, building serves
2  update, there's a parenthetical. On my copy it's
3  -- there's red print. I don't know if that's on
4  anybody else's copy. It's red print. And it says,
5  council comments.
6  A  Uh-huh.
7  Q  What does council comments refer to?
8  A  It refers to the area where councilmen are
9  allowed to talk under councilmen business,
10  councilmen comments or councilmen items. Depends
11  how it's labeled at the particular agenda.
12  Q  Okay. And then when you look at Number 2,
13  water company and residential leaks, there is a --
14  my copy has blue. But there's a word that is in
15  parentheses. It says agenda.
16      What is that a reference to?
17  A  I'm looking at that and looking at the
18  rest of the document. It looks like -- And I might
19  be wrong, but when I posted -- when I requested
20  items to be put on the agenda and when they were
21  posted, I could have beforehand or after,
22  beforehand, typed my notes up. And just from my
23  own notes saying, okay, that was put on the agenda,
24  these were left off.
25      So if I put councilmen comments, it could

178

1  be that, okay, they wouldn't put it on the agenda
2  so people can see what I'm talking about. So I had
3  to bring it up under councilmen comments.
4  Q  And that's what I was going to get to.
5      So this is a document where you're making
6  notes for yourself. If, if one of your requested
7  items were on the agenda, you made note that there
8  was an agenda item for that. If it was not on the
9  agenda, then you made note that it was under the
10  comments portion that you had to discuss that?
11  A  For this particular meeting, I did it that
12  way, apparently. I didn't do it for every meeting
13  like that.
14  Q  Okay. And did you in fact on December
15  10th, did you discuss the things that you intended
16  to discuss?
17  A  I would have to listen to the audio to
18  remember that.
19  Q  Let me hand you Exhibit 17.
20      (Whereupon, Defendant's Exhibit Number 17
21  was marked for identification.)
22  Q  And after you've had a chance to review
23  that document, I have a couple questions about it.
24  A  Okay, sir.
25  Q  What is Exhibit 17?

179

1  A  Exhibit 17 looks like it is an e-mail
2  between -- to Dairian Burke from myself on December
3  19th, 2018. And the reason for the e-mail would
4  be -- I'm sorry. I'm going in order.
5      It's the first e-mail, is the one on the
6  bottom? I think it was that one?
7  Q  That's my understanding; yes, sir.
8  A  Okay. So it's -- My correction. It's
9  going to be an e-mail from me to Dairian Burke
10  dated December 12th, 2018. Items for the next
11  agenda as labeled for subject. And I -- to Dairian
12  I list the items that I wish to be put on the
13  agenda.
14  Q  Okay. It looks like to me like the
15  building serves, that was something that you
16  discussed during council meetings in the December
17  10th meeting; is that right?
18  A  Again, unless I listen to the audio, it
19  was on my previous list. But as I stated, unless I
20  listened to the audio, I can't confirm if I talked
21  about it or not.
22  Q  Did, did Mayor Nebel -- Let me not assume
23  anything.
24      Mayor Nebel would have been the mayor as
25  of December 10th through calendar year 2019?

180

1  A  That's incorrect.
2  Q  During what period of time was Mayor Nebel
3  appointed mayor?
4  A  He was appointed sometime before I was
5  sworn in. And I mentioned they left me out from
6  voting. And then I know this, Mayor MacFarlane was
7  sworn in September 23rd, 2019, so --
8  Q  You helped me out. I would appreciate it.
9  So --
10  A  Okay.
11  Q  -- under -- So Mayor Nebel, was he the
12  mayor between December, 2010 and -- I'm sorry, let
13  me try that again.
14      Was Mayor Nebel the mayor between 2000 --
15  December 10th, 2018, and September 1st, 2019?
16  A  Again, I don't know if that's accurate
17  because they made Mayor MacFarlane interim mayor.
18  And I might be wrong. I'm not sure what the
19  legalities of how that worked --
20  Q  Sure, sure.
21  A  -- but you have mayor pro tem. But I
22  think something happened to him where they made her
23  interim mayor. So he could have stepped down
24  before September 1st.
25  Q  Okay. I'm with you.

177

1   council comments' notes, Number 1, building serves
2   update, there's a parenthetical. On my copy it's
3   -- there's red print. I don't know if that's on
4   anybody else's copy. It's red print. And it says,
5   council comments.
6       A  Uh-huh.
7       Q  What does council comments refer to?
8       A  It refers to the area where councilmen are
9   allowed to talk under councilmen business,
10  councilmen comments or councilmen items. Depends
11  how it's labeled at the particular agenda.
12      Q  Okay. And then when you look at Number 2,
13  water company and residential leaks, there is a --
14  my copy has blue. But there's a word that is in
15  parentheses. It says agenda.
16      What is that a reference to?
17      A  I'm looking at that and looking at the
18  rest of the document. It looks like -- And I might
19  be wrong, but when I posted -- when I requested
20  items to be put on the agenda and when they were
21  posted, I could have beforehand or after,
22  beforehand, typed my notes up. And just from my
23  own notes saying, okay, that was put on the agenda,
24  these were left off.
25      So if I put councilmen comments, it could

178

1   be that, okay, they wouldn't put it on the agenda
2   so people can see what I'm talking about. So I had
3   to bring it up under councilmen comments.
4       Q  And that's what I was going to get to.
5       So this is a document where you're making
6   notes for yourself. If, if one of your requested
7   items were on the agenda, you made note that there
8   was an agenda item for that. If it was not on the
9   agenda, then you made note that it was under the
10  comments portion that you had to discuss that?
11      A  For this particular meeting, I did it that
12  way, apparently. I didn't do it for every meeting
13  like that.
14      Q  Okay. And did you in fact on December
15  10th, did you discuss the things that you intended
16  to discuss?
17      A  I would have to listen to the audio to
18  remember that.
19      Q  Let me hand you Exhibit 17.
20      (Whereupon, Defendant's Exhibit Number 17
21  was marked for identification.)
22      Q  And after you've had a chance to review
23  that document, I have a couple questions about it.
24      A  Okay, sir.
25      Q  What is Exhibit 17?

