247

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION
CASE NO.: 5:21-CV-00480-CEH-PRL

MATTHEW MCGILL, individually,

          Plaintiff,

vs.

MARTHA MACFARLANE, DAVID NEBEL,
and TOWN OF HOWEY-IN-THE-HILLS,
          Defendant.
_____/

          VOLUME 2 OF 2

VIDEOTAPED VIDEO CONFERENCE DEPOSITION OF
               MATTHEW MCGILL

     Examination of a Witness, beginning

at 10:00 A.M. and concluding at 2:17 P.M.

on Monday, May 1, 2023 taken by the

Defendant.  All parties, including the

witness appearing remotely in the State of

Florida, before Roberta Turner, RPR,

FPR-C, CLR, CCR (GA), ACR (NY) Certified

Court Reporter.

---

249

 1             I N D E X
 2 WITNESS
   MATTHEW MCGILL
 3
      Direct Examination by Mr. Noah        253
 4
 5
 6 CERTIFICATE OF OATH                       390
 7 CERTIFICATE OF REPORTER                   391
 8
 9      DEFENDANT'S EXHIBITS MARKED
10 NO. 32  February 4, 2019 Special Session  313
11 NO. 33  April 4, 2019 Special Session     322
12 NO. 34  May 7, 2019 Special Session       325
13 NO. 35  June 3, 2019 Special Session      329
14 NO. 39  June 14, 2019 McGill and MacFarlane
            Meeting                          330
15
   NO. 36  August 28, 2019 McGill and Scott
16          Meeting                          336
17 NO. 37  September 20, 2019 Special Session 341
18 NO. 38  February 14, 2020 McGill and Scott
            Meeting                          343
19
   NO. 41  April 27, 2020 Town Hall Meeting  347
20
   NO. 46  Medical Records                   367
21
   NO. 47  Video Clip                        375
22
23
   NOTE:  Defendant's Exhibits 41 and 47 were retained
24          by Defense Counsel.
25

---

248

 1 APPEARANCES:
 2      The Goodwin Firm
        ANDREW J. SILVERS, ESQ.
 3      andrew@goodwin-firm.com
        801 W. Bay Drive, Suite 705
 4      Largo, Florida  33770
 5          On behalf of the Plaintiff;
 6
        Dean, Ringers, Morgan & Lawton, P.A.
 7      DOUGLAS T. NOAH, ESQ.
        dnoah@drml-law.com
 8      201 E. Pine Street, Suite 1200
        Orlando, Florida  32801
 9
         and
10
        Gray Robinson
11      THOMAS J. WILKES, ESQ
        tom.wilkes@gray-robinson.com
12      301 E. Pine Street, Suite 1400
        Orlando, Florida  32801
13
            On behalf of the Defendants.
14
15
   ALSO PRESENT:  GEORGE OTALVARO, VIDEOGRAPHER;
16         MARTHA MacFarlane, MAYOR,
           Howey-In-The-Hills;
17         Jillian Sotomayor, Paralegal
18
19
20
21
22
23
24
25

---

250

 1      THE VIDEOGRAPHER:  Good morning.  We
 2 are now on the video record.
 3      Participants should be aware that
 4 this proceedings is being recorded, and as
 5 such, all conversations held will be
 6 recorded unless there is a request and an
 7 agreement to go off the record.
 8      Private conversations and/or
 9 attorney-client interactions should be
10 held outside the presence of the remote
11 interface.
12      This is the continued remote video-
13 recorded deposition of Matthew McGill
14 being taken by the counsel for the
15 Defendant.
16      Today is Monday, May 1, 2023.  The
17 time is now 10:07 a.m.
18      We are here in the matter of
19 Matthew McGill versus Martha MacFarlane,
20 David Nebel, and the Town of Howey-In-The-
21 Hills.
22      My name is George Otalvaro.  I am the
23 remote video technician on behalf of
24 Turner Reporting.
25      At this time, will the reporter,

Matthew McGill   5/1/2023

259

1  my only question here, is I want to make sure
2  during your first deposition you've told -- you've
3  talked all about these things that you want to talk
4  about.
5      And the first thing is that you stated
6  that you were retaliated against by being prevented
7  from speaking and/or petitioning the government for
8  redress as you described to a prior interrogatory.
9  So I understand that one.  We're going to talk
10  about that one today or complete that today.
11     A  Okay.  So I'm a little confused because
12  you first started by saying that I answered
13  everything the way I wanted to, and I don't
14  remember saying that.  But I understand that
15  comment you just said.
16     Q  All right.  I'm not asking you to tell me
17  everything about that right now, because I'm going
18  -- I have questions about that today.  We're going
19  to go there, okay?
20         The next thing was that you were
21  retaliated against by an interference from the
22  police town chief into the permitting of your fence
23  resulting from much scorn from town citizens, up to
24  the point of a petition being against your legal
25  fence being started.

260

1          Is there anything else about that incident
2  that you want to augment or tell me about that we
3  did not talk about in your prior deposition?
4      A  Not that I can think of without listening
5  to the first part of the deposition.  I know we
6  talked about it.  And at the time when they put me
7  in violation, the chief of police and the code
8  enforcement and the town building official all
9  believed at that time that my fence was legal, that
10  it was put up legal, it met the requirements,
11  and -- but they were going to still put me in
12  violation because of the pressure from the town,
13  the garden club.  Certain council members' friends
14  started petitions that they didn't like the fence.
15         So at that time when the fence was
16  erected, the chief of police, Larry Chester and Ron
17  Von Frank -- Von Frankenstein all believed at that
18  time that the fence was legal and it should have
19  been signed off on.
20     Q  In that answer that you just gave, was it
21  your intent to change any of your sworn testimony
22  from your prior deposition?
23     A  Not without listening to the audio.  I'm
24  going to reserve that right.
25     Q  Your answer says something about resulting

