# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

MATTHEW T MCGILL,

     Plaintiff,

v.                                          Case No: 5:21-cv-480-CEH-PRL

MARTHA MACFARLANE, DAVID
NEBEL and TOWN OF HOWEY-IN-
THE-HILLS, FLORIDA,

     Defendants.

_____

## ORDER

This cause comes before the Court on the Motions for Summary Judgment of Defendants Town of Howey-in-the-Hills, Florida ("Howey") (Doc. 34) and Martha MacFarlane and David Nebel (Doc. 35). Plaintiff Matthew T. McGill has responded in opposition (Docs. 49, 50), and Defendants have replied (Docs. 51, 52).

Plaintiff alleges that the Town, through MacFarlane and Nebel, violated his First Amendment rights by restricting his ability to raise issues at town council meetings in various ways, and then retaliated against him for exercising his First Amendment rights by working to have him recalled and further suppressing his speech. Defendants move for summary judgment on all counts. Docs. 34, 35.

Having considered the motions, the responses in opposition, the replies, and the parties' Joint Stipulation of Material Facts, and being fully advised in their premises, the Court will grant MacFarlane and Nebel's motion for summary judgment as to

Counts III, IV, V, and VI, and grant-in-part and deny-in-part Howey-in-the-Hills'
motion for summary judgment as to Counts I and II.

## I.    FACTS[1]

Plaintiff Matthew McGill served as a member of the Howey-in-the-Hills town
council from December 2018 until losing his position in a recall election in August
2020. Doc. 46 at 3. Defendant David Nebel was Howey's mayor from December 2018
to September 2019, at which time Defendant Martha MacFarlane became mayor.
Doc. 46 at 2. MacFarlane also presided over some meetings in Nebel's absence during
the summer of 2019. Doc. 34-27 at 7/22/19, 8/12/19, 9/11/19.[2]

During his tenure on the town council, McGill was openly critical of town
officials, the mayors, and the police chief. *See generally* Doc. 34-27. On August 20,
2020, he and two other Howey residents or former residents filed a lawsuit against
Howey, the mayors, and two other Howey officials. *Alimenti et al. v. Town of Howey-in-
the-Hills, Florida*, *et al.*, No. 5:20-cv-386-CEH-PRL, Dkt. No. 1. They alleged that their
First Amendment rights were violated in various ways after they expressed criticism
of the town or its officials. *Id.* After the Court granted the defendants' motion to sever,[3]

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on
the parties' submissions, including declarations and exhibits, as well as the parties' Joint
Stipulation of Material Facts (Doc. 46). For purposes of summary judgment, the Court
considers the facts in the light most favorable to the non-moving party as required by Fed. R.
Civ. P. 56.

[2] Doc. 34-27 contains the audio recordings of town council meetings from 2018-2020. The
remainder of this Order will cite the recordings only by date and time stamp.

[3] Bernard Alimenti was the remaining plaintiff in the originally-filed action. On March 22,
2023, the Court granted the defendant's motion for summary judgment as to both counts of

McGill filed the instant action against Howey, Nebel, and MacFarlane on September 23, 2021. Doc. 1.

In Count I of the Amended Complaint, McGill alleges that Howey violated his First Amendment right to free speech by silencing him when he attempted to speak at town council meetings, preventing him from speaking at all or for the same length of time as other council members who were not critical of the town, muting him during meetings that were held via Zoom, and preventing him from speaking free from ridicule and interruption. Doc. 6 ¶¶ 76-91.  In his response in opposition to the motion for summary judgment, he also alleges his speech was suppressed by the mayors' refusal to place his proposed agenda items on the council meeting agenda, denial of his requests for special meetings, and refusal to attach his requested documents to the meeting minutes. *See* Doc. 49 at 1-2, 5.   In Counts III and V, he alleges that Mayors MacFarlane and Nebel, respectively, violated his right to free speech in the same manner. Doc. 6 ¶¶ 103-113, 120-131.  McGill's second cause of action alleges that the Defendants retaliated against him for exercising his First Amendment rights, by suppressing his speech, ridiculing and defaming him, and by improperly assisting the effort to recall him. Doc. 6 ¶¶ 93-101 (Count II against Howey), 115-119 (Count IV against MacFarlane), 133-136 (Count VI against Nebel); Doc. 49 at 2.

---

the complaint. *See id.* at Dkt. No. 108; *Alimenti v. Town of Howey-in-the-Hills, Florida*, No. 5:20-cv-386, 2023 WL 2598662 (M.D. Fla. March 22, 2023).

A. <u>Structure of Town Government</u>

The Howey town council consists of five elected members vested with all legislative powers of the town, who hold public meetings approximately twice per month. Doc. 34-6 § 42-1; Doc. 34-25 § 2.  The town's mayor, a member of the town council who is appointed by a majority vote of council members, presides over the town council. Doc. 46 at 2; Doc. 34-25 § 3.  The mayor is the town's chief executive officer and official spokesperson. *Id.*  She is responsible for: calling special meetings of the town council; establishing the agenda for town council meetings; investigating the condition of the town and its department and offices; directing and supervising the administration of all town departments, offices, and agencies; making recommendations to the town council concerning the town's affairs; and hiring, appointing, suspending, or removing all town employees. *Id.*  With respect to the latter category, the hiring, appointment, suspension, or removal of executive officers of the town is subject to the approval of the town council. *Id.*

Town council members are subject to Florida's Sunshine Law, which requires public business of any public body of a municipality to be transacted or discussed in a forum that is open and noticed to the public. Fla. Const. Art. 1, sec. 24(b).[4]  McGill's declaration states his belief that the council was not permitted to vote on any item that

---

[4] *See also* Fla. Stat. § 286.011(1); *Town of Palm Beach v. Gardison*, 296 So.2d 473, 477 (Fla. 1974) (the Sunshine Law's purpose is "to prevent at non-public meetings the crystallization of secret decisions to a point just short of ceremonial acceptance"); *Sarasota Citizens for Responsible Gov't v. City of Sarasota*, 48 So.3d 755, 762 (Fla. 2010) (the Sunshine Law was enacted "to protect the public from 'closed door' politics" and must be broadly construed "so as to frustrate all evasive devices.") (quotations omitted).

was not included on the agenda pursuant to the Sunshine Law. Doc. 4-1 ¶ 20.  The town attorney informed him at a meeting that this was "best practice but…not a legal requirement." 9/23/19 at 1:23:30-1:24:10.

### B. Allegations of Speech Prevention

Although the mayor is responsible for establishing the agenda for council meetings, Doc. 34-25 § 3(e)(7), both mayors permitted council members to submit requests for topics to be placed on the meeting agendas. Doc. 46 at 5.  Throughout his time as a council member, McGill routinely submitted a list of topics that he wanted to be added to the agenda in advance of a council meeting. Doc. 49-1 at 12-39.  His requested topics were rarely approved for inclusion on the agenda, with little if any explanation as to why. Doc. 49-1 ¶¶ 16-24.

No written rules determined whether a council member's proposed agenda item was selected for the agenda.  The mayors deny that they turned down McGill's requested agenda topics because of his identity or anticipated viewpoint. Doc. 34-1 ¶ 16; Doc. 34-2 ¶ 7.  Using identical language, both mayors state that they denied his requests for agenda topics that were within the mayor's authority rather than the town council's authority, had previously been considered and resolved by either the town council or the mayor, or were deferred to a future agenda due to the need for more information. *Id.* ¶¶ 5-6; Doc. 34-1 ¶¶ 14-15.

The town charter also gives the mayor the ability to call "special meetings of the town council," while an ordinance states that the town council itself may call a "special session" to handle "emergency business." Doc. 34-25 § 3(e)(6); Doc. 34-6 § 42-2.

McGill made regular requests to the mayor to hold special meetings during his time on the council.  He was granted six special meetings in 2019 and 2020. Doc. 46 at 5-6.  His declaration attests that he requested other special meetings that were either denied or cancelled. Doc. 49-1 ¶¶ 37-40.  McGill stated at a town council meeting that his requests for two special meetings about the budget were denied. 9/23/19 at 43:30.  At another council meeting, Mayor Nebel stated that he had cancelled McGill's requested special meeting "[b]ecause I can." *Id.* ¶ 39; 3/25/19 at 00:48:30.  The record does not contain further information about the topics of McGill's requested meetings or any reason that was provided for the denial or cancellation.  The record also does not contain information about other councilors' requests for special meetings, except for McGill's statement that "other Councilmembers' requests for special sessions were granted." Doc. 49-1 ¶ 40.

McGill also states that he "repeatedly" requested to have documents attached to town council meetings, but never received permission. *Id.* ¶ 25.  On one unidentified occasion, he requested to attach two pages of "town business items that needed to be discussed" to the meeting minutes after he was not permitted to speak about them, but the request was denied. *Id.* ¶ 27.  At another meeting, however, the police chief's wife read a statement out loud and was permitted to attach her letter to the meeting minutes. *Id.* ¶ 28.[5]  McGill identified a special meeting on May 7, 2019, as another

---

[5] McGill does not identify the meeting at which this occurred.  The recording of the March 25, 2019 meeting demonstrates that the police chief's wife read a statement during the public comment period, but it does not contain an indication that she requested the statement be attached to the meeting minutes. 3/25/19 at 3:18:00-3:26:38.

example of a time he was not permitted to attach something to the meeting minutes. *Id.* ¶ 26.  At this meeting, McGill was discussing a list of complaints against Mayor Nebel that he had prepared and given to MacFarlane. *See id.*; 5/7/19.  MacFarlane told him he could not read out a different list of allegations against the police chief for the council to vote on them because Mayor Nebel and the town attorney were not present—a limitation with which McGill agreed. *Id.* at 31:00-35:00.[6]  When McGill asked for his list of complaints against Nebel to be posted to the town website, MacFarlane responded that it was not appropriate to do so because some of the allegations were personal and needed to be reviewed by the town attorney, but that she would make it available to any member of the public who requested it. *Id.* at 45:30-46:30.