179

1       A  Exhibit 17 looks like it is an e-mail
2   between -- to Dairian Burke from myself on December
3   19th, 2018. And the reason for the e-mail would
4   be -- I'm sorry. I'm going in order.
5       It's the first e-mail, is the one on the
6   bottom? I think it was that one?
7       Q  That's my understanding; yes, sir.
8       A  Okay. So it's -- My correction. It's
9   going to be an e-mail from me to Dairian Burke
10  dated December 12th, 2018. Items for the next
11  agenda as labeled for subject. And I -- to Dairian
12  I list the items that I wish to be put on the
13  agenda.
14      Q  Okay. It looks like to me like the
15  building serves, that was something that you
16  discussed during council meetings in the December
17  10th meeting; is that right?
18      A  Again, unless I listen to the audio, it
19  was on my previous list. But as I stated, unless I
20  listened to the audio, I can't confirm if I talked
21  about it or not.
22      Q  Did, did Mayor Nebel -- Let me not assume
23  anything.
24      Mayor Nebel would have been the mayor as
25  of December 10th through calendar year 2019?

180

1       A  That's incorrect.
2       Q  During what period of time was Mayor Nebel
3   appointed mayor?
4       A  He was appointed sometime before I was
5   sworn in. And I mentioned they left me out from
6   voting. And then I know this, Mayor MacFarlane was
7   sworn in September 23rd, 2019, so --
8       Q  You helped me out. I would appreciate it.
9   So --
10      A  Okay.
11      Q  -- under -- So Mayor Nebel, was he the
12  mayor between December, 2010 and -- I'm sorry, let
13  me try that again.
14      Was Mayor Nebel the mayor between 2000 --
15  December 10th, 2018, and September 1st, 2019?
16      A  Again, I don't know if that's accurate
17  because they made Mayor MacFarlane interim mayor.
18  And I might be wrong. I'm not sure what the
19  legalities of how that worked --
20      Q  Sure, sure.
21      A  -- but you have mayor pro tem. But I
22  think something happened to him where they made her
23  interim mayor. So he could have stepped down
24  before September 1st.
25      Q  Okay. I'm with you.

181

1    A  So I just --
2    Q  It's not important to me.  I think what's
3  more important is during the time that Nebel was
4  appointed mayor --
5    A  Okay.
6    Q  -- during that period of time, whenever it
7  was, did he ever prevent you from discussing any
8  issue that you wanted to discuss during council
9  remarks or comments or whatever, whatever name that
10  came under, did he ever prevent you from saying
11  what you wanted to say during that period of time?
12    A  Yes, I believe he did.  I don't have the
13  exact because it's been so long.
14    Q  Okay.  As we sit here today, you don't
15  know one way or the other, you would have to listen
16  to the tapes to determine whether that occurred?
17    A  Or look at my notes, the evidence that I
18  gave you.  I know the one sheet gives you 60 pages.
19  It's like 188 examples of council meetings of when
20  I was --
21    Q  Interrupted and so forth?
22    A  Yeah.
23    Q  Okay.  Then it looks like the response to
24  your requests for topics being placed on the
25  agenda, Nebel denied some of those and he granted

182

1  some of those; is that true?
2    A  Correct.
3    Q  And then a third category, he stated that
4  there is some additional information that needed to
5  be acquired before that was put on the agenda.
6      Are you reading it the same way?
7  Gathering info from building official?
8    A  Number 6?
9    Q  Yeah.
10    A  So Number 6 on mine is about the -- I
11  think, is the wall collapsing at the new house and
12  that they're gathering info from building, so.
13    Q  Is that an acceptable response, is my
14  question, to research the issue further before it
15  actually goes on the agenda item?
16    A  It's, it's not acceptable for them to put
17  it on.  I guess they will talk about it and let
18  people know what's going on.
19      To me, it looks like he was hiding the
20  fact that they were having problems with the
21  builders in town.  And rather than put it on the
22  agenda and have people show up, he put that
23  response on there.
24    Q  Do you -- Have you reviewed any document
25  or has anybody told you that that was Nebel's

183

1  concern, or are you just speculating that that's
2  Nebel's concern?
3    A  At that point with this --
4    Q  Yes, sir.
5    A  -- with the time that has passed, is
6  speculating.
7    Q  Yeah.  Then Ms. Burke includes the
8  sentence that says, any items not put on a meeting
9  agenda may always be brought up in council
10  comments.
11      Up to this time frame, did you have any
12  reason to doubt that?
13    A  I can't remember how the December 10th
14  meeting went.  So unless I heard it and said if I
15  was interrupted at that point, I would have doubt
16  in her comment.  But if I wasn't interrupted and I
17  was allowed to speak at that point, then I would
18  say you're correct.
19    Q  At any rate, she's advising you, don't
20  forget about council comments; you can talk about
21  what you want to here.  Do you construe her comment
22  being the same?
23    A  To the -- Yes.
24    Q  All right.  I'm going to hand you what
25  we'll mark as Exhibit 18.

184

1      (Whereupon, Defendant's Exhibit Number 18
2  was marked for identification.)
3    Q  Do you recognize Exhibit 18?
4    A  This looks like an e-mail from myself to
5  Dairian Burke dated Tuesday, January 22nd, 2019,
6  subject, items for the 28th, January 28th agenda.
7      And I list one of seven items that I
8  requested on the agenda.  And it was followed up by
9  a response from her on January 22nd, 2019.
10    Q  I meant to ask you this on Exhibit 17.
11  Sorry about that.
12    A  Go back to it?
13    Q  Yeah, please.
14      Once again, in your request for topics,
15  you're just identifying the topics that you want to
16  discuss.  You are not expressing what your view on
17  any of those topics are; is that true, on Exhibit
18  17?
19    A  That's not true.
20    Q  And which topic are you expressing a
21  position on?
22    A  Oh, I write, I write here that -- Number
23  5.  Town of Howey Planning and Zoning Board, ethic
24  violations.  So am I saying here that I believe
25  there is an ethics violation and I have an opinion