261

1  in much scorn from town citizens.
2         Can you tell me about that, please.
3      A  Well, the one, the petition we talked
4  about, the fact that they got it -- gathered a
5  bunch of people, I believe I was told, I don't
6  remember from who, from -- starting with the garden
7  club and Councilman Conroy's wife started turning
8  the residents against me saying, you know, pointing
9  out the fence, how it was ugly, it was unsafe, it
10  was a hazard, which was all found to be untrue,
11  based on the building inspector
12  Ron Von Frankenstein.  And that's when it started
13  turning the people against me and the slandering
14  and harassment.
15     Q  Can you describe the scorn that you
16  observe from the town citizens?  How did that
17  manifest?
18     A  At the town council meetings, a lot of the
19  garden club members, Martha MacFarlane supporters,
20  David Nebel's supporters yelling out inappropriate
21  comments at council meetings, spreading lies about
22  me, things of that nature.  Just a couple things I
23  could think of off the top of my head.  I know I
24  listed more in my evidence that I provided to the
25  attorneys.  But I -- just off the top of my head,

262

1  just a couple things I can think of.
2      Q  Did the scorn have to do with the
3  appearance and the safety of your fence?
4      A  I don't know exactly if that pinpointed
5  that's where it stemmed from.  It could have been
6  part of it, one part of many things, though I'm not
7  sure if that's exactly it or solo.
8      Q  Enumerate the lies that were told about
9  you that you just referred to in your prior answer.
10     A  Well, they started saying that I wanted to
11  get rid of the police department, which is a
12  complete lie.  They said that I wanted to become --
13  Oh, this is before this, before being a council
14  member.  But it leads up to that I wanted to be
15  mayor.  McGill was a troublemaker.  He's causing
16  problems in town, because of the fence he put up.
17         All from people that I found that were
18  supporters of Mr. Conroy, Martha MacFarlane,
19  David Nebel.  Again, there's just a few.  There's
20  many more that I provided in my evidence.
21     Q  I do recall talking about that.
22         What about the final item there that says
23  the -- as part of the retaliation, the town
24  supported a recall election against you.  Is
25  that --

TURNER REPORTING, INC.
407-497-6070

Matthew McGill   5/1/2023

275

1  in that recording?
2      A  At the last part of that recording, yes.
3      Q  And was the issue that you were addressing
4  the golf cart crossing update?
5      A  Yes.  But, again, I don't know exactly
6  what I said without listening to it.  But in the
7  beginning I started addressing the issue.
8      Q  Then the next issue that you wanted to
9  raise in your minutes or in your meeting notes was
10  new street lights.
11      MR. NOAH:  I'm going to refer
12  everybody to one hour, nine minutes and 27
13  seconds.  One hour, eight minutes, 39
14  seconds is as close as I can get, so it
15  will take a minute to get there.
16      (Whereupon, an audiotape was played.)
17      Q  In the portion of the recording that I
18  just played you, and we're up to one hour, nine
19  minutes and 46 seconds.
20      Did you recognize any voices in that
21  recording?
22      A  Mr. -- from the beginning -- Well, the
23  beginning was Mr. Conroy.  And then it was Dairian,
24  and now it's David Nebel.
25      Q  And what topic is Nebel introducing during

276

1  the last portion of that recording?
2      A  Street lights.
3      Q  All right.
4      A  I'm not sure if it was on an agenda item
5  or it wasn't.
6      Q  Were you able to present your thoughts on
7  street lights at that meeting?
8      A  I don't remember unless I listen to it.
9      (Whereupon, an audiotape was played.)
10      Q  In the last portion of that recording, did
11  you recognize that voice that made a reference to
12  people starting to paint them?
13      A  Yes.  You stopped it as I just started
14  saying people started to paint them.
15      Q  And that was your voice?
16      A  I believe so.
17      Q  Now that you hear that, do you have a
18  recollection that you were able to talk on that
19  topic during this meeting?
20      A  I was able to talk.  I don't know to what
21  extent, but I was able to talk about it, that's
22  correct.
23      Q  Then the fifth item that you wanted to
24  talk about in your notes is -- has to do with
25  liaisons.  I'm going to refer you to 41 minutes and

277

1  36 seconds.  The closest I can get is 41 minutes
2  and 11 seconds, so it will take a second to get
3  there.
4      (Whereupon, an audiotape was played.)
5      Q  Did you recognize the voice that says,
6  that said something along the lines that, I
7  requested the liaison?
8      A  I -- it was all muffled as I was trying to
9  listen to it.  He was talking and, I believe,
10  that's -- I said something right after that, and I
11  just couldn't hear it.
12      (Whereupon, an audiotape was played.)
13      Q  Okay.  Did you hear that reference to the
14  liaison based on your -- on the person's history as
15  a police officer.  Did you hear that portion?
16      A  That's correct, sir, I did hear it.
17      Q  Whose voice was that?
18      A  It was mine, sir.
19      Q  And does that refresh your recollection
20  that you had an opportunity to speak on that
21  subject at that meeting?
22      A  To a certain extent, yes, that's correct.
23      And also it's important to note, you're
24  bringing up these items, there's a lot of times
25  that council members submitted their items to be on

278

1  the agenda, and a lot of the council members put
2  the same items.  So either the golf cart crossing
3  or the lights, two council members could have put
4  the same thing as a request.  So you don't know who
5  is it put it -- whose it was put under, what name,
6  or the intent on putting it in.  I think it is
7  important to know that.
8      Q  Why is it important to know who requested
9  the agenda item to determine whether or not you
10  were able to speak on it?
11      A  Because throughout the couple of years I
12  was there, and a lot of times they wouldn't put my
13  stuff on the agenda.  If myself and another council
14  member pick the same item, it magically appeared
15  because the other council member also requested it.
16      I'm saying that, because a lot of times if
17  it wasn't two council members putting the same
18  item, it was just me, it would be left off.
19      Q  Not to --
20      A  That's why I think it's important to
21  mention that.
22      Q  I feel, perhaps, like I'm quibbling with
23  you, Mr. McGill.  But the point that I'm making is
24  there are things that you want to talk about and
25  they come -- they either come up or you bring them

TURNER REPORTING, INC.
407-497-6070

Matthew McGill  5/1/2023

279

1  up and you talk about them in the meetings.  Isn't
2  that true?
3      A  There's times they allow me to talk about
4  them, that's correct.  And there's times they
5  wouldn't allow me.
6      Q  Mr. McGill, we're at Exhibit 6 again.
7          Are you able to see that on your screen?
8      A  Exhibit 6, yeah, Section 19, correct.
9      Q  Well, it's Question 19.  The exhibit is --
10     A  Question 19, I'm sorry.
11     Q  I'm going to scroll to Question 15.
12         Are you able to see Question 15 on Exhibit
13  6?
14     A  Number 15 where it starts out by saying,
15  has anything been paid or is anything payable?
16     Q  I'm sorry.  I wanted to refer you to 16
17  actually.  Page 6.
18     A  16 says, do you allege that the town, that
19  starts like that?
20     Q  Yes, sir.
21     A  Uh-huh, I see it.
22     Q  On this interrogatory did you understand
23  that I was asking you of all the times when you
24  were prevented from engaging in free expression,
25  did you understand that when you answered this?