### C. <u>Allegations of Speech Suppression During Council Meetings</u>

McGill's practice was to discuss topics that were rejected as agenda items during a segment of the general council meetings in which council members were permitted to make comments. *See* Doc. 46 at 5.  During Mayor Nebel's tenure, McGill was expressly informed that he could do so. Doc. 49-1 at 13.  In contrast, Mayor MacFarlane initially instituted a rule in which council members were only permitted to comment about agenda items. 9/23/19 at 40:05; 10/14/19 at 1:13:00, 1:17:45-1:19-00.  MacFarlane enforced this rule on September 23, 2019, by preventing McGill from speaking about a controversial letter that was distributed at the meeting by a private

---

[6] McGill read out his list of allegations against the police chief at a subsequent council meeting on August 12, 2019. 8/12/19 at 27:30 – 1:15:30.

citizen, but later allowed him to speak about other topics that were not on the agenda. 9/23/19 at 40:05-43:00. MacFarlane enforced the rule again at the October 14, 2019 meeting, preventing McGill from speaking about several topics that she had not allowed on the agenda. 10/14/19 at 1:17:45, 1:13:00-1:35:40. However, MacFarlane no longer enforced or mentioned the rule after the October 14 meeting.

McGill was not prevented from speaking during his councilor comments in the meetings over which Mayor Nebel presided. *See* 12/10/18; 2/25/19; 4/8/19; 4/22/19b; 6/10/19. There were two occasions when Nebel threatened to cut him off but did not. At the meetings on January 14, 2019, and March 25, 2019, Nebel and McGill engaged in acrimonious exchanges in which Nebel expressed an intent to stop McGill from speaking. On January 14, 2019, McGill was speaking at length regarding what he characterized as ethical violations, breaches of town law, and other improprieties he had observed town officials and Chief Thomas committing. *See* 1/14/19 at B00:00 *et seq.* At various times, Nebel stated, "Look, I'm about to shut this meeting down because you're becoming a pain in the ass," "I am cutting you off because I think everybody's getting tired of listening to you," and "All right, I'll sit here and listen to you while you're running your mouth." *Id.* at B06:00 *et seq.* However, McGill was ultimately permitted to finish his statements. *Id.* at B16:15. On March 25, 2019, during another heated exchange, Nebel told him to "be quiet," and stated, "[t]his town's been functioning very well for a long time without you." 3/25/19 at 18:30:00 *et seq.*.  Nebel then told McGill that he was out of time, and when McGill said there was no time limit that applied to him, Nebel stated "Okay, then we'll all just

take a nap." *Id.*  Again, despite Nebel's remarks, McGill was permitted to finish his councilor comments.[7]

MacFarlane began presiding at meetings during the summer of 2019.  McGill was not interrupted or stopped from speaking at all during his councilor comments in the meetings on July 22, 2019, August 12, 2019, October 28, 2019, March 9, 2020, July 13, 2020, or July 27, 2020.  Although McGill alleges he was prevented from speaking about a police department audit at the November 19, 2019 meeting, Doc. 49-1 at 61, the recording demonstrates that MacFarlane interrupted his comments on this topic only to interject responses, but did not prevent him from speaking. 11/19/19 at 1:43:30 *et seq.*  In fact, at the end of his councilor comments she reminded him about a topic he had included on his list but had not yet brought up. *Id.*  And on June 8, 2020, MacFarlane told McGill his comment was finished over his objection, but later allowed him to complete the comment without interruption. 6/8/20 at 30:00.

There were also several meetings in which MacFarlane directed McGill to move on to a different topic after he had an opportunity to speak, because she asserted that his comment was becoming repetitive or that the topic was resolved because the person

---

[7] After MacFarlane became Howey's mayor, there were several occasions when Nebel made unprofessional remarks during McGill's comments, usually when McGill's comments constituted personal attacks on Nebel. 12/9/19 at 1:17:00 ("Up yours"); 6/8/20 at 1:37:45 (stating that in his ten years of experience on the town council, "from time to time there have been one or two dodos" on the council that "we had to sit there and wait for them to get the hell out of town."); 7/27/20 at 15:30 (calling McGill a "dummy")  Nebel also walked out of several council meetings during McGill's comments, *see* 12/9/19 at 1:17:30, and on one occasion he unsuccessfully moved to adjourn the meeting when McGill's comments became especially heated. 2/24/20 at 1:00:00.

it was directed to had responded or she had taken all the action on it that she intended to take. *See* 12/9/19 at 1:14:00 (MacFarlane: "If you have an issue, and I address it, then you're done." McGill: "So you're stopping me from talking about it? I'm not being repetitive." MacFarlane: "Yes, I'm stopping you from talking about it because you're being repetitive."); 2/10/20 at 36:40 *et seq.* (MacFarlane: "Those were administrative functions and we have closed those items.  Do you have a next item you want to move on to?"); 2/24/20 at 52:30 – 57:30 (during an argument between McGill and the town attorney, MacFarlane: "Please go on to your next item, he's answered your question"; after responding to a different item, MacFarlane: "I've answered this question, please move on to the next item."); 8/10/20 at 1:20:00 (after McGill stated his opinion that an action the council was going to take was illegal, the town attorney responded, and McGill repeated his disagreement with the town attorney's advice, MacFarlane stopped him from speaking further and proceeded with the meeting).  Similarly, MacFarlane stopped McGill from speaking on May 11, 2020, before a very controversial council vote to terminate the town clerk's employment; after permitting McGill to speak on the topic for more than twelve minutes, she stated "We're moving on to public comment because you've had your opportunity to have your say." 5/11/20 at 1:28:30 - 1:42:00.  An argument then ensued between McGill, the town clerk, and two other council members, and MacFarlane again called for public comment while speaking over McGill. *Id.* at 1:46:00.  After the public comment period, McGill said he still had not finished his comment, and he added about thirty

seconds of remarks in the same vein as his previous comment before MacFarlane cut him off and held the vote. *Id.* at 2:08:00.

There were two meetings in which MacFarlane entirely prevented McGill from speaking about an issue.  As noted *supra*, on September 23, 2019, MacFarlane stopped McGill from talking about a letter that was distributed at the meeting by a private citizen. 9/23/19 at 40:05 *et seq.*  Although she then permitted him to speak about all the topics on his proposed agenda list, he was still not allowed to address the letter. *Id.* Second, at the October 14, 2019 meeting, MacFarlane prohibited McGill from addressing several topics. 10/14/23 at 1:12:45 – 1:35:45.  The prohibited items included: 1) the same letter, which MacFarlane stated could not be brought up officially because it was not town business and addressing it would infringe on the First Amendment rights of its author; 2) a special meeting in which McGill said MacFarlane had repeatedly interrupted McGill and another council member, which MacFarlane said McGill had already addressed at two previous meetings and was not on the agenda; and 3) a topic called "holding residents accountable," because MacFarlane said it was inappropriate to call out individual residents in councilor comments. *Id.*  MacFarlane also stopped McGill from elaborating on a topic about which he had already emailed her—police interactions with residents of a particular neighborhood—because she was investigating it and had all the information she needed; from going into detail about the possibility of the county sheriff's department taking over the Howey police, because she needed more information before deciding whether it could go on the agenda and it had not been included on his agenda request

11

email; and from continuing to speak on a topic about which she stated he had already made his point. *Id.*

McGill also attests in his declaration that Mayor MacFarlane intentionally muted him during the council meetings that were held via Zoom during the COVID-19 pandemic. Doc. 49-1 ¶¶ 46-50.  Although McGill describes a message he received informing him "that only the host (MacFarlane) could unmute me," the supporting screenshot he cites was not submitted to this Court. *See id.* ¶ 47.  He states that he tried to call MacFarlane to tell her to unmute him, but his calls went unanswered "and the vast majority of the time, I remained muted and unable to speak." *Id.* ¶ 49.  For her part, MacFarlane's declaration denies that she "ever muted Matthew McGill to prevent him from making public comment during public meetings," but states that technical difficulties occasionally occurred. Doc 34-1 ¶ 23.

The recordings of the May 11, 2020 and June 8, 2020 town council meetings contain many comments by McGill throughout the meetings, without any audible indications that he was being or had been muted. 5/11/20, 6/8/20.  McGill reports two specific occasions of muting during the May 11 meeting, but neither is supported by the recording. Doc. 49-1 at 63.  First, he states that he was muted for about 15 minutes after an interaction at approximately 1:47:25. *Id.*  However, McGill made an audible comment after that interaction, at about 1:50:00. 5/11/20.  McGill also states he was muted at approximately 2:22:00. Doc. 49-1 at 63.  But at this point on the recording McGill can be heard repeating, "Mayor MacFarlane" to try to get her attention while she ran through a list of updates. 5/11/20.  There are no audible

indications that McGill was or had been muted during the June 8, 2020, July 13, 2020, July 27, 2020, or August 10, 2020 Zoom meetings.[8]

### D. Allegations of Retaliation

McGill alleges that the restrictions placed on his speech in connection with town council meetings constituted retaliation against him based on his speech. Doc. 49 at 17.  In addition, he asserts that MacFarlane illegally interfered with and became involved with the recall election against him. *Id.*  McGill cites Fla. Stat. § 100.361 to contend that only the town clerk, rather than the mayor or any elected official, has statutory responsibilities in the recall process. Doc. 49-1 § 56.  Howey's town clerk was Dairian Burke until her termination on or about May 11, 2020. *See* 5/11/23.  Mayor MacFarlane then took on some clerical duties in the summer of 2020 until a new town clerk was hired. *See* Doc. 34-1 ¶ 27; 6/8/2020 at 1:19:00 (MacFarlane states that she "hopes to extricate" herself from town hall by the end of July).