181

1    A  So I just --
2    Q  It's not important to me.  I think what's
3  more important is during the time that Nebel was
4  appointed mayor --
5    A  Okay.
6    Q  -- during that period of time, whenever it
7  was, did he ever prevent you from discussing any
8  issue that you wanted to discuss during council
9  remarks or comments or whatever, whatever name that
10  came under, did he ever prevent you from saying
11  what you wanted to say during that period of time?
12    A  Yes, I believe he did.  I don't have the
13  exact because it's been so long.
14    Q  Okay.  As we sit here today, you don't
15  know one way or the other, you would have to listen
16  to the tapes to determine whether that occurred?
17    A  Or look at my notes, the evidence that I
18  gave you.  I know the one sheet gives you 60 pages.
19  It's like 188 examples of council meetings of when
20  I was --
21    Q  Interrupted and so forth?
22    A  Yeah.
23    Q  Okay.  Then it looks like the response to
24  your requests for topics being placed on the
25  agenda, Nebel denied some of those and he granted

182

1  some of those; is that true?
2    A  Correct.
3    Q  And then a third category, he stated that
4  there is some additional information that needed to
5  be acquired before that was put on the agenda.
6    Are you reading it the same way?
7  Gathering info from building official?
8    A  Number 6?
9    Q  Yeah.
10    A  So Number 6 on mine is about the -- I
11  think, is the wall collapsing at the new house and
12  that they're gathering info from building, so.
13    Q  Is that an acceptable response, is my
14  question, to research the issue further before it
15  actually goes on the agenda item?
16    A  It's, it's not acceptable for them to put
17  it on.  I guess they will talk about it and let
18  people know what's going on.
19    To me, it looks like he was hiding the
20  fact that they were having problems with the
21  builders in town.  And rather than put it on the
22  agenda and have people show up, he put that
23  response on there.
24    Q  Do you -- Have you reviewed any document
25  or has anybody told you that that was Nebel's

183

1  concern, or are you just speculating that that's
2  Nebel's concern?
3    A  At that point with this --
4    Q  Yes, sir.
5    A  -- with the time that has passed, is
6  speculating.
7    Q  Yeah.  Then Ms. Burke includes the
8  sentence that says, any items not put on a meeting
9  agenda may always be brought up in council
10  comments.
11    Up to this time frame, did you have any
12  reason to doubt that?
13    A  I can't remember how the December 10th
14  meeting went.  So unless I heard it and said if I
15  was interrupted at that point, I would have doubt
16  in her comment.  But if I wasn't interrupted and I
17  was allowed to speak at that point, then I would
18  say you're correct.
19    Q  At any rate, she's advising you, don't
20  forget about council comments; you can talk about
21  what you want to here.  Do you construe her comment
22  being the same?
23    A  To the -- Yes.
24    Q  All right.  I'm going to hand you what
25  we'll mark as Exhibit 18.

184

1    (Whereupon, Defendant's Exhibit Number 18
2  was marked for identification.)
3    Q  Do you recognize Exhibit 18?
4    A  This looks like an e-mail from myself to
5  Dairian Burke dated Tuesday, January 22nd, 2019,
6  subject, items for the 28th, January 28th agenda.
7    And I list one of seven items that I
8  requested on the agenda.  And it was followed up by
9  a response from her on January 22nd, 2019.
10    Q  I meant to ask you this on Exhibit 17.
11  Sorry about that.
12    A  Go back to it?
13    Q  Yeah, please.
14    Once again, in your request for topics,
15  you're just identifying the topics that you want to
16  discuss.  You are not expressing what your view on
17  any of those topics are; is that true, on Exhibit
18  17?
19    A  That's not true.
20    Q  And which topic are you expressing a
21  position on?
22    A  Oh, I write, I write here that -- Number
23  5. Town of Howey Planning and Zoning Board, ethic
24  violations.  So am I saying here that I believe
25  there is an ethics violation and I have an opinion

46  (Pages 181 to 184)

181

```
1      A  So I just --
2      Q  It's not important to me.  I think what's
3  more important is during the time that Nebel was
4  appointed mayor --
5      A  Okay.
6      Q  -- during that period of time, whenever it
7  was, did he ever prevent you from discussing any
8  issue that you wanted to discuss during council
9  remarks or comments or whatever, whatever name that
10 came under, did he ever prevent you from saying
11 what you wanted to say during that period of time?
12     A  Yes, I believe he did.  I don't have the
13 exact because it's been so long.
14     Q  Okay.  As we sit here today, you don't
15 know one way or the other, you would have to listen
16 to the tapes to determine whether that occurred?
17     A  Or look at my notes, the evidence that I
18 gave you.  I know the one sheet gives you 60 pages.
19 It's like 188 examples of council meetings of when
20 I was --
21     Q  Interrupted and so forth?
22     A  Yeah.
23     Q  Okay.  Then it looks like the response to
24 your requests for topics being placed on the
25 agenda, Nebel denied some of those and he granted
```

182

```
1  some of those; is that true?
2      A  Correct.
3      Q  And then a third category, he stated that
4  there is some additional information that needed to
5  be acquired before that was put on the agenda.
6         Are you reading it the same way?
7  Gathering info from building official?
8      A  Number 6?
9      Q  Yeah.
10     A  So Number 6 on mine is about the -- I
11 think, is the wall collapsing at the new house and
12 that they're gathering info from building, so.
13     Q  Is that an acceptable response, is my
14 question, to research the issue further before it
15 actually goes on the agenda item?
16     A  It's, it's not acceptable for them to put
17 it on.  I guess they will talk about it and let
18 people know what's going on.
19        To me, it looks like he was hiding the
20 fact that they were having problems with the
21 builders in town.  And rather than put it on the
22 agenda and have people show up, he put that
23 response on there.
24     Q  Do you -- Have you reviewed any document
25 or has anybody told you that that was Nebel's
```

183

```
1  concern, or are you just speculating that that's
2  Nebel's concern?
3      A  At that point with this --
4      Q  Yes, sir.
5      A  -- with the time that has passed, is
6  speculating.
7      Q  Yeah.  Then Ms. Burke includes the
8  sentence that says, any items not put on a meeting
9  agenda may always be brought up in council
10 comments.
11        Up to this time frame, did you have any
12 reason to doubt that?
13     A  I can't remember how the December 10th
14 meeting went.  So unless I heard it and said if I
15 was interrupted at that point, I would have doubt
16 in her comment.  But if I wasn't interrupted and I
17 was allowed to speak at that point, then I would
18 say you're correct.
19     Q  At any rate, she's advising you, don't
20 forget about council comments; you can talk about
21 what you want to here.  Do you construe her comment
22 being the same?
23     A  To the -- Yes.
24     Q  All right.  I'm going to hand you what
25 we'll mark as Exhibit 18.
```