280

1      A  When I answered it the first deposition,
2  the first date?
3      Q  No.  When you answered these questions,
4  when you signed this document.
5      A  Would I believe my answer is, is the way I
6  understood the question?  Or is it accurate?  I'm
7  not sure of the question, sir.
8      Q  When you signed this document, did you
9  understand that the town was asking you for each
10  time that you believe that you were prevented from
11  engaging in free expression?  Did you understand
12  that when you signed it?
13     A  Yeah.  I think I indicated that because
14  down below I indicated that I didn't get all the
15  evidence, but whatever I had, I could provide.  But
16  there's other stuff I couldn't provide.
17     Q  And were your answers accurate at the time
18  that you signed this document?
19     A  They weren't complete because I didn't
20  have all the evidence.  But what I knew at that
21  time, that's correct.
22     Q  And did you understand that you were
23  signing these under oath?
24     A  No.  But I accept that.
25     Q  I just wanted to go through a couple of

281

1  the incidents that you talked about as preventing
2  from -- being prevented from expressing speech.
3          The first one I'm going to refer you to is
4  January 14, 2019.  And just take a few minutes and
5  review that and then I will have a couple questions
6  about it.
7      A  Okay.  I read it.
8      Q  In paragraph Number 2 to your answer for
9  that particular date, you quote David Nebel as
10  stating, I'm going to shut this meeting down
11  because you are becoming a pain in the ass, end
12  quote.
13         Is -- did Nebel in fact shut the meeting
14  down at that point?
15     A  Did he shut it down?  He stopped it at
16  that point.
17     Q  Did the meeting continue and go through
18  its completion until adjournment?
19     A  I believe it did.
20     Q  So that was a threat but he did not carry
21  through with that threat; is that true?
22     A  That is correct.
23     Q  And the second prevention that you talk
24  about is, you're quoting David Nebel once again
25  stating, I'm cutting you off because people are

282

1  tired of hearing from you.  Then Nebel said, we
2  will all sit here while you run your mouth.
3          Have I read that accurately?
4      A  I believe so too, yes.
5      Q  When he, when he made the statement, we
6  will all sit here while you run your mouth, did you
7  go on to respond and continue talking about
8  whatever it was you were discussing at that point?
9      A  I don't remember.
10     Q  Does that suggest to you that he did not
11  cut you off?
12     A  Does that second line where you're
13  circling, we will all sit here --
14     Q  Yes?
15     A  -- while you run your mouth, is that what
16  you're referring to?
17     Q  That is what I'm referring to.  That's
18  what you -- To me, not to be argumentative, it
19  suggests to me that he agreed to sit there while
20  you continued to talk.
21     A  Okay.  If I talked after that, if I was
22  able to say everything I wanted to say, I don't
23  recall unless I listen to it, or I look at the
24  evidence I presented -- prevented -- presented, I'm
25  sorry.

9 (Pages 279 to 282)

283

1    **Q  Do you recall saying anything after that?**
2    A  I don't remember unless I listen to it,
3  sir.
4    **Q  The next answer I'm going to refer you to**
5  **is March 25, 2019 on -- as a, as being prevented**
6  **from talking you cite, Nebel said to plaintiff, and**
7  **then it's a quote, be quiet; this town has been**
8  **functioning well without you, end quote.**
9        **Up to that point, have I read it**
10  **accurately?**
11    A  Yes.  Can you hold on one second?  My
12  computer screen just went almost dark.  Let me plug
13  in my computer.  My battery is going low.  I
14  apologize.
15    **Q  It's all right.**
16        **Do you recall whether or not you responded**
17  **or said anything further after he made that**
18  **statement?**
19    A  I don't remember, sir.
20    **Q  The second thing that you listed for that**
21  **date as being prevented to speak is Nebel allowed**
22  **verbal abuse from audience.**
23        **How did that prevent you from saying**
24  **whatever you wanted to say?**
25    A  How did it prevent me?

284

1    **Q  Yes, sir.**
2    A  Well, when the person that is running the
3  meeting is supposed to control the meeting and he's
4  allowing the audience to verbally abuse me,
5  continue to interrupt me, and to a point that it's
6  creating an atmosphere that's toxic to not only the
7  council meeting, but to the town, it's hard to
8  continue.
9        But to be, to be more accurate than that,
10  that answer, I'd have to actually listen to it to
11  exactly see what I was saying at the time and the
12  topics I wanted to talk about on March 25, 2019, to
13  see, as far as what I was able to say and what not
14  to say.
15    **Q  Well, it looks to me like -- Well, let me**
16  **ask you, not assume anything.**
17        **When you look at the March 25, 2019**
18  **reference, Paragraph Number 1 under that has a**
19  **number 18:30.**
20        **What does that number refer to?**
21    A  I think it's 18 minutes and 30 seconds
22  into the meeting.  And that's the recording that I
23  had.  So it's approximate.  It would be around
24  that.  It's not exact.
25    **Q  And that suggests to me that when you**

285

1  **filled out these interrogatory answers, you were**
2  **actually listening to the tape in order to -- or to**
3  **the recording, excuse me, to be able to quote the**
4  **speakers; is that true?**
5    A  That's not correct.
6    **Q  And how is it incorrect?**
7    A  Because you're saying I listened to the
8  audio at the time I filled this out.  This could
9  have been already listened to a while ago, already
10  in my notes as evidence submitted to the attorney.
11  I could have just referred to that.  So I might not
12  have been listening to the audio at the time I
13  filled this out.  I could have been referring to
14  notes I took, as far as what they did to me.  And I
15  guess, like I said, the evidence that I provided to
16  the attorneys, so that that would be a little more
17  accurate.
18    **Q  At any rate, at one point during this**
19  **litigation, you listened to these recordings in**
20  **order to provide that information either to us or**
21  **to your attorney; is that correct?**
22    A  That's correct.
23    **Q  And yet as we sit here after listening to**
24  **it, and as part of this litigation, you can't tell**
25  **us whether or not you spoke after Nebel made that**