McGill was the subject of two petitions to request his recall prior to the vote itself. Doc. 46 at 10.  Both were filed by a private citizen named David Miles. *Id.*  The first petition, filed on December 19, 2019, was found to be legally insufficient to establish statutory grounds for recall. *Id.*; Doc. 37-1 at 1.[9]  The second petition, dated

---

[8] The recording of the June 22, 2020 meeting indicates that McGill was unable to join the meeting due to technical difficulties.  MacFarlane attempted to assist McGill in joining the meeting several times, including attempting to call him on her cell phone so that he could participate through speakerphone, but was unsuccessful.  McGill does not appear to assert that his inability to join the meeting was due to any intentional actions by Howey officials.

[9] The first petition included an allegation against McGill that involved the cost of fees for the town attorney, based on a report MacFarlane commissioned in late 2019. *See* Doc. 37-1. McGill's declaration alleges that an independent audit demonstrated the fee report was

April 18, 2020, was upheld as legally sufficient. *Id.* at 94-105; Doc. 46 at 10-11.   The recall vote occurred in August 2020. *Id.* at 10.

McGill first alleges that MacFarlane "forced" Burke "to proceed forward when the recall committee submitted false information." Doc. 49-1 ¶ 58.   "According to Ms. Burke, and Mayor MacFarlane herself," he next alleges, "MacFarlane ordered other employees with the Town to perform the clerk's duties with the recall process; personally went to the Supervisor of Elections office regarding the recall process to discuss same with the Supervisor of Elections; personally went to the court to obtain an election date for the recall against me; and personally supervised the verification of signature on the petition." *Id.* ¶ 59.   McGill contends that these actions occurred during Burke's employment. *Id.* ¶ 60.   Further, he asserts that MacFarlane knowingly and unlawfully failed to complete a Proclamation for the Special Recall Election to prevent McGill's supporters from knowing how to keep him in office. *Id.* ¶¶ 62-65.   Although he alleges that the information came from Burke and MacFarlane, McGill does not provide any evidence in support of these contentions besides his own declaration.   In her declaration, MacFarlane denies using her office to further the recall effort, participating in the collection, certification, or verification of petition signatures, or otherwise assisting in the recall efforts. Doc. 34-1 ¶ 27.

---

fraudulent. Doc. 49-1 ¶ 61.  However, he did not submit the audit into evidence. *Cf. id.* (citing report "attached hereto").  In addition, the allegation regarding attorney's fees was removed from the second recall petition and was not the basis for his recall. Doc. 37-1.

## II.    LEGAL STANDARD

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" after reviewing the "pleadings, the discovery and disclosure materials on file, and any affidavits[.]" Fed. R. Civ. P. 56(c)(2).    In determining whether a genuine issue of material fact exists, the Court must consider all the evidence in the light most favorable to the nonmoving party. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003).    Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).    A fact is "material" if it may affect the outcome of the suit under governing law.    *Id.*

The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).    That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.    "Only when that burden has been met does the burden shift to the non-moving party." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

"[I]n order to survive summary judgment, the nonmoving party must set forth specific facts showing there is a genuine issue for trial." *Johnson v. New Destiny Christian*

*Ctr. Church, Inc.*, 826 F. App'x 766, 770 (11th Cir. 2020) (citing *Anderson*, 477 U.S. at 249-50).  "[U]nsupported 'conclusory allegations' do not suffice." *Middlebrooks v. Sacor Fin., Inc.*, 775 F. App'x 594, 596 (11th Cir. 2019).  Likewise, "[a] 'mere existence of a scintilla of evidence' cannot suffice to create a genuine issue of material fact." *Johnson*, 826 F. App'x at 770 (quoting *Anderson*, 477 U.S. at 252).

## III.   DISCUSSION

### A. Count I: First Amendment Violations Against the Town

In Count I, McGill alleges that Howey violated his First Amendment rights through four different types of restrictions on his speech in connection with town council meetings.  Howey raises several arguments in support of its motion for summary judgment.  Each argument will be addressed in turn.

#### 1.  A Reasonable Jury Could Find that the Mayors Restricted McGill's Speech.

Howey's initial two arguments in support of summary judgment on Count I are interrelated.  Howey first asserts that the mayors could not have restricted McGill's speech at council meetings because the town charter and ordinances did not give them the power to do so.  As a result, if McGill was unable to express a viewpoint it was his choice "to yield to convention and defer to the wishes of the chairperson presiding over the meeting." Doc. 34 at 19.  Howey further argues that a review of the record reveals there was never an instance in which McGill was unable to discuss a topic he sought to raise, demonstrating that his speech was not actually restricted. *Id.* at 19-20; Doc. 51 at 3-4, 4 n.1.

Neither argument supports a grant of summary judgment.  First, the arguments refer primarily to McGill's councilor comments, but McGill has identified several other categories of speech that he alleges were restricted.  Howey has presented no evidence that its officials lacked the ability to decline to schedule McGill's requested special meetings or to refuse his requests to attach documents to meeting minutes.  Nor has Howey offered evidence to refute McGill's allegations that these types of restrictions occurred.  Similarly, Howey does not dispute that the mayors refused to place many of McGill's requested topics on the agenda, or that they were within their power to do so.  The record demonstrates that town officials were capable of, and did, restrict McGill's speech in various ways.  Whether they violated his rights when doing so is a separate question, to be addressed *infra*.

Moreover, contrary to Howey's arguments, the meeting recordings do include instances where MacFarlane, though not Nebel, unambiguously prevented McGill from speaking about certain topics during his councilor comments.  *See* Section I(C), *supra*.  In doing so, she acted in accord with the researched advice of the town attorney that the town charter gave her such authority, *see* 10/28/19 at 59:10—advice and actions that conflict with the position Howey is now taking.  Regardless of whether the charter and ordinances gave the mayor the *explicit* authority to stop a council member from speaking at a meeting, a reasonable jury could find that MacFarlane acted within her role as the presiding officer of the meeting when she stopped McGill from speaking.  And, viewing the evidence in the light most favorable to McGill, a jury could find that her actions suppressed McGill's speech.

On the other hand, the record does not support McGill's contention that his speech was restricted by MacFarlane intentionally muting him during Zoom meetings. Although McGill's declaration asserts that evidence of intentional muting exists, no such evidence was submitted to the Court.  Moreover, McGill's contentions in his declaration about the Zoom meetings are inconsistent with the meeting recordings, in which he is heard speaking and participating throughout the proceedings without mentioning that he was ever muted.  MacFarlane denies intentionally muting McGill. Absent any evidence that supports his conclusory allegations, McGill has failed to establish the existence of a genuine dispute of fact as to whether MacFarlane muted him during Zoom meetings.

Additionally, the evidence does not reveal any instances in which Nebel prevented McGill from speaking at council meetings, despite his threats to do so.  The Court will therefore set aside these two aspects of McGill's clam for the remainder of its consideration of the motions for summary judgment.

### 2. Howey Has Not Demonstrated McGill's Speech Was Unprotected Government Speech.

Howey next argues that McGill's claims fail because the speech he alleges was restricted constitutes government speech, which is not protected by the First Amendment. Doc. 34 at 20-22.  McGill responds that council meetings are a forum for council members to discuss, debate, and vote upon agenda items rather than an endorsement of any position. Doc. 49 at 14.  In any event, McGill asserts that restrictions on even government speech must be viewpoint- and content-neutral. *Id.* at

15-16.  Howey's reply refutes the latter contention, explaining that the Free Speech Clause does not regulate government speech. Doc. 51 at 5.

Pursuant to the government speech doctrine, speech that is characterized as government speech is "strip[ped] of all First Amendment protection" under the Free Speech Clause. *Mech v. Sch. Bd. of Palm Beach Cnty., Fla.*, 806 F.3d 1070, 1074 (11th Cir. 2015) (citations omitted).  Courts have held that "imposing a requirement of viewpoint-neutrality on government speech would be paralyzing"; such speech is instead regulated by the political  process. *Matal v. Tam*, 582 U.S. 218, 234 (2017): *Mech*, 806 F.3d at 1074.  Accordingly, "[w]hen the government exercises the right to speak for itself, it can freely select the views that it wants to express." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1230 (11th Cir. 2019), quoting *Mech*, 806 F.3d at 1074.[10]  Because the doctrine is "susceptible to dangerous misuse," however, courts "must exercise great caution before extending" it. *Matal*, 582 U.S. at 235; *see also Mech*, 806 F.3d at 1074 ("we do not [characterize speech as government speech] lightly").

The Eleventh Circuit has articulated three factors that are relevant to determining whether speech should be characterized as government speech: history, endorsement, and control. *Cambridge Christian*, 942 F.3d at 1230.  The three factors "are neither individually nor jointly necessary" to conclude that speech constitutes government speech, but a finding that all three factors weigh in favor of government

---

[10] Plaintiff's argument that even government speech must be viewpoint-neutral is therefore incorrect and need not be addressed further.

speech "will almost always result in a finding that the speech is that of the government." *Gundy v. City of Jacksonville, Fla.*, 50 F.4th 60, 77 (11th Cir. 2022) (quotation omitted).

Here, there are four types of speech that McGill argues were unlawfully restricted: 1) requested agenda items, 2) councilor comments, 3) documents attached to meeting minutes, and 4) requested special sessions.  Neither party addresses them individually in its arguments about government speech.  Howey appears to assert that all of McGill's statements or requested statements are government speech simply because he is an elected council member. Doc. 34 at 21; Doc. 51 at 6-7.  Because the question of whether speech is government speech "is a heavily fact-intensive one," *Cambridge Christian*, 942 F.3d at 1223, the Court disagrees with such a broad contention.  It instead finds that each type of requested speech must be analyzed individually to determine whether it is government speech.