184

```
1        (Whereupon, Defendant's Exhibit Number 18
2  was marked for identification.)
3      Q  Do you recognize Exhibit 18?
4      A  This looks like an e-mail from myself to
5  Dairian Burke dated Tuesday, January 22nd, 2019,
6  subject, items for the 28th, January 28th agenda.
7        And I list one of seven items that I
8  requested on the agenda.  And it was followed up by
9  a response from her on January 22nd, 2019.
10     Q  I meant to ask you this on Exhibit 17.
11 Sorry about that.
12     A  Go back to it?
13     Q  Yeah, please.
14        Once again, in your request for topics,
15 you're just identifying the topics that you want to
16 discuss.  You are not expressing what your view on
17 any of those topics are; is that true, on Exhibit
18 17?
19     A  That's not true.
20     Q  And which topic are you expressing a
21 position on?
22     A  Oh, I write, I write here that -- Number
23 5.  Town of Howey Planning and Zoning Board, ethic
24 violations.  So am I saying here that I believe
25 there is an ethics violation and I have an opinion
```

46  (Pages 181 to 184)

197

1  comments on the other, councilmen comments is when
2  they wouldn't allow it to go on the agenda.  This
3  could have been the same situation that I had put
4  next to my notes that it has to go under councilmen
5  comment.
6      **Q  And that's a reminder to you as you're**
7  **getting ready for the meeting to raise those issues**
8  **during councilmen comments?**
9      A  Well, as I did previously, if I put agenda
10 next to it, I can refer to the agenda.  And then I
11 wouldn't have to -- when I come to councilmen
12 comments, I can skip that because it was already
13 brought up during -- It's on the agenda.
14     **Q  Yeah, I'm sorry.  What I mean to -- meant**
15 **to say is, on the notes where it refers to**
16 **councilmen comments, those are, those are topics**
17 **that you knew that you needed to bring up during**
18 **the council report in that section of the public**
19 **meeting?**
20     A  These are, these are areas that I was
21 requesting, or I wanted to bring up during the
22 council meeting.
23     **Q  And you knew that you had to bring them up**
24 **during that section because they were not agenda**
25 **items?**

198

1      **I don't know why that's a difficult**
2  **question.  Why is it difficult?**
3      A  I didn't say it was a difficult question.
4      **Q  But am I correct about that?  You're**
5  **making that, you're making those notes because you**
6  **know you have to bring it up during that period of**
7  **the agenda -- or of the town council meeting?  Is**
8  **that true?**
9      A  It's not true.  Because I didn't put that
10 there because I knew it's the only time I can bring
11 it up.  I could have possibly brought it up other
12 times.  I'm just putting it there probably because
13 during the councilmen business and councilmen
14 comments, that's the time to bring it up.  It's not
15 the only time I'm saying there.
16     **Q  You think you can bring those up at any**
17 **time in the meeting as the meeting was being -- as**
18 **the meeting was proceeding, in your estimation, you**
19 **could just bring the topics that you wanted to talk**
20 **about at any time in the meeting?**
21     A  No.  It depends on if another council
22 member brought it up.  There is times that I put
23 something on there and maybe Councilman MacFarlane
24 brought it up, so I just went right to my notes,
25 'cause it was the same topic, and then I started

199

1  talking about it.
2      **Q  Okay.  I think I understand.**
3      **Would you agree that if it's not on -- if**
4  **it's not a specific agenda item, you can simply**
5  **bring them up while other specific agenda items are**
6  **being discussed; is that true?**
7      A  If it's not -- if they weren't put on the
8  agenda, I was -- I believe as council members we
9  can bring it up during councilmen business,
10 councilmen comments, councilmen items.  That answer
11 your question?
12     **Q  When you use those three headings, does**
13 **that all refer -- Are they synonymous?  Do they all**
14 **refer to the same thing, or they referring to**
15 **different parts of the meeting?**
16     A  It refers to the same thing.  They just
17 change the language on different agendas.  That's
18 why I didn't want to leave one out.
19     **Q  All right.  So I think I understood you**
20 **then.**
21     A  Do you want me to just refer to one from
22 here on out, as long as it refers to all of them,
23 then I can do that.
24     **Q  That is -- Based on your testimony, my**
25 **understanding is that whenever you talk about**

200

1  **councilmen comments or council discussion or**
2  **council reports, all of that means the same thing.**
3  **That's the way I've understood your testimony.**
4      **Is that correct?**
5      A  Yes, sir.
6      **Q  Okay.  Then I'm going to hand you Exhibit**
7  **20.**
8      **(Whereupon, Defendant's Exhibit Number 20**
9  **was marked for identification.)**
10     **Q  And after you've had a minute to review**
11 **that, I have a couple questions for you.**
12     A  So far my second paragraph, and it looks
13 like an e-mail that I sent out or a letter or --
14 I'm not sure exactly if this is an e-mail or a
15 letter.
16     **Q  And Exhibit 20 is a document that you**
17 **drafted?**
18     A  Looks like it is, yeah.  Just reading the
19 first two paragraphs, but I can continue.
20     **Q  The heading says, February 25, 2019 town**
21 **council meeting.  And then underneath that it says,**
22 **Councilman Matthew McGill remarks and comments from**
23 **meeting.**
24     **Can you describe for us what you're**
25 **referring to there when you write that out?**

Matthew McGill  4/4/2023

197

1  comments on the other, councilmen comments is when
2  they wouldn't allow it to go on the agenda. This
3  could have been the same situation that I had put
4  next to my notes that it has to go under councilmen
5  comment.
6      Q  And that's a reminder to you as you're
7  getting ready for the meeting to raise those issues
8  during councilmen comments?
9      A  Well, as I did previously, if I put agenda
10  next to it, I can refer to the agenda. And then I
11  wouldn't have to -- when I come to councilmen
12  comments, I can skip that because it was already
13  brought up during -- It's on the agenda.
14      Q  Yeah, I'm sorry. What I mean to -- meant
15  to say is, on the notes where it refers to
16  councilmen comments, those are, those are topics
17  that you knew that you needed to bring up during
18  the council report in that section of the public
19  meeting?
20      A  These are, these are areas that I was
21  requesting, or I wanted to bring up during the
22  council meeting.
23      Q  And you knew that you had to bring them up
24  during that section because they were not agenda
25  items?