286

1  **comment?**
2    A  Two, three years later and after all the
3  meetings, it's hard to remember everything he said
4  at every meeting unless I listen to it.
5    **Q  Let me make this distinction in your mind.**
6  **When you say that the verbal abuse from the**
7  **audience made it difficult to talk, are you saying**
8  **that you were unable to talk because of the**
9  **interference from the audience, or are you saying**
10  **that you could continue to talk, it was just**
11  **difficult for you to continue?**
12    A  Without listening to it, it could have
13  been both ways.  And as I said previously, it also
14  could have been because the meeting was getting so
15  out of control and the mayor wasn't controlling the
16  audience, it just -- it wasn't -- I don't want to
17  say safe, but it wasn't -- it was very difficult to
18  continue.
19    **Q  I'm going to refer you to the -- Actually,**
20  **I'm going to come back to that one.**
21        **The September -- the reference to the**
22  **September 23, 2019 town council meeting, just read**
23  **through that and refresh your recollection on those**
24  **events, and I have a couple questions about those**
25  **as well.**

10 (Pages 283 to 286)

Matthew McGill   5/1/2023

291

1   allow him to speak.  And she still wouldn't allow
2   me to speak.
3       Q   Did Mayor MacFarlane ever threaten to
4   eject you from a meeting if you insisted on
5   speaking?
6       A   I don't recall if she did or not.  I'd
7   have to listen to the audios.
8       Q   Are you saying that that's something
9   that's significant enough to you that if she said
10  words like that to you, you'd probably recall it?
11      A   Not necessarily.  But she could have done
12  it.  I just don't recall.
13      Q   Do you have any notes or journal entries
14  that reflect that she ever made any comment
15  remotely similar to that?
16      A   If I do, and if I did, I do, it was
17  submitted into evidence.  And there is a lot of
18  stuff, that e-mails going back and forth, that I
19  couldn't submit into evidence because Mayor
20  MacFarlane took my e-mail access away.  So I lost
21  all that evidence.
22          So there might be evidence out there that
23  was taken away from me that could prove that, but
24  if I do have evidence on my own, that was submitted
25  into -- to my attorney, which was given to the town

292

1   attorneys.
2       Q   When you say that you have submitted
3   evidence, is that what you mean, that you've given
4   documents and statements and notes to your
5   attorney?  Is that what that means?
6       A   Yes.  During the time to give all my
7   discovery in evidence, that's what I'm referring to
8   as numerous documents, USB, the audio recordings,
9   all that.
10      Q   Did Mayor MacFarlane ever threaten you
11  that she would have law enforcement, town law
12  enforcement remove you from a public meeting if you
13  didn't stop talking?
14      A   She could have, but I don't recall exactly
15  if she did or not.
16      Q   Do you think that that's important enough
17  to you that you might recall it, if that was said
18  to you?
19      A   It's an important statement, but it's not
20  -- it's been two or three years, four years, so --
21  and it's a lot of evidence to remember, so, again,
22  she could have.  I don't recall.
23      Q   Assuming for a moment that she never made
24  statements like that to you, how does Mayor
25  MacFarlane, actually, stop you from talking?  Even

293

1   when she tells you, you don't have the floor or
2   yield, why is it that you are forced to stop
3   talking?  I'm still trying to get my mind wrapped
4   around that.
5       A   Well, when I'm trying to talk, she will
6   talk over me.  She will talk louder.  She will hit
7   the gavel.  She will get her people in the audience
8   all riled up, start making inappropriate comments
9   when I continue to try to talk, to the point that I
10  can't talk.  So that's one example.
11      Q   Are there any other examples?
12      A   There could be.  If it is, it's in my
13  evidence.  Again, it's been three or four years,
14  two, three, four years.
15      Q   And is this an accurate statement.  As we
16  sit here today, the only manner in which you can
17  currently recall that Mayor MacFarlane ever stopped
18  you from talking was by either talking over you or
19  failing to maintain audience control?  Is that
20  accurate?
21      A   As of what I can remember as of this time,
22  without referring to my notes or evidence?  Is that
23  -- is that accurate?
24      Q   I'm sorry.  Is that an answer to my
25  question?

294

1       A   Yeah, yeah.  I just want to clarify what
2   you're asking.
3       Q   This is what I'm asking you.  I will ask
4   you, if you --
5       A   Thank you, sir.
6       Q   You did exactly the right thing.  If you
7   don't understand, ask me to repeat it.
8           As we sit here today, based on the very
9   best --
10      A   Sorry.  I lost you.
11          THE COURT REPORTER:  You went out,
12  Mr. Noah.
13          You're having a drill right now.
14          THE WITNESS:  You can't make this up.
15          MR. NOAH:  We gotta stop.  I'm sorry.
16          THE VIDEOGRAPHER:  Going off the
17  video record.  The time is 11:22 a.m.
18          (Whereupon, a recess was had from
19  11:22 a.m. to 11:39 a.m.)
20          THE VIDEOGRAPHER:  We are back on the
21  video record.  The time is 11:39 a.m.
22  BY MR. NOAH:
23      Q   Mr. McGill, did Mayor Nebel ever threaten
24  to have you ejected from one of the public
25  meetings?