First, McGill's councilor comments during meetings do not qualify as unprotected government speech.  Howey has produced no evidence that it has traditionally exerted control over the content of council members' meeting comments.[11]  McGill persuasively argues that council meetings were an opportunity for councilors to discuss and debate topics rather than simply conveying messages on

---

[11] Indeed, Howey's unsupported argument that even councilor comments are "within the Town's ability to control," Doc. 51 at 7, is in conflict with its claim that the mayor had no authority or ability to stop a council member from speaking.  Moreover, the town charter provides that the mayor is the "official spokesperson for the town," but makes no similar provision for council members. Doc. 34-25 at 3, § 3(e)(3).

behalf of the town.   The format of the meetings supports this argument: council members were given an opportunity to discuss each agenda item, sometimes hearing public comment as well, before they voted on it.  It stands to reason that they would be expressing a variety of viewpoints in their comments, rather than conveying a single message on behalf of the town.   The meeting recordings underscore that council members expressed their own, often conflicting, views, and not those of the town.

Moreover, courts have long been reluctant to classify the speech of elected officials as unprotected.  In *Bond v. Floyd*, 385 U.S. 116 (1966), the Supreme Court held that the expulsion of a state representative because of his public statements violated his right to free expression under the First Amendment.  The court recognized that "[t]he manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy[,]" because the "central commitment of the First Amendment…is that 'debate on public issues should be uninhibited, robust, and wide open.'" *Id.* at 135-36, quoting *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964); *see also Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022) ("The First Amendment surely promises an elected representative…the right to speak freely on questions of government policy."); *Wood v. Georgia*, 370 U.S. 375, 395 (1962) ("The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance.").  Consequently, most courts to reach the issue have declined to extend to elected officials the doctrine, stemming from *Garcetti v. Ceballos*, 547 U.S. 410 (2006), that government employees' speech made in the course

of their official duties is unprotected. *See Boquist v. Courtney*, 32 F.4th 764, 779 (9th Cir. 2022) (holding that the rationale for allowing the government to restrict the speech of government employees is not applicable to elected officials); *Phelan v. Laramie Cnty.*, 235 F.3d 1243, 1247 (10th Cir. 2000) (same); *Warren v. DeSantis*, 631 F. Supp. 3d 1188, 1196-97 (N.D. Fla. 2022) (finding *Garcetti* does not apply to elected officials' speech);[12] *Werkheiser v. Pocono Twp.*, 210 F. Supp. 3d 633, 638 (M.D. Pa. 2016) (same, collecting cases); *Melville v. Town of Adams*, 9 F. Supp. 3d 77, 102 (D. Mass. 2014) (same).

In light of the longstanding tradition that elected officials' speech in the course of their official duties is not only deserving of First Amendment protection but is central to a representative government, as well as the evidence regarding the purpose of speech at Howey's town council meetings, the Court declines to find that McGill's comments during council meetings are unprotected government speech.

The remaining types of speech—agenda items, special sessions, and documents attached to council meeting minutes—present a closer question.  At first blush, they may appear to be classic forms of government speech or mere ministerial functions. *See Bloomberg v. Blocker*, 586 F.Supp.3d 1251 (M.D. Fla. Feb. 17, 2022) (decisions of whether to issue a ceremonial proclamation or whether to even place discussion of the citizen's proposed proclamation on a board meeting agenda were unprotected government speech).  On closer examination, however, the Court concludes Howey

---

[12] The Eleventh Circuit recently expressed doubt that *Garcetti's* government-speech doctrine applies to elected officials but declined to decide the question because the speech at issue remained protected even if it did. *Warren v. DeSantis*, __ F.4th __, 2024 WL 132518, at *11-14 (11th Cir. Jan. 11, 2024).

has presented insufficient evidence that the town is seen to endorse these types of speech, or that it has historically conveyed government messages using these particular means.   Rather, the record reveals that meeting discussions and special sessions are some of the only permissible fora for Howey-in-the-Hills' town council members to confer and debate town business pursuant to the Sunshine Law.   Absent additional evidence supporting the endorsement and history factors of the government speech analysis, the Court does not find that these types of speech are unprotected by the First Amendment.

Each of the three government speech factors will be addressed in turn with respect to the remaining types of speech.

a.  *Control*

The control factor "asks whether the relevant government unit 'maintains direct control over the messages conveyed' through the speech in question." *Cambridge Christian*, 942 F.3d at 1234, quoting *Walker v. Texas*, 576 U.S. 200, 213 (2015).   The government need not control "every word or aspect of speech in order for the control factor to lean toward government speech." *Gundy*, 50 F.4th at 79 (quotation omitted).

In *Walker*, the Supreme Court held that the control factor weighed in favor of a finding of government speech where the government exercised "final approval authority" over all aspects of specialty license plates. 576 U.S. 200; *see also Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 472-73 (2009) (same, where city exercised final approval authority over park monuments donated by private entities); *Mech*, 806 F.3d at 1078 (schools exercised final approval authority and control over banners'

design, contents, size, and location); *cf. Matal*, 582 U.S. at 235 (holding that registered trademarks are not government speech; noting the trademark examiner may not reject a mark based on the viewpoint it appears to express, and, once the mark is registered, the government cannot remove it from the register absent certain procedures).

Here, the evidence establishes that Howey, through the mayor, maintains final approval authority over town council meeting agenda topics and special meetings. The town charter invests the mayor with the power to call special meetings of the town council and establish the agenda for town council meetings. Doc. 34-25 at 3, §§ 3(e)(6)-(7). While council members could suggest agenda topics for each meeting, Doc. 46 at 5, the mayor had authority to decide whether to include those topics on the agenda. The parties have not identified any source of written guidelines for the mayor's decision to establish the agenda and call special meetings, suggesting it may be entirely, or almost entirely,[13] within her discretion. Accordingly, the control factor weighs in favor of a finding that the agenda and calling of special sessions are government speech.

The ordinances submitted into the record and the town charter are silent as to the practice of attaching documents to the town council meeting minutes, aside from stating that the mayor shall examine and certify the correctness of the minutes. *See* Doc. 34-6 at 2, § 42-8. Neither mayor's declaration refers to meeting minutes or their

---

[13] MacFarlane's and Nebel's declarations refer to scenarios in which they did not have discretion to omit an item from the agenda pursuant to unidentified "laws, ordinances, and regulations." Doc. 34-1 ¶¶ 8-9. Neither party asserts that McGill's suggested topics fell within this category.

attachments.  In practice, in the few instances in the record in which someone made a request to attach items to meeting minutes, the mayor decided whether to grant it. *See* Doc. 49-1 ¶¶ 25-28.  The town clerk is responsible for preparing the minutes, so it is possible that she also has authority to attach items to them.  In either event, it is likely—and McGill does not dispute—that a town official has the final approval authority over items that are attached to the minutes.  The control factor also weighs in favor of government speech with respect to items attached to the meeting minutes.

       *b.   Endorsement*

The next factor asks whether "observers reasonably believe the government has endorsed the message" or whether "the kind of speech at issue is often closely identified in the public mind with the government." *Cambridge Christian*, 942 F.3d at 1232-33 (quotations omitted).  In *Walker*, the court found that specialty license plates were closely associated with the state because the government required and regulated them and stamped "Texas" on them. 576 U.S. at 212-13. The court contrasted specialty license plates, which conveyed government approval of the message displayed, with bumper stickers, which were purely private speech. *Id.*  Likewise, the banners in *Mech* were presumably government-endorsed because "schools typically do not hang them on school property for long periods of time if they contain messages with which they do not wish to be associated." 806 F.3d at 1076 (quotation omitted). The fact that the banners also identified the sponsor as a "Partner in Excellence" with the school, which suggested a close relationship, and contained the school's initials, distinguished them from purely private advertisements. *Id.* at 1076-77; *see also Leake v.*

*Drinkard*, 14 F.4th 1242, 1249 (11th Cir. 2021) (city endorsed parade's message where it publicly advertised and promoted the parade on its website, identified itself as a co-host, explicitly identified and endorsed the parade's goal, and covered almost all parade costs).  In *Cambridge Christian*, the court found that speech disseminated over a public address system at a football game would generally be assumed to convey messages with which the game's organizers agreed. 942 F.3d at 1233; *cf. Matal*, 582 U.S. at 237-38 (no evidence that the public associates the contents of trademarks with the government, and government agency decisions have "made it clear that registration does not constitute approval of a mark.").

The Court will first consider whether the endorsement factor supports a finding that special meetings of the town council are unprotected government speech.  The parties agree that Howey "conducted special meetings under a number of circumstances to allow council members to discuss Town business between themselves" without violating the Sunshine Law's prohibition against private conversations about town business between elected officials. Doc. 46 at 5 n. 7; *see* Section I(A) n.4, *supra*.  No ordinance or charter provision addresses their content or provides further details.

The agenda of a special meeting included the town's header and identified the special session as a meeting of the town council. Docs. 34-17, 34-18, 34-19, 34-20, 34-21, 34-22.  The agenda makes clear that a special meeting itself was a town-sponsored event. *See Mech*, 806 F.3d at 1076; *Leake*, 14 F.4th at 1249.

On the other hand, the *content* of the meeting was not necessarily sponsored or endorsed by the town.  The agenda announced the meeting topic in a neutral manner; for example, the topic of a meeting in which McGill sought to discuss the removal of the police chief and code enforcement officer was announced as "Discussion and Action regarding Town Personnel." Doc. 34-19.   The town declined to endorse McGill's viewpoint in the written agenda.  Moreover, the only identified purpose of a special meeting was to provide a forum for council members to speak lawfully to each other about town business.  As a result, the discussion that ensues would be similar to councilor comments in a regular council meeting—which the Court has found do not constitute government speech.  By withholding permission to hold a special meeting, the mayor is effectively precluding, or at least limiting, councilors' ability to hold discussions at all.  Considering the limited evidentiary record and arguments on this topic, Howey has not provided sufficient evidence for the Court to conclude that holding a special meeting suggests government endorsement of the meeting topic or content discussed, such that the meeting qualifies as government speech that is entirely unprotected.