198

1        I don't know why that's a difficult
2  question. Why is it difficult?
3      A  I didn't say it was a difficult question.
4      Q  But am I correct about that? You're
5  making that, you're making those notes because you
6  know you have to bring it up during that period of
7  the agenda -- or of the town council meeting? Is
8  that true?
9      A  It's not true. Because I didn't put that
10  there because I knew it's the only time I can bring
11  it up. I could have possibly brought it up other
12  times. I'm just putting it there probably because
13  during the councilmen business and councilmen
14  comments, that's the time to bring it up. It's not
15  the only time I'm saying there.
16      Q  You think you can bring those up at any
17  time in the meeting as the meeting was being -- as
18  the meeting was proceeding, in your estimation, you
19  could just bring the topics that you wanted to talk
20  about at any time in the meeting?
21      A  No. It depends on if another council
22  member brought it up. There is times that I put
23  something on there and maybe Councilman MacFarlane
24  brought it up, so I just went right to my notes,
25  'cause it was the same topic, and then I started

199

1  talking about it.
2      Q  Okay. I think I understand.
3          Would you agree that if it's not on -- if
4  it's not a specific agenda item, you can simply
5  bring them up while other specific agenda items are
6  being discussed; is that true?
7      A  If it's not -- if they weren't put on the
8  agenda, I was -- I believe as council members we
9  can bring it up during councilmen business,
10  councilmen comments, councilmen items. That answer
11  your question?
12      Q  When you use those three headings, does
13  that all refer -- Are they synonymous? Do they all
14  refer to the same thing, or they referring to
15  different parts of the meeting?
16      A  It refers to the same thing. They just
17  change the language on different agendas. That's
18  why I didn't want to leave one out.
19      Q  All right. So I think I understood you
20  then.
21      A  Do you want me to just refer to one from
22  here on out, as long as it refers to all of them,
23  then I can do that.
24      Q  That is -- Based on your testimony, my
25  understanding is that whenever you talk about

200

1  councilmen comments or council discussion or
2  council reports, all of that means the same thing.
3  That's the way I've understood your testimony.
4        Is that correct?
5      A  Yes, sir.
6      Q  Okay. Then I'm going to hand you Exhibit
7  20.
8          (Whereupon, Defendant's Exhibit Number 20
9  was marked for identification.)
10      Q  And after you've had a minute to review
11  that, I have a couple questions for you.
12      A  So far my second paragraph, and it looks
13  like an e-mail that I sent out or a letter or --
14  I'm not sure exactly if this is an e-mail or a
15  letter.
16      Q  And Exhibit 20 is a document that you
17  drafted?
18      A  Looks like it is, yeah. Just reading the
19  first two paragraphs, but I can continue.
20      Q  The heading says, February 25, 2019 town
21  council meeting. And then underneath that it says,
22  Councilman Matthew McGill remarks and comments from
23  meeting.
24          Can you describe for us what you're
25  referring to there when you write that out?

TURNER REPORTING, INC.
407-497-6070

201

1    A  So, apparently, again it's been a while, a
2  long time since that meeting.  Because of the way
3  the meeting went and, apparently, the way I was
4  treated, I can't comment too much on it without
5  listening to exactly what happened during that
6  meeting.  I drafted this up to have it attached to
7  the meeting minutes.  So the residents knew exactly
8  what -- how I felt, what happened, my opinion on
9  something or whatever it may be.
10       Once again, without listening to the audio
11  from that meeting, I don't know exactly why I
12  drafted this, but I know I wanted it attached to
13  the meeting minutes, which was one of the many
14  things she refused to do and she would attach
15  others for other people.
16    Q  Who is she in that sentence?
17    A  Also -- both Mayor Nebel and Mayor
18  MacFarlane.  At this point it was Mayor Nebel.
19    Q  Do -- Are you able to say whether you
20  actually read these comments into the record during
21  a town council meeting?
22    A  I can't say I did it or I didn't.  But
23  requesting to be attached to town minutes.  Again,
24  without going back and listening, I typically do
25  that.  If they wouldn't allow me to talk, so I want

202

1  it at least on record so everyone can -- whoever
2  reads the town minutes can see this.  And, but I
3  don't know if they allowed me to read it or not.
4    Q  And in this one instance, do you know if
5  Nebel granted your request to attach this to the
6  minutes, or do you know whether that request was
7  denied?
8    A  When I last checked, when I did all my
9  discovery, it wasn't on there.
10    Q  During the -- At the Town of Howey while
11  you served as an elected official, was there a
12  practice for reviewing the minutes from a prior
13  town council and approving those minutes as being
14  accurate?
15    A  Yes.
16    Q  So in a case like this when you requested
17  a document to be attached to the minutes, in the
18  following meeting where the minutes were approved,
19  did you object that the comments were not attached?
20    A  I don't recall at that time if I did.  And
21  if I did, was it at that meeting or the next
22  meeting after that.  I don't know.  Because a lot
23  of --
24    Q  Do you recall ever doing that?
25    A  I can't remember.  Because a lot of times

203

1  the clerk was months and months and months behind
2  of drafting up the minutes.  So I wouldn't see it
3  -- we wouldn't see the minutes for three, four
4  months at a time.
5       As a matter of fact, when I filed the
6  lawsuit, there was still minutes missing when I was
7  a council member, which I provided into evidence.
8    Q  If you drop down to the third paragraph of
9  Exhibit 20.  Just read along with me and make sure
10  that I'm reading this accurately.
11       First critical issue I brought up was the
12  hiring of Police Officer Travis Cavallero.
13       Have I read that accurately?
14    A  Yes.
15    Q  And then it looks like -- I'm summarizing
16  now.  But it looks like you spoke to the chief
17  about that.  You had some concerns about that hire.
18  And it appears that you're investigating that, or
19  you spent some time investigating that issue.
20       Is that a fair, accurate -- is that a fair
21  summary of what's going on?
22    A  I spoke to the chief, that's fair.  As far
23  as me doing an investigation, I don't think I did
24  an investigation.
25    Q  Doesn't that seem to be directly one of