TURNER REPORTING, INC.
407-497-6070

Matthew McGill  5/1/2023

315

1     A  I had a meeting with Mr. Nebel.  I don't
2  know if this is the one or was another one.  But I
3  did have a meeting with him.  So if there's an
4  audio, which there should be, attached to this
5  particular meeting, I think that will answer it.  I
6  just don't remember if it was February 4th.
7     **Q  I'm going to show you your interrogatory**
8  **answers again.  And I'm specifically on page 10.**
9     **You make a reference in your answers of**
10  **times you were restricted from speaking to a**
11  **February 4tth special session meeting with**
12  **Mayor Nebel.**
13     **Do you see that?**
14     A  Yes, I do.
15     **Q  Does that refresh your recollection that**
16  **the meeting did, in fact, occur?**
17     A  Again, I remember a meeting occurring.  I
18  did sit down with him.  So if that is the
19  particular date and the audio supports that date,
20  then I agree.
21     **Q  So the meeting you had in mind, who**
22  **actually attended the meeting?**
23     A  Everybody, as far as audience, council
24  members, and town employees, I can't remember,
25  because it was how many years ago, three or four

316

1  years ago.  I -- obviously, me and Mr. Nebel.  And
2  typically when we have a special session, the town
3  clerk is there to attend take notes and audio
4  record the meeting.
5     If there was town residents there, I
6  couldn't remember because it was so long ago.  And
7  we wouldn't document that.  Typically document that
8  in the minutes when they write them out.  So I'm
9  pretty sure it was me, Nebel.  And if there wasn't
10  a town clerk, in her absence, her assistant.  And
11  her assistant at that time is either Stephanie
12  something or Rebecca Eller.
13     **Q  Who requested this meeting?**
14     A  I believe I did.
15     **Q  What was your purpose in requesting this**
16  **meeting?**
17     A  Because the meetings were getting out of
18  control.  The behavior of Mr. Nebel towards me at
19  the council meetings, the abusive behavior,
20  allowing the crowds to get out of control, to go
21  over things that I think he was in violation of or
22  the town was in violation of.  I thought it would
23  be a good idea to have a one-on-one meeting --
24  well, whoever wanted to attend, but it would be
25  under a different atmosphere that he wouldn't act

317

1  up as he did at the other meetings.  Again, abusive
2  behavior towards me, interrupting me, letting the
3  audience abuse me.
4     That was my thinking when I had this
5  special session with Mr. Nebel.  And, actually, if
6  I recall, it worked because he was a different
7  person during that meeting.
8     **Q  Bear with me for a minute.**
9     **Going back to the Exhibit 32.  Do you**
10  **understand that this is a notice that went to the**
11  **public advertising the meeting that you were going**
12  **to have with Mayor Nebel?**
13     A  It's a document that's drafted letting
14  people know that we have a meeting.  How they
15  advertised it, I think they listed on their web
16  page, which at times they forget, they wouldn't
17  advertise it, they wouldn't put it on.
18     And as my evidence that I submitted, I,
19  actually, submitted copies of their web page where
20  they just left dates blank.  They didn't put the
21  meeting minutes in or they forget to put the notice
22  in.  So this is a document drafted to let people
23  know that there's a meeting going on, on this date.
24     **Q  All right.  And under new business, it**
25  **looks like it -- Well, just read along with me and**

318

1  **make sure I'm reading this accurately.**
2     **Councilor McGill meeting with Mayor Nebel**
3  **to discuss town business.**
4     **Have I read that accurately?**
5     A  Yes, you did.
6     **Q  And that was the extent of the agenda that**
7  **was published to the public, or that was noticed to**
8  **the public?**
9     A  If that's the official document, yeah.  I
10  mean, I had agenda items, obviously, that are not
11  on there.  But if that is the official document
12  that was given to the public, you're correct.
13     **Q  Well, isn't -- to discuss town business,**
14  **isn't that a broad enough topic to include anything**
15  **that you wanted to discuss during that meeting?**
16     A  You should put topic items, town-specific
17  items on there so the people know exactly what
18  you're talking about.  Because there are certain
19  items that people might want to go to the meeting
20  and listen to.  And there are certain items that
21  people might say, you know what, I'm not interested
22  in that, I'm not going to attend that meeting.
23     So it's -- that isn't fair to the public
24  or anybody else who wants to attend council
25  meetings to see if it's worth their while to attend

TURNER REPORTING, INC.
407-497-6070

Matthew McGill   5/1/2023

---

319

1  that particular meeting.
2      Q  Perhaps I wasn't clear.  I did not intend
3  to ask you a normative question.
4      A  Okay.
5      Q  I meant to ask you a descriptive question.
6  And the descriptive question is, isn't that new
7  business category broad enough to encompass any
8  number of town business topics that you might want
9  to have discussed?  Isn't that true?
10     A  It could be -- it just says discuss town
11  business, so, yeah.
12     Q  So when you had the meeting with Nebel,
13  what you were requesting was a -- was communication
14  with him to discuss the things that you have now
15  told us about; is that right?
16     A  Well, again, I think there's an e-mail
17  between me and Dairian Burke as to the exact topics
18  I wanted to talk about, which should have been
19  listed on there.  So to me that notice was
20  unacceptable, unacceptable for the public and
21  unacceptable for other council members.
22     Q  I'm off of the notice now.  Just trying to
23  understand from your perspective what you're trying
24  to achieve.  And I think what you told me -- I'm
25  just trying to get on the same page with you,

---

320

1  Mr. McGill, to get on to the next set of questions.
2      A  Sure.
3      Q  What you told me was that you wanted an
4  audience with Mayor Nebel to discuss issues that
5  you were having with him where you felt
6  disrespected and cut off, and you wanted to talk
7  about that and other town items directly with him;
8  isn't that what you testified to?  Isn't that what
9  you wanted to do?
10     A  Yeah.  I testified that I wanted in a
11  different atmosphere than a regular town council
12  meeting, that's correct.
13     Q  Now, so you mentioned that both you and
14  Mayor Nebel appeared at this meeting.  Did any
15  other council members appear at this meeting?
16     A  I think I answered that.  I don't recall.
17  I do recall, again, myself, Mr. Nebel, and it could
18  have been Dairian Burke or one of her assistants
19  taking the notes or recording the meeting.
20     Q  When council members choose to appear at
21  these meetings, do they appear in their capacity as
22  a council member or as an audience member?
23     A  With my past experience, I've had them
24  both ways.
25     Q  Okay.  Did anybody in the -- Did any of