For similar reasons, it is also not clear that agenda topics for regular town council meetings are presumed to be endorsed by the town.  The meetings themselves are plainly associated with the government: they are run by the government and held on government property.  And the agendas are published by the town.  Although there are no examples in the record, they presumably have the same characteristics as the special meeting agendas.  The nature of the meetings and agendas suggest government

endorsement. However, the agenda topics are simply a list of the anticipated content of the meetings. As noted, the meeting recordings demonstrate that a council meeting is a forum for council members to discuss and vote on various topics, most of which are included on the agenda in advance. It does not follow that every item listed on the agenda is endorsed by the town. After all, some agenda items will not pass the council vote; others will not even be voted on. Logically speaking, the town cannot be seen to have "endorsed" an agenda item unless and until the item passes a council vote or is otherwise the subject of official action. Simply being listed on the agenda for discussion is not enough to imply that a topic has been endorsed by the town. Here, too, Howey has not presented any evidence or authority to the contrary.

The Court reaches the same conclusion with respect to attachments to meeting minutes. The parties have not submitted into evidence any examples of documents that were attached to meeting minutes, nor any information about the effect of attaching items to the minutes. The meeting minutes and any attachments were sometimes published on the town website.[14] Their publication on the town website is comparable to hanging a banner on school property, *see Mech*, 806 F.3d at 1076, and is one factor that suggests town endorsement. *See Leake*, 14 F.4th at 1249 (parade advertised on town website suggested town endorsement).

---

[14] *See* Doc. 34-5 at 9, 324:16-20 ("[I]f you go to the town website they're supposed to have the transcribed minutes to what occurred during that meeting; not verbatim, but supposed to be, I think, 80 percent of what was said. … But…the town…either didn't do the minutes or it took 'em a year to finish them at times. So I know there's a lot of blank dates that it wasn't available.").

Closer examination, however, casts doubt on an endorsement theory for this type of speech as well.  The minutes themselves are simply a factual account of what was said at the meeting, in summary form.  *See* Doc. 34-11.  A reader would not assume that the town endorsed every comment that was made at the meeting simply because it was recorded in the minutes.  The same could therefore be said for the contents of a document that was attached to the minutes.  Howey has presented no evidence indicating that attachment to meeting minutes conveys or suggests the town's endorsement of a document's contents.  For this category, too, Howey has not provided enough information to demonstrate that the endorsement factor weighs in favor of a finding that attachments to meeting minutes—as with special meetings and agenda items—are government speech.

> c.  *History*

Finally, the history factor considers whether the type of speech "has traditionally communicated messages on behalf of the government." *Cambridge Christian*, 942 F.3d at 1232 (quotation omitted).  To determine whether this factor supports a finding of government speech, courts have reviewed historical evidence to determine the manner in which a medium has traditionally been used.  In *Leake v. Drinkard*, 14 F.4th at 1248-49, for example, the court examined the world history of military parades, as well as the history of the particular parade at issue, to determine that "the medium used here and the message conveyed through it are ones traditionally associated with governments." *See also Gundy*, 50 F.4th at 77-78 (reviewing the "well-established history and tradition" of legislative invocations in general, which the court

described as "part of the fabric of this country," as well as the history of the invocation at issue); *Summum*, 55 U.S. at 471-72 (municipalities historically have exercised editorial control over donated monuments); *Walker*, 576 U.S. at 210-11 ("the history of license plates" suggests "they long have communicated messages from the state").

Here, Howey has offered no evidence regarding the history of any of the three types of speech at issue, either with respect to Howey-in-the-Hills or more generally. *Cf. McGriff v. City of Miami Beach*, 594 F.Supp.3d 1302, 1313-14 (S.D. Fla. 2022) (on summary judgment, finding history factor supported government after consideration of expert report analyzing government-sponsored art throughout history, with a focus on Miami Beach); *Cambridge Christian School, Inc. v. Fla. High School Athletic Ass'n*, No. 8:16-cv-2753, 2022 WL 971778, *6-8 (M.D. Fla. March 31, 2022) (on summary judgment, reviewing historical evidence about loudspeaker use at high school football playoff games, including ten years of transcripts, to find that defendant traditionally used the public address system to communicate to the public).  And, unlike a military parade, monuments in a public park, or a legislative invocation, the Court is unaware that any substantial history exists regarding the traditional use of attachments to council meeting minutes or special meetings of a town council.  Speaking broadly, meetings of local government have been a historical forum to convey government messages, but it is unclear that the type of meeting at issue in this case—one of the only fora in which elected officials are permitted to discuss town business and reach decisions under the Sunshine Law—is equivalent.

In *Mech*, the court confronted a similar lack of historical evidence and found that, "[o]n this record, we cannot conclude that [banners on school fences] long have communicated messages from the government." 806 F.3d at 1075.  The *Mech* court held that the absence of historical evidence was not decisive and could be overcome by the other indicia of government speech; in that case, strong evidence supported the control and endorsement factors. *Id.* at 1075-76, 1079.  Here, however, only the control factor supports Howey's bare-bones argument that the types of speech McGill alleges were restricted were government speech.  Absent evidence that the history or endorsement factors weigh in its favor, Howey has failed to prove that any type of speech was government speech.

> **3. Genuine Disputes of Material Fact Exist as to Whether Howey Lawfully Restricted McGill's Speech in the Limited Public Forum of Town Council Meetings.**

Although those types of speech may not constitute government speech, a council member's ability to exercise his First Amendment rights at town council meetings is not unfettered.  As this Court explained in its Order granting summary judgment in the companion case to this action,

> "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). The extent to which the government may restrict private speech depends on the public or private nature of the forum in which the speech occurs. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015); *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 800 (1985).

One type of forum in which governments are permitted to restrict speech is a limited public forum, which "exists where a government has reserve[d it] for certain groups or for the discussion of certain topics." *Walker*, 576 U.S. at 215, quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829, (1995). Governments may restrict the content of speech in a limited public forum in order to confine the forum "to the limited and legitimate purposes for which it was created." *Rosenberger*, 515 U.S. at 829; *see Barrett v. Walker Cnty. School Dist.*, 872 F.3d 1209, 1225 (11th Cir. 2017). However, any such restriction must be reasonable in light of the forum's purpose and cannot discriminate based upon the speaker's viewpoint. *Id.*; *see also Good News Club v. Milford Central School*, 533 U.S. 98, 106 (2001) ("[W]hile a public entity may not censor speech about an authorized topic based on the point of view expressed by the speaker, it has broad discretion to preserve the property under its control for the use to which it is lawfully dedicated.").

Viewpoint discrimination occurs when the "specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. A viewpoint-neutral restriction on content "is one that is evenhandedly applied without regard to the specific message being advocated." *Moms for Liberty – Brevard Cnty., Fla. v. Brevard Public Schools*, 582 F.Supp.3d 1214, 1219 (M.D. Fla. 2022). Provided the restriction serves purposes unrelated to the content of expression, it will be deemed neutral even if it "has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

*Alimenti v. Town of Howey-in-the-hills, Fla.*, No. 5:20-cv-386, 2023 WL 2598662, *9 (M.D. Fla. March 22, 2023). Here, as in *Alimenti*, the parties agree that town council meetings are a limited public forum. *See id.* at *11 n.13; Doc. 34 at 22-23; Doc. 49 at 16.

McGill does not argue that any restrictions the town placed upon speech in connection with council meetings were unreasonable on their face, but contends that

they were applied in a manner that was neither content- nor viewpoint-neutral. *Id.* at 16-17.  He argues there is a genuine dispute of fact as to whether Howey acted with a motive to suppress his speech based on his viewpoints, particularly because the alleged rules the mayors were applying were unwritten and undefined. *Id.* at 17.

Howey responds that any restrictions it placed on speech were viewpoint-neutral. Doc. 34 at 24-25.  With respect to agenda items, it asserts that its "laws and ordinances…mandated which types of business required inclusion on the agendas, which could be deferred to a  subsequent meeting, and which were to be excluded." *Id.* at 24.  The latter included "items that could not be reasonably considered Town business." *Id.*  In any event, Howey contends, the mayors' actions could not have been based on McGill's viewpoint because his agenda requests did not express his views, and on some occasions he was able to speak on the same topic he'd requested after it was brought up by a different council member. *Id.* at 24-25.  Moreover, Howey argues that the meeting recordings of instances in which McGill was interrupted from speaking demonstrate that the mayors intended to evenhandedly apply rules of order without regard to viewpoint. Doc. 51 at 3-4.

As noted, McGill identifies four categories of speech restrictions that he alleges were discriminatory.  Howey's limited public forum argument in its motion for summary judgment does not address the denial of McGill's requests for special meetings and to attach documents to meeting minutes.  Nor do the mayors' declarations or any other evidence set forth guidelines or general rationales under which decisions were made regarding these categories, except for MacFarlane's

intimation that McGill's special meeting requests did not pertain to "town business." Doc. 34-1 ¶ 18.

The mayors' declarations did identify some standards under which they made decisions with respect to agenda items and councilor comments.  Contrary to Howey's assertion, however, the record is devoid of evidence that any *laws or ordinances* "mandate which type of business required inclusion on the agendas, which could be deferred to a subsequent meeting, and which were to be excluded." *Cf.* Doc. 34 at 24. The town charter and the ordinances provided to the Court are silent on this topic. Docs. 34-6, 34-25.  McGill is also correct that the laws do not define "town business." The only detailed information on either topic comes from identical statements in Mayor Nebel's and MacFarlane's declarations. Doc. 34-1 ¶¶ 8-15; Doc. 34-2 ¶¶ 3-6.[15]

The lack of written guidelines—or any guidelines at all—to govern speech restrictions is disfavored in First Amendment law.  After all, even in a nonpublic forum the government "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Minn. Voters Alliance v. Mansky*, 585 U.S. ---, 138 S.Ct. 1876, 1888 (2018).   Policies that afford unlimited discretion to a decisionmaker are vulnerable to viewpoint discrimination. *See id.* at 1891 (without

---

[15] Mayor MacFarlane gave a presentation about "meeting agendas and protocol" at the October 14, 2019 meeting, in which she noted that agenda items "are limited to town business. Items should be brief and should pertain to the business of our town and the government." 10/14/19 at 00:20:10.  She did not further define town business.  The town attorney stated in a First Amendment presentation at the October 28, 2019 meeting that "town business," for the purpose of limiting councilors' statements or agenda items, referred to "town *council* business," versus topics within the exclusive purview of the mayor. 10/28/19.