204

1  the things that the mayor was empowered to do, was
2  to question these kinds of decisions as opposed to
3  a council member?
4    A  Well, if she didn't know about it, how
5  would she investigate it?
6    Q  You said she in that sentence.
7    A  I'm sorry.  He.  If he didn't know about
8  it maybe at the time, how would he investigate it?
9    Q  I don't know.  I assume by a council
10  member saying, hey, I have some concerns about the
11  hiring of this officer and his background; can
12  somebody look into that.
13    A  And this appears that's what I did.
14    Q  So you did say that during a council
15  meeting?
16    A  Again, looking at this and bringing it up,
17  it looks like I brought it to the town council
18  attention, specifically the mayor being there at
19  the time, about the hiring of this individual.
20    Q  Well, it also looks like you're doing the
21  mayor's job here from what's being described here.
22    A  Okay.  Can you please point that out?
23    Q  Well, the entire paragraph where you're
24  talking about inquiring of the chief about one of
25  the chief's hires.

Matthew McGill   4/4/2023

209

1  as an example.  He has done that.
2      Did he do it at this particular meeting, I
3  don't recall without reviewing the audio tape.
4      **Q  If I were to go on and ask you about your**
5  **notes that you generated that make reference, even**
6  **to like the February 25 note --**
7      A  This one?  Exhibit 21?
8      **Q  I'm actually referring to Exhibit 19.**
9          **Even in an exhibit like that where you**
10  **say, you say January -- this is your words, January**
11  **28th council meeting, my comments.**
12          **Is your answer always going to be the**
13  **same, that you don't know if you made those**
14  **comments or not, you would have to review the tapes**
15  **in order to know?**
16      A  I would have to review the tape for that.
17      **Q  Okay.  All right.  And that will be true**
18  **in every one of these meetings during the time that**
19  **you were an elected official?**
20      A  When it refers to the notes that you're
21  passing out?
22      **Q  Yes, sir.**
23      A  Without me referring to an audio or
24  anything else, yes, that's correct.
25      **Q  Okay.  Let me hand you Exhibit 22.**

210

1      **(Whereupon, Defendant's Exhibit Number 22**
2  **was marked for identification.)**
3      **Q  This appears to me that you're making**
4  **another request for topics to go onto the agenda;**
5  **is that correct?**
6      A  E-mail from me dated March 20th, 2019, to
7  Dairian Burke, and I cc'd Sydney Stephenson.  And
8  the subject is March 25th agenda items.  So it
9  looks like I'm talking about agenda items here.
10          It looks like an e-mail that I sent out,
11  yes.
12      **Q  Okay.  Who is Sydney Stephenson?**
13      A  She was an employee with the Town of Howey
14  when I first got elected.  She wasn't a deputy
15  clerk.  She, I mean, I don't think we had a deputy
16  clerk.  She might have worked at the water
17  department area, a clerk.
18          But she was an employee with the Town of
19  Howey, and she assisted at times Dairian Burke.
20  For example, if she couldn't attend a meeting, she
21  might fill in the minutes or any other job she
22  might have been responsible for.
23      **Q  Okay.  Let me hand you Exhibit 23.**
24      **(Whereupon, Defendant's Exhibit Number 23**
25  **was marked for identification.)**

211

1      **Q  Do you recognize Exhibit 23?**
2      A  It looks like a copy, a Word copy of an
3  e-mail that I might have sent to Dairian Burke,
4  town clerk, requesting a special meeting, or it's
5  called special session.
6      **Q  Do you recall in the April time frame in**
7  **2019 making a request like that?**
8      A  I remember requesting a special session or
9  special meeting.
10      **Q  What are the circumstance that implicate a**
11  **special meeting or a special session?**
12      A  It could be a number of things.  It could
13  be something that's time sensitive and items for
14  the town that need to be addressed before the next
15  meeting.  Or, it could be, a lot of times items
16  aren't being brought up at all.  And I might
17  request a special session just with myself and the
18  mayor to discuss why the agenda items are not being
19  brought up.  It could be a number of things.
20          So this particular one, I can't remem --
21  unless I read everything off here.  This might have
22  been a request for a special session with myself
23  and Mayor Nebel.  But that doesn't stop any other
24  member, nor the public from attending this.
25          But I want -- I don't -- I know I had a

212

1  special session with Mayor Nebel, and I know he
2  denied one.  And I don't know which one this is
3  looking at this document.
4      **Q  Okay.**
5      A  But I know I did have one with him.
6      **Q  Is a special session between two council**
7  **members, is that noticed to the public and --**
8      A  It is.
9      **Q  -- and advertised and so forth --**
10      A  It is.
11      **Q  -- just like a regular meeting?**
12      A  The public can be there.
13      **Q  Okay.  The meeting that you had with**
14  **Nebel, where did it actually occur?**
15      A  That occurred at town hall.
16      **Q  Is there a particular meeting place or an**
17  **office, or in the conference room where the town**
18  **council meets?**
19      A  I think we had it in the council chambers,
20  because since it's open to the public, you don't
21  know who is going to show up, so you have got to
22  make sure there is enough room.
23      **Q  The meetings are recorded?**
24      A  Yes, sir.
25      **Q  Are minutes kept of meetings?**

TURNER REPORTING, INC.
407-497-6070

213

1     A  They're supposed to be, sir.
2     Q  Do you recall the time that you did meet
3  with Nebel what the two of you discussed?
4     A  Not without going to my notes, no.
5     Q  Let me hand you 24.
6        (Whereupon, Defendant's Exhibit Number 24
7  was marked for identification.)
8     Q  What is that document?
9     A  It's an e-mail from myself dated May 7,
10  2019, to Dairian Burke.  Subject, items for agenda.
11     Q  And does this document reveal your view on
12  any of these topics, or does it just list the
13  topics?
14     A  It appears to just list the topics.
15        MR. NOAH:  So I'm not taking up
16     everybody's time up with this, why don't
17     you all give me an opportunity to take a
18     10-minute break and see if I can read
19     through some of these things.
20        THE VIDEOGRAPHER:  Going off the
21     video record.  The time is 4 p.m.
22        (Whereupon, a recess was had from
23  4:00 p.m. to 4:17 p.m.)
24        THE VIDEOGRAPHER:  We are back on the
25     video record.  The time is 4:17 p.m.