---

321

1  the public attend this meeting, other than you and
2  Mr. Nebel, and other council members?
3      A  I have answered it twice, and I will
4  answer a third time.  What I recall is me and
5  Mr. Nebel, and I believe Dairian Burke or her
6  assistant was there to record it.  Anybody else,
7  being two, three, four years ago, I can't recall if
8  another council member was there or someone was in
9  the audience.
10     Q  Okay.
11     A  But the audio should help with that
12  because the audience -- if there is someone in the
13  audience, they still have the right to make a
14  public comment.  So if you referred to that audio
15  of that meeting, that might answer your question.
16     Q  And forgive me, I didn't realize that you
17  were limiting your answer that way.  I get you now.
18  I understand.
19         You mentioned that following this meeting
20  you felt like it was effective because Mayor Nebel
21  treated you differently after that.
22     A  No.  I didn't say that.  I said the
23  meeting I thought was -- he acted different during
24  that meeting.  He said he would change.  He said he
25  would look into certain things of my concerns.  He

---

322

1  said it during that meeting.
2         But during the next meeting, the following
3  meetings, he went back to the way he was.
4      Q  Were you able to air with Mayor Nebel all
5  the things you wanted to discuss with him that led
6  you to request this meeting?
7      A  I'm not sure if I was able to air all of
8  it.  We talked about a lot of items.  I don't know
9  if I talked about all the ones I wanted to talk
10  about.
11     Q  Did he prevent you from talking anything
12  you wanted to discuss at this meeting?
13     A  I don't recall him preventing me either
14  way.
15        (Whereupon, Defendant's Exhibit Number 33
16  was marked for identification.)
17     Q  Mr. McGill, I'm showing you what we will
18  attach as Exhibit 33 to your deposition.  I'm just
19  going to scroll down.  And now that you've seen
20  it --
21        MR. NOAH:  Roberta, when you're doing
22     the documents, it's at 5866-McGill is
23     where this document is located.
24     Q  Do you recognize the document that I'm
25  showing you?

TURNER REPORTING, INC.
407-497-6070

Matthew McGill 5/1/2023

323

1    A  Yeah.  It looks like an official town
2  document when they put notice to the town, to the
3  citizens and elected officials, that there is an
4  upcoming meeting in the town.
5    Q  All right.  So is it true that this is a
6  notice to the public of another town council
7  special session that was to occur on April 4, 2019?
8    A  It reflects that, that's correct.
9    Q  Okay.  When you -- Who requested this
10  special session?
11    A  I don't remember.
12    Q  As you look at the topics to be discussed,
13  does it suggest to you who requested the meeting?
14    A  Well, looking at the first two,
15  Martha MacFarlane and myself both talked about.
16  That, so it could have been either one of us.
17       District elections.  District elections,
18  that could have been any of the council members.
19       Briefing of budget schedule/process of new
20  council.  I -- that doesn't -- Other than the body
21  cameras, I can't confirm who it was.
22    Q  What is it about the body cameras that's
23  significant to you?  Who do you think requested
24  that?
25    A  I talked about them in the past, I

324

1  believe, or after this.  But I talked about the
2  policy that was required the police department to
3  have prior to using the body camera.  So that's why
4  it's familiar to me.
5       And I believe, actually, Councilman Scott
6  talked about it as well.  That's why it's so open
7  to right at this point, unless you listen to the
8  audio, who actually called it.  Because usually
9  during these meetings when they call it a special
10  session, they give a date.  I believe that they --
11  the town clerk says, the special session was called
12  by such and such council member.  And it starts
13  from there.
14       So I think it would help, if not only we
15  had the audio to listen to this to see who called
16  for it, but also if you go to the town website
17  they're supposed to have the transcribed minutes to
18  what occurred during that meeting; not verbatim,
19  but supposed to be, I think, 80 percent of what was
20  said.  And that would be helpful if that was
21  document -- that document was provided with this
22  today.
23       But I know if you looked in my evidence,
24  the town was reckless with that.  They just -- they
25  either didn't do the minutes or it took 'em a year

325

1  to finish them at times.  So I know there's a lot
2  of blank dates that it wasn't available.
3    Q  To the best of your recollection today, do
4  you know which council members actually attended
5  this meeting?
6    A  I have no idea, sir.
7    Q  To the best of your recollection today, do
8  you recall whether any -- whether the audience
9  included anyone other than an elected official or
10  employee of the town?
11    A  I have no idea, sir.
12    Q  Were you prevented from saying anything
13  that you wanted to say at this special session?
14    A  Without listening to the audio to see if I
15  was there and what I talked about, I can't answer
16  that.  It was too long ago.
17       (Whereupon, Defendant's Exhibit Number 34
18  was marked for identification.)
19    Q  Mr. McGill, I'm showing you what we are
20  going to mark as exhibit -- or attach as Exhibit 34
21  to your deposition.  It's located at 5867-McGill.
22       Do you recognize the document that I'm
23  showing you now?
24    A  It looks like a Howey official document
25  notifying the public and council members of a

326

1  council meeting.
2    Q  So it's another notice or another town
3  council special session to occur on May 7th, 2019?
4    A  That's what it says.  That's correct.
5    Q  And as you look at the new business, do
6  you recall who it was that requested this
7  particular special session?
8    A  No, sir.
9    Q  Was discussions and actions toward town
10  personnel, was that a topic that you were
11  interested in?
12    A  It does fall in line with some of the
13  concerns and problems that were occurring in the
14  town that I discussed in the past.  So if that was
15  exactly me, I'm not sure.
16    Q  Is it a topic that you wanted to be heard
17  on?
18    A  Again, there was concerns with personnel
19  in the past that I needed to bring up.  So it could
20  be, yes, that's correct.
21    Q  Did this meeting on May 7th, 2019,
22  actually occur?
23    A  I am not sure because several of them were
24  cancelled last minute.  Some were cancelled that
25  same day, within hours of the meeting occurring,

20  (Pages 323 to 326)