"objective, workable standards" to guide a decisionmaker's discretion, the decisionmaker's own beliefs may shape his decisions).  For this reason, courts have found unconstitutional grants of "unbridled discretion," meaning laws that provide no standards by which a government official's decision to restrain speech must be guided. *See Barrett v. Walker Cnty. School Dist.*, 872 F.3d 1209, 1221-23, 1225 (11th Cir. 2017) (holding that the unbridled discretion doctrine applies to limited public fora, but declining to decide whether it applies outside the context of prior restraints on expression).  Moreover, "[c]ourts have found that unwritten, informal, unevenly enforced 'policies' that in fact afford great discretion to the decisionmaker, even in limited public fora, are w[o]nt to lead to viewpoint discrimination." *McMahon v. City of Panama City Beach*, 180 F.Supp.3d 1076, 1109 (N.D. Fla. April 12, 2016) (citations omitted).  Where a policy is unwritten, it may lead to the use of impermissible post-hoc rationalizations for decisions that were actually motivated by viewpoint discrimination. *McMahon*, 180 F.Supp.3d at 1109 (collecting cases).

McGill does not raise an unbridled discretion theory of unconstitutionality, nor any facial challenge to the speech restrictions he alleges Howey employed. Nonetheless, the fact that the mayors' decisions regarding his speech were not based on a written policy or any objective standards that were articulated before this action was instituted is relevant to his claim that the mayors restricted his speech based on his viewpoint. *Cf. Alimenti*, 2023 WL 2598662 at *12 (no evidence supported plaintiff's claim that clear rules preventing audience members from speaking twice during the

same comment session or exceeding three minutes in a single comment were applied discriminatorily).

Moreover, the Court rejects as contrary to the evidence Howey's claim that the mayors were unaware of McGill's viewpoints and therefore could not have engaged in viewpoint discrimination.  In fact, the record demonstrates that the mayors were very familiar with his viewpoints, about which he was outspoken during the course of his tenure as a councilman.  Viewing the entire record in the light most favorable to McGill, there is ample evidence to support his characterization of himself as a "thorn in the[] side" of longstanding town officials, Doc. 49-1 ¶ 66, who persisted—often *ad nauseum*—in demanding accountability when he learned of an action he perceived to violate Howey's laws.  On top of that, the titles of many of his requested agenda topics were far from objective.  As just a small selection, the titles included the following: "Addressing the hiring of Reserve Officer Cavallero, Chief misleading town council, as well as lying about officer's background. Discussion about incident, then motion should be made on whatever action council decided," Doc. 49-1 at 16; "Mayor MacFarlane's Malfeasance and egregious act [*sic*] with illegally conducting two council meetings; …. Continued unethical law practices of the town attorney (14 examples to be provided); … Immoral, unethical and inappropriate behavior by Councilor Nebel towards Councilor McGill during council meetings.  Mayor MacFarlane's failure to act," *id.* at 25; and "Discussion and action to remove Martha MacFarlane as Mayor; … New evidence that Mayor MacFarlane interfered with recall process; Criminal investigation into Mayor MacFarlane." *Id.* at 34.  Whether because

of the phrasing of these proposed topics or because of McGill's oft-stated views, a reasonable jury could find that the mayors had the information they needed to discriminate against him based on his viewpoints when they were deciding whether to restrict his speech.[16]

With this background, each of the four categories of speech McGill alleges Howey restricted will be addressed in turn to determine whether there is a material dispute of fact as to whether viewpoint discrimination occurred.

        *a.   Special Meetings and Attachments to Meeting Minutes*

First, given the absence of official guidelines or a non-discriminatory explanation for denying or impeding McGill's requests for special meetings, a reasonable jury could find that these decisions resulted from viewpoint discrimination. Mayor Nebel stated in a recorded council meeting that he had cancelled one special meeting McGill requested, "[b]ecause I can." 3/25/19 at 00:48:30.   Nebel also declined, without explanation, to attend a special meeting McGill requested about the police chief; his absence prevented a council vote or any other action from being taken during the meeting. *See* 5/7/19 at 31:00-35:00.   Although the record does not contain much information regarding the topics of the denied special meetings, McGill stated at a council meeting that at least one of his denied requests was for a special meeting

---

[16] Howey's argument that the fact that McGill's views were well-known belies his First Amendment claims is unpersuasive. Doc. 51 at 4 n.1.  It is undisputed that McGill was able to express his views on many occasions without interference.  This lawsuit examines whether there were any occasions in which the Defendants unlawfully restricted his speech.  The two propositions are not mutually exclusive.

about the budget—a topic that surely qualifies as "town business" within the purview of the town council. 9/23/19 at 44:00; *cf.* Doc. 34-1 ¶ 18 (in MacFarlane's declaration, stating she "was not required to grant Council member requests for special meetings to discuss topics outside of Town business."). Howey offers no contrary evidence, instead it simply observes that some of McGill's special meeting requests were granted. Doc. 34 at 10. It has failed to meet its burden of showing an absence of evidence to support McGill's case. *Celotex*, 477 U.S. at 325. Instead, a genuine dispute of fact exists as to whether McGill's special meeting requests were denied or impeded based on his viewpoints. Accordingly, this allegation will survive summary judgment.

In contrast, McGill has not offered sufficient evidence to support his allegation that his requests to attach documents to meeting minutes were denied based on his viewpoints. He mentions one occasion in which his request was denied, while the request of the police chief's wife was granted on another, but he neglects to identify the meeting in which either event occurred. Doc. 49-1 ¶¶ 27-28; *see* Fed. R. Civ. P. 56(c)(1)(A) (requiring party opposing summary judgment to cite to "particular parts of materials in the record"). Neither the meeting recordings nor the documentary evidence submitted to the Court provide validation of those events. Without more, there is not enough evidence from which a reasonable jury could conclude the difference in the outcome of the two requests was due to the requester's viewpoint. Moreover, McGill's request to post a list of his complaints about Mayor Nebel to the town website after the May 7, 2019 special meeting fails to constitute sufficient evidence of viewpoint discrimination. Doc. 49-1 ¶ 26. On the meeting recording,

MacFarlane explained that some of the allegations were personal and needed to be reviewed by the town attorney before they could be posted publicly, but that she would provide the list to any member of the public who requested it. 5/7/19 at 45:30-46:30. McGill offers no evidence beyond conclusory allegations to counter MacFarlane's contemporaneous, non-discriminatory explanation of the partial refusal of his request. In all, the allegation of viewpoint discrimination with respect to attachments to meeting minutes cannot survive summary judgment.

### b. *Agenda Items and Councilor Comments*

Based on a review of the whole record, the Court concludes that summary judgment is warranted in Howey's favor as to McGill's councilor comments, but not his proposed agenda items.

As a threshold matter, a reasonable jury could choose not to credit the mayors' post-hoc explanation of the standard under which they made decisions about McGill's speech. Nebel did not provide any contemporaneous explanation of his decision to reject McGill's agenda topics. *See*, *e.g.*, Doc. 49-1 at 13. MacFarlane often stated that she was denying McGill's proposed agenda topics or attempting to restrict his councilor comments mostly because they were not "town business." As noted, this term remained undefined until the mayors' declarations. MacFarlane's declaration explains that the agenda topics and comments were impermissible because they were either outside the scope of the town council's authority, topics that the council had previously voted on or that the mayor had finalized all actions intended on the matter, or topics that the council had tabled for a future agenda due to the need for

39

investigation or advice from a third party. Doc. 34-1 ¶¶ 14-15.  She explains that she attempted to limit him to "discussing Town business and updating the other Councilor members on those actions" in lieu of discussing the impermissible matters. *Id.* ¶ 17. Her statements create an inference that she defines "town business" as excluding the impermissible topics.  But that explanation does not align with either a common-sense definition of "town business" or the term as MacFarlane defined it at the October 14, 2019 meeting: that items should "pertain to the business of our town and the government." 10/14/19 at 00:20:10.  For example, it could reasonably be considered "town business" to bring a topic to the mayor's attention even if she is the only one with the authority to take action on it, or to ask for a public update about what, if any, action was taken on such a subject.  Likewise, while there might be valid reasons to table discussion of a topic on which more information is needed or the council has already voted, classifying those categories as "not town business" strains credulity.  In the absence of a clear and consistently-applied standard, a reasonable jury could find that some of McGill's proposed topics or comments were rejected because of McGill's viewpoints.

Moreover, Howey has not offered evidence that the articulated standard was applied evenhandedly with respect to proposed agenda topics, such that other councilors' proposed topics were also denied. *Cf. Cleveland v. City of Cocoa Beach, Fla.*, 221 F. App'x 875, 879 (11th Cir. 2007) (finding mayor enforced a restriction against promotional campaign materials evenhandedly, without regard to the particular candidate that was being endorsed).  Nor has it offered an explanation that covers the

alleged impropriety of all McGill's denied topics.  Howey does not dispute McGill's content, which is supported by the evidence, that the mayors routinely and repeatedly denied McGill's requests to place topics on the council meeting agenda for more than a year.  A reasonable jury could find that the denials resulted from viewpoint discrimination.

Howey argues that liability is precluded with respect to the denied agenda items because the denials did not limit McGill's ability to express himself.  After all, most of the time the mayors' denial did not prevent him from raising the topics at council meetings.  Under Mayor Nebel, McGill's ability to raise topics during his councilor comments was unlimited.  Mayor MacFarlane also did not restrict McGill's councilor comments during many of the meetings over which she presided.