214

1  BY MR. NOAH:
2     Q  Mr. McGill, I'm going to hand you Exhibit
3  25.
4        (Whereupon, Defendant's Exhibit Number 25
5  was marked for identification.)
6     Q  Do you recognize the exhibit that I've
7  sent you -- or that I've given to you?
8     A  Okay.
9     Q  What is the document that I've handed you
10  as Exhibit 25?
11     A  It looks like a -- I don't know if it's an
12  e-mail or a letter to residents.  I don't know if
13  initiate --
14     Q  Is this a document that you drafted?
15     A  Yeah, it looks like one I drafted; yes,
16  sir.
17     Q  Okay.  It's addressed to residents.  Do
18  you know if this letter, this e-mail, actually went
19  out?
20     A  I have no idea.
21     Q  What would refresh your recollection on
22  that?
23     A  I don't know.  I wish it went out.  I
24  don't know if it did.  I --
25     Q  This is a document that we received from

215

1  you.  If --
2     A  Yeah.
3     Q  -- if you don't know, nobody in the world
4  does.
5     A  Unless I sent it out to people that had
6  social media that I didn't have and they ended up
7  posting it and I didn't see it, I don't -- but you
8  can see my intention there to let the residents
9  know that, here is my agenda items for the next
10  council meeting that aren't being posted.
11        But did it actually get out; I don't
12  recall that it ever did or not.
13     Q  If it went out, did you -- Was there any
14  adverse action ever taken against you from any
15  elected town official or from a town employee in
16  response to you sending this out, if it went?
17     A  I never -- I don't recall any action --
18     Q  Adverse action?
19     A  Yes, sir.  -- regarding this.
20     Q  Okay.  So if it went out, you expressed
21  yourself; you told everybody what it is you wanted
22  to talk about at council meetings, and there was no
23  action taken from the town?
24     A  Yeah.  My intention was -- Yeah.
25     Q  With respect -- Was the --

216

1        What was your purpose in sending this
2  document out?
3     A  So the residents of Howey knew the topics
4  that I wanted to talk about during the meeting.
5  Some maybe needed to be voted on, some didn't, that
6  we're being forbidden from being on the agenda.
7     Q  Okay.  Did that provide the town residents
8  with the opportunity to make comment on that during
9  public comment, if they chose to?
10     A  Well, if -- No.  Well, yes, because during
11  public comment they can talk about anything they
12  want for three minutes.
13     Q  Is there anybody that you can think of
14  that would know whether or not they received this
15  document from you?
16     A  Not that I can think of off the top of my
17  head.
18     Q  When you were an elected official for
19  Howey, did you have a address list of constituents
20  that you would write to, either electronically
21  through e-mail, through posting or through the U.S.
22  mails?
23     A  I did not.
24     Q  Did you maintain a Facebook account in
25  your capacity as a elected official at Howey?

221

```
 1  conducting two council meetings, period.  Action
 2  still required.  Continues the violation of
 3  councilman's rights during council meeting, and as
 4  elected officials with their responsibilities and
 5  duties.
 6        Have I read that accurately?
 7     A  Yes, you have.
 8     Q  And is all of that your writing in the
 9  first instance?
10     A  It looks like my writing, correct.
11     Q  And then to your understanding, Mayor
12  MacFarlane responded, this was addressed at the
13  2-10 meeting?
14     A  If she's the blue, that's correct.
15     Q  Okay.
16     A  And then I'm the green.
17     Q  And then the remainder would be you, this
18  is not fully addressed?
19     A  Yes.
20     Q  Okay.  Was the subject discussed at all
21  during the February 10th meeting?
22     A  I don't know if it was discussed at all.
23  But as I put in the green here, this was not fully
24  addressed.
25     Q  Okay.
```

222

```
 1     A  So --
 2     Q  So we would have to listen to the minutes
 3  to know?
 4     A  Correct.
 5     Q  Okay.  And in response to Number 2, if
 6  you're correct about the blue type being Mayor
 7  MacFarlane, she writes -- just read along with me
 8  and make sure I'm reading this accurately.
 9        Please provide copies to the town clerk so
10  the information can be considered and the
11  contraction analysis.  Additionally, the Venezia
12  contract -- contraction will be on the March 9th
13  agenda.
14        Have I read that accurately?
15     A  You did.
16     Q  And is that a reasonable request for Mayor
17  MacFarlane to make that you provide copies and
18  information?
19     A  If she didn't already have it, it would be
20  a reasonable request.  But if you look how I wrote
21  underneath it, it said that she should have
22  received letters from the Venezia, which they
23  advised that they sent to Mayor MacFarlane.
24     Q  Was there -- I don't know if you had this
25  experience while you were at the town, but if --
```

223

```
 1        Did you all have like conditional use
 2  permits, things of that nature, or do you even know
 3  what that is?
 4     A  I'm sorry, sir, I don't know what that is.
 5     Q  When a citizen asks for town action, was
 6  there packets of materials that they had to
 7  provide, such as the application that they were
 8  making, what it is that they wanted?  Maybe there
 9  might be specifications and drawings and things
10  like that, or did you ever have that experience?
11     A  I had no knowledge of that, nor was I
12  involved in that in any way, if it was --
13     Q  Okay.  In general would you consider it a
14  reasonable request for the mayor to ask for
15  documents supporting a particular topic so that it
16  can be disseminated among the council members and
17  the council members can review those in preparation
18  for the discussion, or is that unreasonable?
19     A  No, it's reasonable.
20     Q  All right.  I think in the interest of
21  time, that's all I'm going to ask you about 27.
22        Let me hand you what we'll mark as Exhibit
23  28.
24        (Whereupon, Defendant's Exhibit Number 28
25  was marked for identification.)
```