331

1    A  Doesn't say special meeting up top, like
2  the other ones did.  So it's been so long, I can't
3  remember if that was a -- what kind of meeting it
4  was.
5        They were just so inconsistent with these
6  documents when they printed out the agenda with the
7  order of business and the way they labeled stuff.
8  It was just par for the course with the town.  They
9  were just so inconsistent.
10       Q  Returning to your interrogatory answers,
11  you make a reference -- On Exhibit 39 the notice
12  reads, Councilor McGill and Mayor Pro Tem
13  MacFarlane meeting.
14       Seeing that description, does that have
15  any significance to you as to whether or not this
16  was a special session between the two of you,
17  versus a regularly scheduled council meeting?
18       A  It possibly leans that way.  As I said,
19  again, they were so inconsistent the way they fill
20  out this document.  But if you look at it, it
21  doesn't say town council meeting.  But it doesn't
22  say special meeting either.  So it leans more
23  towards a special session between myself and Mayor
24  Pro Tem MacFarlane.
25       Q  And did the special session occur between

332

1  you and Mayor MacFarlane?
2    A  Again, looking at the notes, I don't know
3  if it did or not.
4       Q  Do you recall at any time during your
5  tenure as a council member having a special session
6  with Mayor MacFarlane?
7    A  I already commented on that, yes, when you
8  brought the first one up.
9       Q  When you had the special session with
10  Mayor MacFarlane, do you remember who showed --
11  whether or not any council member showed up to that
12  meeting?
13    A  Are we talking about the June 14 notice
14  here?
15       Q  Yes.
16    A  I don't know -- I don't recall if it even
17  happened or not.  I would have to refer to the
18  audio and the evidence notes.
19       Q  Then let me just rely on your
20  recollection.  For whatever special session meeting
21  you recall having with Mayor MacFarlane, do you
22  recall any council member showing up to that
23  meeting, other than the two of you?
24    A  I don't recall.  But the audio will
25  reflect who was there.

333

1    Q  Do you recall whether any residents, other
2  than elected officials or employees of the town
3  showed up?
4    A  I don't recall.  But, again, the audio
5  will reflect because we always -- we're supposed to
6  give room for public comment.  And it doesn't mean
7  that there was someone there because it is a public
8  comment.  Someone might not just spoke.  So, I
9  mean, there could have been audience, so -- but
10  that would help if you had the audio.
11       Q  With respect to the special session you
12  recall having with Mayor MacFarlane, why did you
13  want to talk to her?
14    A  It was so long ago, I -- one thing stands
15  out I remember talking to her about.  And it was
16  the issues with the Chief Herbert Thomas and all
17  his violations, ordinance violations, policy
18  violations, harassment against town employees and
19  residents.  I know that was one of the things I
20  brought up in a meeting with Martha MacFarlane.
21       Other things, without going through my
22  notes or listening to audio, I couldn't be accurate
23  with it.
24    Q  Did you express those things about the
25  chief to Mayor MacFarlane during the meeting?

334

1    A  During the special session?
2    Q  Yes, sir.
3    A  I believe I did, yes.
4    Q  And were you prevented from saying
5  anything about that subject that you wanted to say?
6    A  Without listening to the audio, I can't --
7  I don't know.
8    Q  Who would have prevented you from saying
9  anything that you wanted to say at a meeting like
10  that?
11    A  Well, the mayor, either Nebel or
12  MacFarlane.  Whoever runs the mayor, they run the
13  mayor -- they run the meeting.  Sorry.  Those
14  mayors run the meeting.
15       So they can prevent me from saying
16  anything.  If the chief of police attended and felt
17  the need to abuse his power and force me in some
18  way or another just to not talk about something, he
19  could.  I'm not saying that he did.
20       I'm just answering your question who was
21  able to do that.  But that's just a couple off the
22  top of my head.
23    Q  And the way the mayor would do that is, as
24  you testified before, by interrupting you and --
25  well, just that, interrupting you?  That's how she

Matthew McGill   5/1/2023

339

1  **Scott?**
2     A  Yes, sir.
3     **Q  Which other council members came?**
4     A  As indicated in this document you're
5  showing me here, Martha MacFarlane.
6     **Q  Do you know whether any councilor, other**
7  **than the three of you were present at this meeting?**
8     A  I believe it was us three, because she
9  didn't come to the council table.  It was just
10  Councilman Scott and I.  And she --
11     **Q  In that circumstance, who was chairing the**
12  **meeting?**
13     A  Whoever called for it at the time.  Again,
14  the audio would reflect that.
15     **Q  So that would it either be you or Council**
16  **Member Scott were the chair of this meeting?**
17     A  That's correct.  And when Mayor MacFarlane
18  showed up, we offered her to join the meeting as an
19  elected official to run it, and she denied several
20  times.
21     **Q  Right.  So she was participating as a --**
22  **in her capacity as an audience -- as an audience**
23  **member, in her capacity as a resident of the town?**
24     A  No.  The way she acted, she was acting in
25  her capacity of mayor pro tem.  But I think it was,

340

1  at that point, the interim mayor.  Because I think
2  Mayor Nebel was stepping down or was ill.  And I
3  think they made her -- I know there is a difference
4  between mayor pro tem and -- I think it's called
5  interim major, which she is pretty much the mayor
6  at that point.
7        So she wasn't acting in the capacity as a
8  resident in the audience, she was acting as the
9  mayor, but just sitting in the audience.
10     **Q  And since it was either you or Scott**
11  **chairing the meeting, how did you prevent you**
12  **from talking on this occasion?**
13     A  Continuously interrupted; told me I
14  couldn't speak on certain items as listed in there.
15  Saying I couldn't look at the audience when I
16  spoke.  I couldn't interact with the audience when
17  I spoke.  And, like, again, it's just so much
18  during that meeting, it's all on the audio.
19     **Q  Despite those interruptions, were you and**
20  **Council Member Scott able to have the discussion**
21  **that you wanted to have?**
22     A  We could not have the discussion we wanted
23  to have in its entirety.
24     **Q  For the reasons that you just said?**
25     A  Because she was continuously interrupted

341

1  me and wouldn't allow us to speak.
2        I don't want to say us.  I want to retract
3  that, because I'm not gonna speak for Councilman
4  Scott.  It was me.
5     **Q  Was anyone present at this special session**
6  **with Council Member Scott that was not an elected**
7  **official or employee of the town?**
8     A  You talking about people in the audience,
9  sir?
10     **Q  Yes.**
11     A  There was people in the audience.
12        (Whereupon, Defendant's Exhibit Number 37
13  was marked for identification.)
14     **Q  Showing you what we'll attach as Exhibit**
15  **37 to your deposition.  It's found at page 5870.**
16        **Do you recognize the document I'm showing**
17  **you now?**
18     A  Looks like an official document indicating
19  a town special meeting, town council special
20  meeting, and for September 20th.
21     **Q  Of 2019?**
22     A  2019.  And new business -- Councilman
23  McGill requesting to discuss the following items.
24  Based on that sentence right there, it looks like
25  it was a meeting that I requested.  And looking at