The practical impact of the denial of a proposed agenda item is unclear where the council member can still address the topic in their general meeting comments.  A comparison to special meetings is illustrative: while calling a special meeting might be the only opportunity for a council member to have an in-depth discussion with a colleague without violating the Sunshine Law, *see* Section III(A)(2), *supra*, the same is not true for agenda items compared to councilor comments.  McGill's assertion that a topic had to be on the agenda before the council could vote on it, Doc. 49-1 ¶ 20, is incorrect. *See L. & Info. Servs., Inc. v. City of Riviera Beach*, 670 So. 2d 1014, 1016 (Fla. 4th DCA 1996) (it does not violate the Sunshine Law to discuss and vote on a topic not on the published agenda, as long as the meeting itself was publicized in accordance with the law); *see also* 9/23/19 at 1:23:30-1:24:10 (town attorney advising McGill that

doing so was not "best practice" but it was legal).  Members of the public would have the opportunity to comment on any item that was up for a vote, regardless of its inclusion on the agenda. *Cf. id.* ¶ 19.  On the other hand, the agenda's publication before meetings provided advance notice to residents and council members of the main topics to be discussed. *See* Doc. 49-1 ¶ 18.  This means it is possible that the omission from the agenda of an item that was going to be discussed could impact public attendance, including from those who would have taken advantage of the opportunity to comment.

Howey's argument that McGill's rights were not violated by the denial of his agenda items because he still had the opportunity to address the topics essentially contends that any viewpoint discrimination in the former was harmless.  But it does not cite any authority that supports such a standard in the First Amendment context.  Absent any such authority, the Court is reluctant to preclude liability when there is at least some difference between a topic's listing on the published agenda and its inclusion in a council member's comments.

In addition, there were at least two occasions when MacFarlane precluded McGill from raising topics in his councilor comments because they were not on the meeting agenda. *See* 9/23/19 at 40:05; 10/14/23 at 1:12:45 – 1:35:45.  But, of course, they were not on the agenda because MacFarlane had denied his request to place them on the agenda.   In all, there is enough evidence for a reasonable jury to find that the consistent denial of McGill's proposed agenda items resulted from viewpoint discrimination.

However, the evidence compels the opposite conclusion with respect to restrictions on McGill's speech during council meetings. In addition to the two meetings when topics he wanted to address were precluded completely, *see id.*, there were several times when MacFarlane cut McGill off before he was finished speaking. On most of those occasions she stated she was doing so because he had already addressed the topic at length, either at the current meeting or a previous one, or because the person to whom he was addressing his comment had answered his question. The recordings verify her contemporaneous explanations.

The Eleventh Circuit has recognized that there is "a significant governmental interest in conducting orderly, efficient meetings of public bodies." *Rowe v. City of Cocoa, Fla.*, 358 F.3d 800, 803 (11th Cir. 2004). In *Jones v. Heyman*, 888 F.2d 1328, 1332 (11th Cir. 1989), the court declined to speculate about a mayor's mindset when he removed the plaintiff from a meeting where the evidence showed the plaintiff had been disruptive and had failed to adhere to the agenda item under discussion. In *Rowe*, the court upheld a speech restriction during city council meetings, because "[t]o permit repetitious questions and arguments not related to an agenda topic would be 'to deny the presiding officer the authority to regulate irrelevant debate'" and "'would cause such meetings to drag on interminably, and deny others the opportunity to voice their opinion.'" 358 F.3d at 803, quoting *Jones*, 888 F.2d at 1333;

Howey's town charter requires the mayor, as the presiding officer of town council meetings, to maintain order and ensure that meetings do not exceed a three-hour time limit. Doc. 34-6 §§ 42-1, 42-4. MacFarlane was therefore within her

43

authority to restrict speech, even that of council members, in order to achieve those goals—provided she did not do so in a discriminatory manner.  And the evidence does not create a genuine dispute of material fact that she engaged in viewpoint discrimination during the times when she cut McGill off.  The meeting recordings demonstrate that McGill spoke at far greater length in council meetings than any other council member besides the mayor, and his councilor comments significantly exceeded those of the other council members.  There is certainly no evidence McGill was given less time to speak than council members whose viewpoints aligned more closely with that of the mayor.  Further, most of the time McGill was permitted to finish his comments without interruption, even when his comments consisted of personal accusations and *ad hominem* attacks against the mayor or other town officials.  Nor do the recordings include similar instances in which MacFarlane cut off Councilor Scott, who was often politically aligned with McGill against MacFarlane and other long-time town officials.  While the Court views the evidence in the light most favorable to McGill, it does so in the context of the entire record.  In that context, no reasonable jury could find that MacFarlane stopped McGill from speaking because of the viewpoint he was expressing.[17]

Further, a closer examination of the few topics that MacFarlane completely prevented McGill from discussing does not reveal evidence from which a reasonable

---

[17] Howey cites MacFarlane's deposition on the topic of her subjective intent during council meetings. Doc. 34 at 9, 9 n.12.  However, the MacFarlane deposition was not provided to the Court with Howey's evidence in support of its motion for summary judgment.  Accordingly, the Court cannot consider Howey's representations about its content.

jury could conclude the decisions resulted from viewpoint discrimination.  At the October 14, 2019 meeting, MacFarlane stopped McGill from discussing two topics that he had already addressed, and one about which she requested additional information before it was discussed.  None of those incidents manifest viewpoint discrimination, as discussed *supra*.  She also twice prevented McGill from discussing an inflammatory letter that a private citizen handed out before the council meeting. *See* 9/23/19; 10/14/19. The letter consisted of vitriolic personal attacks against McGill, Scott, and residents of a neighborhood that was the subject of controversy within the town; MacFarlane made clear the letter was not endorsed by the town and stated it should not have been distributed at the meeting. *See* 9/23/19 at 1:42:00 *et seq.* She also stopped McGill from discussing a topic he called "holding residents accountable," in which he apparently sought to call out individual residents by name for their inappropriate behavior toward council members. 10/14/23.  Stopping a council member from discussing the personal views and actions of individual members of the public at a council meeting is a reasonable means of maintaining order.  Absent evidence that she permitted others to discuss similar topics, which the meeting recordings do not reveal, a reasonable jury could not conclude her decisions on these topics resulted from viewpoint discrimination.

There was one topic that MacFarlane stopped McGill from addressing that could, in a vacuum, be seen to result from viewpoint discrimination.  On October 14, 2019, she stopped him from sharing residents' concerns about certain police actions because she said she was investigating the incidents and had all the information she

needed to do so.   Although only the mayor is tasked with supervising town departments, including the police, Doc. 34-25 § 3(e)(10), public concerns with the police department could reasonably be considered "town business" that should be publicly discussed at a council meeting.   However, there is no evidence that MacFarlane prevented McGill from raising similar issues, including with the police department, at any other meeting.   On the contrary, concerns about the police chief and police department were among the most frequent topics McGill discussed at council meetings—usually unimpeded.   Further, the October 14 meeting was nearly three hours long, which means that time restraints may have factored into MacFarlane's actions.   Finally, McGill brought up the same topic in his councilor comments at the following meeting on October 28, 2019, and was able to discuss it with the input of the police chief and the town attorney without being cut off. 10/28/19 at 1:19:30 – 1:23:15.  As a result, this instance does not constitute sufficient evidence from which a jury could reasonably find that MacFarlane prevented McGill's speech due to viewpoint discrimination.   Howey is therefore entitled to summary judgment as to this category of speech.

      *c.  Conclusion*

      Because there is insufficient evidence of viewpoint discrimination, even viewing the evidence in the light most favorable to McGill, the Court will grant summary judgment as to Count I with respect to McGill's councilor comments and his requests to attach items to meeting minutes.  However, a genuine dispute of material fact exists regarding whether Howey committed viewpoint discrimination against McGill with

respect to his proposed agenda items and special meeting requests.  Those aspects of Count I will therefore survive summary judgment.[18]

### B.  Counts III and V: First Amendment Violations Against the Mayors

Counts III and V allege that MacFarlane and Nebel, respectively, violated McGill's First Amendment rights in the same manner as the allegations against Howey in Count I.  In their motion for summary judgment, the mayors argue that qualified immunity protects them against the claims. Doc. 35.

Qualified immunity shields government officials who are acting within their discretionary authority from money damages unless the plaintiff can establish that (1) the official violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citations omitted).  To determine whether qualified immunity applies, the government official defendant must first show that he was acting within the scope of his discretionary authority. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  If he does, then the burden shifts to the plaintiff to show that qualified immunity is not appropriate using the two-part analysis above. *Id.*

---

[18] Howey does not argue in its motion for summary judgment that it lacks liability under the *Monell* doctrine as to either count against it, except in connection with a theory of retaliation under Count II that McGill subsequently withdrew. Doc. 34 at 25-28; Doc. 49 at 2 n.1; *Monell v. Dep't of Social Servcs. of City of N.Y.*, 436 U.S. 658, 690 (1978); *cf. Alimenti v. Town of Howey-in-the-Hills, Fla.*, 2023 WL 2598662 at *13-16 (concluding plaintiff's retaliation claims against Howey in related action were barred under the *Monell* doctrine).  Accordingly, the Court does not consider the application of this doctrine with regard to Howey's liability.

Here, McGill concedes that Nebel and MacFarlane were acting within their discretionary authority when they performed the actions he alleges violated his rights. Doc. 50 at 3. He therefore has the burden to show that any violation of his rights was clearly established. McGill's half-page response does not identify sufficient evidence or legal support to meet his burden as to either mayor. They are therefore entitled to summary judgment.

McGill contends that "the mayors were advised by Town's attorneys that they had to let McGill speak at meetings," and that ignoring the advice of counsel demonstrates a knowing violation of his federal rights. *Id.* at 3-4. He alleges that Heather Ramos "interjected" at the September 23, 2019 meeting to "advise[] MacFarlane that McGill had a right to speak." *Id.* at 4. Three weeks later, however, MacFarlane refused to let him speak on the very same subject. *Id.*

McGill's argument does not encompass Nebel, who was no longer Howey's mayor on September 23, 2019. McGill offers no argument or evidence to meet his burden of demonstrating that Nebel violated a clearly established constitutional right when he allegedly committed viewpoint discrimination with respect to McGill's agenda requests and special meetings. Accordingly, Nebel is entitled to summary judgment.