224

```
 1     Q  So the first question is, once you've
 2  reviewed this, do you recognize Exhibit 28?
 3     A  Looks like my handwriting, the font I use,
 4  and then notes for a special meeting --
 5     Q  Okay.  I did --
 6     A  -- from March 26, 2019.
 7     Q  Is this referring to the special meeting
 8  that you had with Nebel?
 9     A  Again, sir, I don't remember, 'cause there
10  was, remember there was two requests.  One he
11  cancelled and one I got.  And I don't know which
12  one without referring to my -- the evidence which
13  one was canceled, which one wasn't, so.
14     Q  Okay.  I think you also testified that you
15  requested a special meeting with Mayor MacFarlane;
16  is that true?
17     A  I don't remember testifying to that.
18     Q  Did you request a special meeting with
19  Mayor MacFarlane during the time that you were an
20  elected official?
21     A  I could have.  I don't recall, but --
22     Q  Was the -- did you have a special meeting
23  with Mayor MacFarlane?
24     A  I don't remember if I did or not.
25     Q  You don't recall having a special meeting
```

TURNER REPORTING, INC.
407-497-6070

Matthew McGill   4/4/2023

196:2 209:8
**19-09-5275** 138:1
**192** 4:6
**1994** 11:4
**19th** 157:24
160:9 165:1
179:3 218:3
219:10
**1st** 180:15,24

**2**

**2** 1:12 3:10,12
75:21,23 76:4
76:13 78:20,23
115:19 140:16
140:17,18 150:3
150:3 172:1
177:12 187:19
222:5
**2-10** 221:13
**2:37** 165:8,10
**2:57** 165:10
**2:58** 165:12
**20** 4:7 107:7
146:5 170:4
200:7,8,16
203:9
**20-something**
141:13 146:21
**20:43** 160:9
**200** 4:7
**2000** 180:14
**2004-331** 76:17
**2009** 106:5,15,23
**201** 1:18 2:8
**2010** 180:12
**2013-010** 3:13
**2013-10** 115:24
**2014** 29:3
**2015** 11:5
**2016** 29:3,6 30:14
**2017** 17:16 30:21
32:1 48:25
86:11
**2018** 49:6 70:12
70:25 87:17
89:1 107:7,20

120:10 122:14
122:17 123:9
124:13 127:14
127:22 134:9
140:13 141:16
147:1,18 148:10
150:13 151:12
152:14 154:19
155:5,24 156:3
156:4,8 157:8
157:15 158:5
159:1,4,22
164:11 165:1
170:4 174:25
176:17 179:3,10
180:15
**2019** 4:15 32:1
107:18 155:12
157:12 179:25
180:7,15 184:5
184:9 191:16
200:20 210:6
211:7 213:10
224:6
**2020** 17:17 39:3
49:20 52:1,3
70:18 147:18
217:3,7 218:3
219:10,10
229:13,15 230:6
232:14,25
**2023** 1:17 5:15
245:17 246:22
**206** 4:8
**20th** 210:6
219:10
**21** 4:8 205:25
206:1,4 209:7
**210** 4:9,10
**213** 4:11
**214** 4:12 140:20
**217** 4:13
**218** 4:14
**22** 4:9 118:20
209:25 210:1
**223** 4:15

**229** 4:16
**22nd** 184:5,9
191:16
**23** 4:10 117:13
148:10 150:12
151:12 210:23
210:24 211:1
**233** 4:17
**23rd** 106:5 180:7
**24** 4:11 213:5,6
**242** 3:4
**244** 246:11
**245** 3:6
**246** 3:7
**25** 4:12 141:3,11
200:20 209:6
214:3,4,10
**25th** 4:8 206:11
208:18 210:8
**26** 4:13 217:22,23
217:25 224:6
**27** 4:14 218:15,16
218:18 223:21
229:13,15
**27th** 229:11
230:2 232:12,21
232:25 246:22
**28** 4:6,15 223:23
223:24 224:2
**286.0114** 3:15
**28th** 184:6,6
193:19 194:17
196:14 209:11
**29** 4:16 229:5,6,8

**3**

**3** 3:12,13 90:18
90:21 98:4,5,5
115:20 118:15
172:24 188:7
193:2
**3-7-2018** 134:6
**30** 4:17 33:4 94:3
94:10 141:3,12
233:6,7,9
**301** 2:12
**301(g)** 239:12

**32** 122:2
**32801** 2:8,12
**33770** 2:4
**34** 188:9,14

**4**

**4** 1:17 3:14 5:15
73:25 77:15
100:7,9 105:7
148:12,16
213:21 246:11
**4:00** 213:23
**4:17** 213:23,25
**4:54** 244:23,25
**4:55** 1:16
**42** 3:14 100:14,17
100:20,25
106:10 107:3,23
114:16 171:14
**42-10** 171:19
**42-6** 101:8,12,14
106:21,25
114:20
**4471** 193:10
**4472** 193:11
**4473-McGill**
196:6
**4556** 219:14
**48** 106:10
**48-1** 105:14
**4th** 218:2 245:17

**5**

**5** 3:15 68:22
77:11 96:25
105:6,7,22,22
115:11,12,17
116:2,4 148:12
148:16,18,18
150:3 184:23
185:5 186:5
239:17
**5:21-CV-00480...**
1:3

**6**

**6** 3:3,16 4:15

78:15 105:6
116:16,17,22
118:13 182:8,10
**60** 46:17 181:18
**62228** 245:22
**67** 3:11

**7**

**7** 3:18 78:23
119:23,24 120:1
133:7 134:8
141:17,25 142:3
191:8 195:7,21
213:9
**705** 2:3
**72** 191:9
**72-hour** 191:12
**75** 3:12
**7th** 142:14
229:14

**8**

**8** 3:19 74:1
124:25 125:1,4
132:5 139:15
**801** 2:3

**9**

**9** 3:20 73:9 77:15
131:10,11,14
139:15 140:13
141:16
**90** 3:13
**9th** 142:15,16
222:12