342

1  the items, it looks like it was a special budget
2  meeting, not a special session or a special -- or a
3  council meeting.  It looks, based on the topics, it
4  looks like it's a budget meeting.
5     **Q  Were these issues that you wanted to talk**
6  **about?**
7     A  There were issues.  They look familiar,
8  yes.
9     **Q  Did the meeting actually occur?**
10     A  Well, legislative account is a little -- I
11  don't remember that.  But the police department
12  account and then the other one, it looks familiar.
13  Did it actually occur?  Again, I'd have to refer to
14  the evidence and the audio.
15        There are several meetings that I made
16  requests for special sessions or special meeting
17  that were denied.  And I don't know if this is one
18  of them.
19     **Q  Do you recall what the topics, what the**
20  **topics were that you wanted to discuss in a special**
21  **meeting, that the meeting -- the request was**
22  **denied?**
23     A  For this particular meeting?
24     **Q  No.  Now I'm asking a general question.**
25     A  Okay.

24 (Pages 339 to 342)

351

1  five council members supposed to be there, I'm
2  there but I'm muted and they take a vote, it will
3  say four-zero; rather it should say five-zero, if I
4  voted yes or four-one, or whatever it may be.  So
5  it reflects the fact that they know I was muted
6  because they didn't put me in the tally for the
7  vote.
8       I don't know if this is the particular
9  meeting that happened, but it has happened.
10      Q  So on page 3 of this transcript there is a
11  reference to motion passes three to one.  Is that
12  what you're referring to?
13      A  If this, if this -- If there was five
14  people there, yes, that would be what I was
15  referring to.
16      Q  Yeah.
17      A  I just don't know the particular meeting.
18  I have to, again I have to listen to audio, look at
19  the notes and to see if that -- actually all five
20  of us were there.  And then, yeah, that would be
21  accurate to what I said.
22      Q  Let me try again.
23      A  Okay.
24      Q  I'm trying to tie this transcript to the
25  complaint that you reported in your interrogatory

352

1  answers.  And in the interrogatory answers my
2  recollection is that you said that you were muted,
3  so you weren't present, you didn't indicate your
4  presence during roll call.  And then when the
5  minutes were sought to be approved, you were not
6  included in the vote.  And that's what I understood
7  that you -- those are two of the things that you
8  were complaining about in your interrogatory
9  answers.
10      Am I right up to that point?
11      A  If that's what my notes say; yes, sir.
12      Q  And then with respect to this transcript,
13  is it consistent with those complaints?  That's all
14  I am asking.
15      A  Again, sir, I'm looking at this, and I
16  just see what you're showing me; Councilman Scott,
17  no.  Town clerk, motion passes three to one.  It
18  doesn't say what we're voting on.
19      You're being specific by saying the agenda
20  minutes.  So what are we -- there we go.
21      Q  There is the meeting minutes, Mr. McGill.
22      A  Okay.  Thank you.  That wasn't showing on
23  the screen.  Thank you.
24      Q  This question -- And then there is a --
25      Is this consistent with your complaints

353

1  or --
2      A  If this is -- If we're voting on the
3  agenda items, I'm sorry, the previous agenda items
4  and approving the minutes, then yes.
5      Q  Now at the same meeting, now I'm going to
6  refer you down to page 12 of the document.
7      Do you recall that you had made a request
8  for council reports and council comments?
9      Does that square with your recollection of
10  this meeting?
11      A  No, sir.
12      Q  When you look down at what this transcript
13  says transpired, do you recall any of this
14  occurring at this meeting where you raise the issue
15  about not being able to vote on the agenda minutes
16  and that you would have voted against it?
17      A  It sounds familiar.  But without listening
18  to the audio, which is accurate, I can't confirm.
19  But it sounds familiar, yes.
20      Q  Do you have any specific rec -- Do you
21  have any recollection that during the Zoom
22  conference meeting where you did not get to vote on
23  the approval of the minutes, that in that meeting
24  you had the opportunity to say that you objected to
25  the minutes and you would have voted against them?

354

1      Do you recall that?
2      A  That is such a specific question, it was
3  so long ago, I can't remember if that both occurred
4  at the same meeting.  Again, it would say in my
5  evidence and the audio recordings.
6      Q  One of the complaints that I recall
7  reading in your lawsuit were that your personal
8  information was disclosed on the internet in July,
9  2018 and not removed until November, 2018.
10      Is that a complaint that you're making in
11  this lawsuit?
12      A  If it's listed in my lawsuit, I believe it
13  is a complaint that I'm making.
14      Q  What was the personal information that was
15  disclosed?
16      A  I believe, again, a long time ago.  I
17  think it was 2018 or '19 -- '18, that when I filled
18  out an application to be on the planning and
19  zoning, we talked about during the first deposition
20  is where they illegally rejected me, they posted my
21  application online with my personal information,
22  driver's license, date of birth -- or maybe not
23  date of birth -- just personal information.  I
24  don't know the exact personal information.
25      But when I brought it to the town clerk's

27 (Pages 351 to 354)

Matthew McGill   5/1/2023

**58** 273:18 274:22
**5866-McGill**
  322:22
**5867-McGill**
  325:21
**5868** 329:10
**5869** 336:13
**5870** 341:15
**5871** 343:9
**5872** 330:17
**5890** 368:1
**59** 270:13
**5981** 368:25

**6**
**6** 257:1,16 258:3
  279:6,8,13,17
**6053** 368:2
**62228** 390:22

**7**
**7** 249:12 327:8
  328:15
**705** 248:3
**7th** 326:3,21
  327:4,24

**8**
**8** 300:22 375:4
**8-18-2020** 369:10
**80** 324:19
**801** 248:3
**80s** 375:17

**9**
**9** 307:3 309:9
  310:6 379:8
**90s** 375:17,18