MacFarlane challenges McGill's claim about the town attorney's advice. Doc. 52 at 3-4. She argues that McGill's statement in his declaration that the advice occurred is not enough to defeat summary judgment in light of the meeting recording, which contradicts it. *Id.*

The Court concurs that the recording of the September 23, 2019 meeting does not contain a statement by the then-town attorney, Heather Ramos, that MacFarlane is not permitted to stop McGill from speaking. Ramos weighed in on two occasions during the meeting. First, MacFarlane asked her to address McGill's comment regarding the propriety of calling a special meeting or special session. 9/23/19 at 45:10-30. Ramos responded that only the entire council was permitted to call a special meeting per the town code, but that the council could change the code by a vote. *Id.* McGill disagreed with her reading of the code. *Id.* at 45:30-47:30. Second, Ramos was asked to advise on whether the council could vote on an item that was not listed on the agenda. 9/23/19 at 1:23:30-1:24:10. She responded that it was not best practice but not unlawful. *Id.* Neither discussion included advice on whether the mayor, generally, or MacFarlane, specifically, was legally permitted to stop McGill from speaking. Moreover, McGill and MacFarlane had a lengthy discussion on that topic at the beginning of McGill's councilor comments, but Ramos did not audibly weigh in; nor were there any inaudible pauses that could have contained it, or any audible statement by MacFarlane or McGill that would have been made in response to it.

McGill does not provide a recording time or any other details regarding when in the meeting Ramos allegedly gave her advice. He also offers no explanation for why the statement would not be on the meeting recording. Further, it is noteworthy that at the October 28, 2019, meeting—just two meetings later—Ramos gave a presentation about her legal conclusion that Howey's mayor *is* empowered to stop councilors from speaking without violating their First Amendment rights. 10/28/19

at 58:45 – 1:05:00.  She had apparently written a detailed memo on the same topic that was distributed to the council before the meeting. *Id.*  Although the Court must adopt the factual account most favorable to the non-movant on summary judgment, this principle "is subject to the caveat that the nonmoving party's version of events must be sufficiently supported by the record that a reasonable jury could find it to be true." *Prosper v. Martin*, 989 F.3d 1242, 1252 (11th Cir. 2021).  In light of the evidence contradicting it, McGill's account does not satisfy this standard.

In any event, the Court has already concluded that no reasonable jury would find that MacFarlane's actions during council meetings violated McGill's First Amendment rights.  Only the mayors' denial of special meeting and agenda topic requests will survive summary judgment.  And McGill offers no evidence or legal support to attempt to meet his burden of proving that MacFarlane violated his clearly established rights through those denials.  MacFarlane is therefore entitled to summary judgment as well.

### C. Counts II, IV, and VI: First Amendment Retaliation

These three counts allege that Howey, MacFarlane, and Nebel, respectively, are liable for retaliating against McGill for exercising his First Amendment rights.  McGill argues that the retaliation took the form of improperly participating in a recall election, and suppressing his speech in the same manner as Count I.[19]

---

[19] McGill initially alleged that the retaliation also included selective code enforcement. Doc. 6 ¶¶ 60, 96.  He subsequently withdrew that theory of retaliation. Doc. 49 at 2 n.1.

*1. Mayors' Qualified Immunity Defense*

As with Counts III and V, the mayors argue that McGill has failed to meet his burden of proving that they violated a clearly established right.  McGill offers no response whatsoever to this argument as to the retaliation claims.  To the extent his argument regarding Counts III and V is intended to apply to these counts as well, the Court has already found that it is insufficient to survive summary judgment.  The same is true for Counts IV and VI.  McGill has failed to meet his burden of demonstrating that the mayors are not entitled to qualified immunity as to Counts IV and VI.  Accordingly, summary judgment is warranted.

*2. Recall Election*

With respect to Count II, brought against Howey, McGill alleges that one form the retaliation took was MacFarlane's improper involvement in the recall election.  His evidence regarding this claim stems solely from his declaration, in which he explains that former town clerk Dairian Burke "and Mayor MacFarlane herself" informed him that MacFarlane had personally discussed the recall election with the Supervisor of Elections, obtained an election date, and supervised the verification of signatures on the petition. Doc. 49-1 ¶ 59.  He also states MacFarlane "forc[ed] Burke to proceed forward when the recall committee submitted false information." *Id.* ¶ 58.

Assuming, *arguendo*, that these actions would constitute First Amendment retaliation, McGill does not provide any evidence that it is within the declarant's personal knowledge that they occurred.  For example, he offers no evidence from

Burke or MacFarlane, or from any other firsthand witness.  A declaration used to oppose a motion for summary judgment "must be made on personal knowledge" and "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4).  McGill's report of Burke's and MacFarlane's alleged statements is double hearsay that is outside of McGill's personal knowledge.  McGill offers the statements for their truth but does not identify a basis for their admissibility at trial. *See Macuba v. Deboer*, 193 F.3d 1316, 1323-24 (11th Cir. 1999) (evidence in a declaration that can be "reduced to admissible form" at trial may be considered on summary judgment).   Because McGill's opposition to summary judgment relies solely on inadmissible hearsay outside of his personal knowledge, Howey is entitled to summary judgment on Count II as to a theory that it retaliated against McGill through actions related to the recall election.

### 3. Speech suppression

Finally, McGill also alleges that the retaliation took the form of the restrictions on his speech at town council meetings discussed in connection with Count I. Doc. 49 at 17-18.  Howey's motion for summary judgment does not substantively argue that this conduct did not constitute retaliation; the motion focuses solely on the allegations involving code enforcement and the recall election. Doc. 34 at 25-30, 14 n.18; *compare* Doc. 50 at 7-8 (Defendant characterizing McGill's response in opposition to the motion for summary judgment as "limit[ing] McGill's retaliation claim to the allegation that MacFarlane" interfered with the recall election) *with* Doc. 49 at 17-18 (in McGill's response, "Plaintiff has claimed two forms of retaliation against him based on his speech: the restrictions on his speech at the Town Council meetings,

including the refusal to place his items on the agenda, and illegal interference and involvement in his recall election.").

To prevail on a claim for First Amendment retaliation, the plaintiff must establish that: 1) his speech was constitutionally protected; 2) the defendant's retaliatory conduct adversely affected the protected speech; and 3) there is a causal connection between the retaliatory actions and the adverse effect on speech. *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). A plaintiff suffers adverse action "if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* The causal connection prong means that the defendant's retaliatory motive must be the "but-for cause" of the adverse action. *Nieves v. Bartlett*, 587 U.S. ---, 139 S.Ct. 1715, 1722 (2019).

To the extent that Howey applies its Count I arguments to this theory of retaliation under Count II, *see* Doc. 34 at 14 n.18, it argues only that McGill's speech was neither protected nor restricted. *See* Sections III(A)(1)-(2), *supra*. But the Court has already found that the evidence does not support these arguments as a matter of law. *Id.* The Court concluded that a reasonable jury could find that McGill's speech was unconstitutionally restricted based on his viewpoint through the repeated denials of his proposed agenda items and requests for special meetings. *Id.*

In addition, the meeting recordings contain many instances in which McGill was interrupted or stopped from speaking during his councilor comments. The Court's finding that there is no evidence from which a reasonable jury could find that MacFarlane stopped him from speaking during meetings because of viewpoint

53

discrimination likely applies to retaliation as well—a reasonable jury would not find that there was an adverse action or retaliatory motive in MacFarlane's conduct. However, Mayor Nebel's conduct during certain council meetings may provide a basis for a retaliation claim.  Although he never stopped McGill from expressing himself, despite threatening to do so, there is a genuine issue of material fact as to whether his conduct toward McGill would have deterred a person of ordinary firmness from continuing to speak at council meetings.  There is also evidence from which a reasonable jury could find a causal connection, given that his insulting comments were nearly always directed toward McGill, both before and after he served as the mayor, *see* Section I(C) n.7, and that he was a frequent target of McGill's criticism.

Accordingly, absent any argument from Howey as to why the Court should grant summary judgment on Count II as to McGill's speech restriction theory, the Court concludes there is evidence from which a reasonable jury could find that Howey is liable.

## IV.   CONCLUSION

Howey's motion for summary judgment is due to be granted-in-part and denied-in-part.  As to Count I, the motion is granted to the extent that there is no evidence from which a reasonable jury could conclude that McGill's speech was unconstitutionally restricted by denying his requests to attach items to meeting minutes or preventing him from speaking during council meetings.  The motion is otherwise denied as to Count I.  As to Count II, the motion is granted only to the extent that there is no evidence from which a reasonable jury could conclude that

Howey retaliated against McGill in connection with the recall election. It is otherwise denied as to Count II.

Nebel and MacFarlane's motion for summary judgment is due to be granted in its entirety. Summary judgment is warranted in their favor as to Counts III, IV, V, and VI.

Accordingly, it is **ORDERED**:

1. Defendant Town of Howey-in-the-Hills, Florida's Motion for Summary Judgment (Doc. 34) is **GRANTED-IN-PART and DENIED-IN-PART**. The motion is granted to the extent set forth in this Order, and is otherwise denied.

2. Defendants Martha MacFarlane and David Nebel's Motion for Summary Judgment (Doc. 35) is **GRANTED**.

3. To avoid piecemeal judgments, a final judgment in favor of Defendant MacFarlane as to Counts III and IV, and Defendant Nebel as to Counts V and VI will be entered at the conclusion of this litigation.

4. The remaining claims in this case will be scheduled for a jury trial. To facilitate the rescheduling of the jury trial, on or before April 11, 2024, the parties shall file a notice advising the Court of the months within which they are available for a jury trial during the remainder of 2024 and the first six (6) months of 2025.

**DONE** and **ORDERED** in Tampa, Florida on March 28, 2024.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Parties